# United States Court Of Appeals For The First Circuit

### No. 22-1216

_____

## Caius Veiovis,
## *Petitioner-Appellant*

## v.

## Collette Goguen, Superintendent
## *Respondent–Appellee*

_____

### On Appeal From A Judgment Of The United States District Court For The District Of Massachusetts

_____

### Brief for the Petitioner-Appellant

_____

**Dana A. Curhan**
Bar # 44690
45 Bowdoin Street
Boston, MA 02114
(617) 267-3800

**Attorney for the Petitioner/Appellant**

# Table of Contents

Table of Authorities                               i

    A.    Cases                          i

    B.    Statutes                    iv

    C.    Constitutional Provisions     iv

    D.    Other Authorities         iv

Statement of Jurisdiction               1

Statement of the Issue                 2

Statement of the Case                 3

Statement of Facts                     6

    A.    The Commonwealth's Evidence    6

        1.    David Glasser's Problem With Adam Hall    6

        2.    Hall's Scheme To Discredit Glasser    7

        3.    Events Prior To The Disappearance    11

        4.    The Three Men Disappear    15

        5.    Events Following The Disappearance    18

        6.    The Ongoing Investigation    28

    B.    Veiovis' Evidence    39

    C.    The Commonwealth's Rebuttal    41

Summary of the Argument    42

Standard of Review    43

Argument    46

I.    The District Court Should Have Granted Veiovis Habeas Relief Where The Evidence Was Legally Insufficient To Support His Conviction For First Degree Murder Or The Related Offenses In The Absence Of Any Physical Or Forensic Evidence Tying Him To The Crimes, In The Absence Of Any Witness Identifying Him As A Participant, In The Absence Of Any Incriminating Admissions, In The Absence Of Evidence Of Consciousness Of Guilt, And Based Solely On Evidence That He Spent Time With The Two Perpetrators During The General Time Period Of The Murders    46

    A.    The Standards For Evaluating A Habeas Claim Addressing The Sufficiency Of The Evidence    47

    B.    Where The Evidence At Trial Failed To Establish Veiovis' Guilt On The Charged Offenses, The Decision Of The Massachusetts Courts Allowing His Conviction To Stand Meets The Standards For Habeas Relief    49

        1.    The Joint Venture Standards In Massachusetts    50

        2.    Even Viewed In The Light Most Favorable To The Commonwealth, The Evidence At Trial Fell Far Short Of Proof Beyond A Reasonable Doubt That Veiovis Participated In The Kidnapping And Killings    51

II.   Conclusion                                          60

Certificate of Compliance Under Rule 32(a)(7)

Certificate of Service

Addendum

# Table of Authorities

## A. Cases

*Commonwealth v. Jenks,*
426 Mass. 582, 689 N.E.2d 820......................................................51

*Commonwealth v. Longo,*
402 Mass. 482, 524 N.E.2d 67 (1988) ...........................................51

*Commonwealth v. Veiovis,*
477 Mass. 472, 78 N.E.3d 757 (2017) .............................................5

*Commonwealth v. Zanetti,*
454 Mass. 449, 910 N.E.2d 869 (2009) ..........................................51

*Cooper-Smith v. Palmateer,*
397 F.3d 1236 (9th Cir. 2005) .......................................................44

*DiBenedetto v. Hall,*
272 F.3d 1 (1st Cir. 2001)........................................................43, 45

*Dorisca v. Marchilli,*
941 F.3d 12 (1st Cir. 2019)............................................................49

*Francis v. Franklin,*
471 U.S. 307 (1985) ......................................................................47

*Gomes v. Silva,*
958 F.3d 12 (1st Cir. 2020)............................................................48

*Hensley v. Roden,*
755 F.3d 724 (1st Cir. 2014)....................................................45, 49

*Hodge v. Mendonsa,*
739 F.3d 34 (1st Cir. 2013)............................................................43

*Housen v. Gelb*,
744 F.3d 221 (1st Cir. 2014)..................................................49, 50

*Hurtado v. Tucker*,
245 F.3d 7 (1st Cir. 2001)............................................. 49

*In re Winship*,
397 U.S. 358 (1970) ....................................................... 47

*Jackson v. Virginia*,
443 U.S. 307 (1979) ....................................47, 48, 49, 50

*John v. Russo*,
561 F.3d 88 (1st Cir. 2009)............................................. 44

*Juan H. v. Allen*,
408 F.3d 1262 (9th Cir. 2005) ....................................... 52

*Leftwich v. Maloney*,
532 F.3d 20 (1st Cir. 2008)......................................43, 56

*Linton v. Saba*,
812 F.3d 112 (1st Cir. 2016).......................................... 56

*Morgan v. Dickhaut*,
677 F.3d 39 (1st Cir. 2012)......................................44, 45

*Nadeau v. Matesanz*,
289 F.3d 13 (1st Cir. 2002)............................................ 45

*Newman v. Metrish*,
543 F.3d 793 (6th Cir. 2008) ......................................... 58

*O'Brien v. DuBois*,
145 F.3d 16 (1st Cir. 1998)............................................. 50

*O'Laughlin v. O'Brien,*
  568 F.3d 287 (1st Cir. 2009)...............................................50, 52, 58

*Parker v. Matthews,*
  567 U.S. 37 (2012) ......................................................................49

*Rosenthal v. O'Brien,*
  713 F.3d 676 (1st Cir. 2013).............................................43, 44, 45

*Trimble v. Bobby,*
  804 F.3d 767 (6th Cir. 2015) ......................................................52

*United States v. Czubinski,*
  106 F.3d 1069 (1st Cir. 1997).....................................................48

*United States v. Hernandez,*
  109 F.3d 13 (1st Cir. 1997)..........................................................48

*United States v. Spinney,*
  65 F.3d 231 (1st Cir. 1995)..........................................................48

*United States v. Valle,*
  72 F.3d 210 (1st Cir. 1995)..........................................................48

*Vachon v. New Hampshire,*
  414 U.S. 478 (1974) ...................................................................47

*Winfield v. O'Brien,*
  775 F.3d 1 (1st Cir. 2014)............................................................49

*Woods v. Sinclair,*
  655 F.3d 886 (9th Cir. 2011), cert. granted,
  judgment vacated sub nom.
  *Woods v. Holbrook*, 566 U.S. 902 (2012)......................................53

*Yeboah-Sefah v. Ficco,*
  556 F.3d 53 (1st Cir. 2009)..........................................................44

## B. Statutes

28 U.S.C. § 1291 ...............................................................1

28 U.S.C. § 2253 ...............................................................1

28 U.S.C. § 2254 ........................................................1, 5, 43, 49

28 U.S.C. § 1331 ...............................................................1

28 U.S.C. § 2241 ...............................................................1

## C. Constitutional Provisions

United States Constitution, Fourteenth Amendment...................47

## D. Other Authorities

ONEPERCENTERBIKERS, Hells Angels Membership
 Requirements, August 31, 2015, http://www.onepercenter
bikers.com/hells-angels-membership-requirements/......................58

# Statement of Jurisdiction

The appellant Caius Veiovis brought his habeas petition in the United States District Court for the District of Massachusetts pursuant to 28 U.S.C. § 2254 challenging his Massachusetts State convictions on three charges of murder in the first degree and other related charges. The District Court had jurisdiction to hear the petition pursuant to 28 U.S.C. §§ 1331 and 2241. On March 23, 2022, the District Court (Hillman, D.J.) issued a decision denying the writ of habeas corpus and dismissing the case. On the petitioner's motion, the District Court issued a certificate of appealability as to the issue raised in this brief that same day. This Court has jurisdiction to hear the appeal pursuant to 28 U.S.C. § 1291, which vests in the United States Courts of Appeals jurisdiction of appeals from all final decisions of the District Court, as well as 28 U.S.C. § 2253.

## Statement of the Issue

Whether the evidence was legally sufficient to support Veiovis' convictions for murder and related offenses in the absence of any physical or forensic evidence tying him to the crimes, in the absence of any witness identifying him as a participant, in the absence of any incriminating admissions, in the absence of evidence of consciousness of guilt, and based solely on evidence that he spent time with the two perpetrators during the general time period of the murders.

## Statement of the Case

On October 6, 2011, a Berkshire County grand jury returned an indictment charging the petitioner Caius Veiovis with three counts of murder, three counts of kidnapping, and three counts of intimidation of a witness. (Indictment No. BECR2011-00141). On October 11, 2011, Veiovis entered pleas of not guilty to all counts. The Commonwealth subsequently filed an amended indictment adding nine identical counts (Counts 10-18), to which Veiovis entered pleas of not guilty on August 19, 2012. On December 21, 2012, the Commonwealth moved to nolle prosequi Counts 1-9.

Prior to the start of trial, the parties filed and the court considered various motions not relevant to the instant appeal.

On October 30, 2013, a judge of the Superior Court (Kinder, J.) issued an order that Veiovis and codefendants Adam Hall and David Chalue would be tried separately.

Veiovis' trial commenced before Judge Kinder and a jury on September 3, 2014. On September 18, 2014, at the close of the Commonwealth's evidence, Veiovis moved for a required finding of not guilty on all counts. Judge Kinder denied that motion. Veiovis renewed that motion that same day at the close of all of the evidence. Judge Kinder denied the renewed motion.

After deliberations that spanned six days, the jury returned verdicts of guilty on all counts on September 26, 2014. The jury based its verdict on the murder counts on a theory of deliberate premeditation. On September 29, 2014, Judge Kinder sentenced Veiovis to consecutive life sentences on the three murder counts. He imposed eight to ten year sentences on the remaining counts, to be served concurrently with the corresponding murder counts. Veiovis filed a timely notice of appeal that same day.

The Supreme Judicial Court of Massachusetts docketed the case on December 15, 2015. On July 19, 2017, the Supreme Judicial Court affirmed the judgment below in a 3-

2 split decision.[1] *Commonwealth v. Veiovis,* 477 Mass. 472, 78 N.E.3d 757 (2017).

On August 2, 2013, Veiovis filed a habeas petition pursuant to 28 U.S.C. § 2254 in the United States District Court for the District of Massachusetts. [Appendix 2, 5-19]. He filed a number of supporting motions together with his petition. [Appendix 2].

The respondents filed an answer on September 15, 2020. [Appendix 3, 20-25].

As noted above, on March 23, 2022, following briefing, the District Judge (Hillman, D.J.) issued a memorandum and order denying the writ of habeas corpus and dismissing the case. That same day, the District Court issued a certificate of appealability as to the issue raised in this brief. Veiovis filed a notice of appeal on March 23, 2022. [Appendix 3, 26-44].

This Court opened the case on March 31, 2022.

---

[1] The two dissenting justices focused on an issue of Massachusetts state law not raised herein. *Commonwealth v. Veiovis*, 477 Mass. at 490, 78 N.E.3d at 774 (Lowy, J., dissenting, with whom Lenk, J., joins).

# Statement of Facts

## A.    The Commonwealth's Evidence

The prosecution offered the following evidence at trial:

### 1.    David Glasser's Problem With Adam Hall

David Glasser and Edward Frampton, two middle-age men with moderate developmental disabilities, shared an apartment at 254 Linden Street in Pittsfield. Both were fairly independent but received assistance from social service providers contracted by the State. Glasser owned a pickup truck and did odd jobs or gave people rides for money. [Tr. **2**, 85-97, 34-37, 117-118]. Robert Chadwell lived across the street and was friendly with both men. [Tr. **2**, 125-129].

A couple of times a week, Glasser would sell scrap metal to Perlman Scrap Yard in Pittsfield. In mid-July of 2009, he sold some wire and motor parts. A customer later recognized the parts as belonging to Adam "Leo" Hall, a high ranking member of the local Hells Angels chapter. Hall came to the shop and bought the parts back. [Tr. **3**, 91-96].

Glasser sometimes did odd jobs at Hall's house in Peru, Massachusetts. Believing that Glasser had stolen the parts, Hall confronted him on July 21, 2009. He hit Glasser with a baseball bat. [Tr. **3**, 97-117]. He then had Glasser sign over the title to his truck, which he sold at a local car lot. He told salesman Earl Persip, who bought the truck, that it had belonged to someone who owed him money. When Persip later found out how Hall had acquired the title, he returned the truck to Glasser and demanded that Hall refund his money. [Tr. **3**, 137-149].

Massachusetts State Trooper Dale Gero took a statement from Glasser at the hospital and later interviewed him at the State Police barracks. He observed extensive bruising. [Tr. **3**, 124-136; Tr. **4**, 82-85]. Two days later, while Gero was again interviewing Glasser, Hall called Glasser's cell phone and threatened him. Troopers arrested Hall that day and recovered a baseball bat from his vehicle. [Tr. **3**, 153-162].

## 2.    Hall's Scheme To Discredit Glasser

In August of 2009, Hall tried to recruit Alicia Tatro to go to New York with him and pin a rape charge on

Glasser. She refused. [Tr. **4**, 121-124]. In late 2009, Hall asked his friend Justina Cole to help him frame Glasser for rape. She refused. [Tr. **4**, 100-104]. In July of 2010, he had Scott Langdon offer Glasser $3,000 to drop the charges. Glasser refused. [Tr. **3**, 218-224]. Hall wrote to his friend Steven Hinman asking him to say that Glasser had stolen scrap metal from his yard. Hinman refused. [Tr. **5**, 70-71]. Hall then asked Ocean Sutton to set up Glasser. She refused. [Tr. **7**, 25-26].

In July of 2010, Hall asked Nicole Brooks, one of his many girlfriends, to hire Glasser to drive her to upstate New York and report that he had kidnapped her. She thought it was a stupid idea but agreed to do it. Hall recruited Langdon, Teresa Cunigan and Alexandra Ely, another girlfriend, to assist in the plan. On August 11 or 12, Hall showed Brooks a handgun. He then drove her to a rest area upstate New York where he fired the gun at two or three trees. He planned to plant the gun in Glasser's truck and wanted her to show the police the bullet holes in the trees. On August 13, Hall, Brooks, Langdon, Cunigan and Ely met and refined the plan. Hall told

Langdon to hire Glasser to drive him to Wells, New York, near the rest area. Once Glasser dropped him off, Brooks would report the kidnapping. Hall gave Brooks Glasser's plate number and showed her his picture so she could identify him. [Tr. **3**, 162-185, 225-231; Tr. **4**, 11-18].

The next morning, Hall drove Brooks to the Price Chopper in Pittsfield to cash a check. They then met Ely. Hall took Brooks' wallet, which had receipts and IDs but no money. Langdon had Glasser drive him to Wells. Brooks drove to Wells, and Hall and Ely followed in a separate car. On the way, Brooks, Hall and Langdon spoke by phone and agreed to meet at a gas station with a convenience store. As Brooks pulled in and saw Glasser's truck parked in the back. She removed a bag with a gun from under the seat, put it in a backpack, and went into the store. When she handed it to Langdon, he told her to hide it in the bathroom. She did so and left. Langdon retrieved the bag and put it behind the seat of the truck. A few minutes later, Glasser dropped Langdon off in Wells and left. [Tr. **3**, 186-201, 231-239; Tr. **4**, 19-25].

Brooks drove to the rest area. Hall and Ely pulled in and picked up the car. Brooks went to a friend's house and reported the kidnapping to the police. The next morning, she picked Glasser's photograph out of a photo array, and she showed the police the rest area where the alleged kidnapping took place. [Tr. **3**, 202-207].

On August 16, police in Pittsfield stopped Glasser. During a search of his truck, they found a revolver wrapped in a shirt inside a plastic bag behind the driver's seat, as well as Brooks' wallet. They arrested Glasser, who seemed confused about what was happening. The police then searched Glasser's residence where they found printed and handwritten directions between Pittsfield and Wells. Notwithstanding this evidence, the police began to doubt Brooks' story. Glasser said he had been framed, and officers from the Western Massachusetts Gang Task Force suggested to investigators from New York that Hall may indeed have framed him. [Tr. **4**, 32-79].

Officers investigating the kidnapping obtained surveillance videos showing Brooks at the Price Chopper in Pittsfield when she should have been in Wells and at

the Hess station at the same time as Langdon. They obtained phone records showing that Brooks, Hall, Langdon and Ely made a series of calls to each other. When confronted, Langdon and Brooks continued to lie, but the scheme quickly unraveled. All of the participants, including Hall, were ultimately charged in connection with the scheme. [Tr. **3**, 207-212, 240-242; Tr. **4**, 26-28, 50-53, 86-99].

During the course of these events, Hall told Brooks that if the plan to discredit Glasser failed, he would have to make him disappear. [Tr. **3**, 212].

### 3.    Events Prior To The Disappearance

In 2011, Hall asked his friend Bryan Johnson to repair a PLR 16 handgun. Johnson ordered a new trigger but could not fix the gun. He returned the gun and trigger to Hall in early August. [Tr. **3**, 105-113].

During latter half of August 2011, Hall started hanging around with David Chalue and Veiovis. Later that month, Chalue told Hall not to worry about the pending charges, that everything would be okay and that he would not go to jail. [Tr. **5**, 202-205].

Toward the end of the month, Hall purchased two vehicles, a tan Buick and a purple Hyundai. [Tr. **5**, 205-207]. He paid a mechanic $500-$600 to get the Buick running. It was in nice shape for its age, and the interior, including the back seat and carpets, were intact. [Tr. **6**, 167-171].

Sometime that month, Hall and Veiovis visited Alyssa Turner at the trailer park where she lived. While there, Hall mentioned Veiovis possibly getting a motorcycle and becoming a Hells Angels prospect. Veiovis said nothing. [Tr. **5**, 119-122].

On August 24, 2011, Veiovis and another man went into a Home Depot store and asked employee William Gregory where the saws were. Gregory directed them to the tool section. The second man then asked if that was all the saws they had. Gregory pointed him to the power saws and chain saws in other aisles. The second man picked up a hatchet and made chopping motions. [Tr. **4**, 126-137, 143-144]. Surveillance video from store security cameras confirmed that the two men arrived in the parking lot in a soft top Jeep at 6:45:13 and went to the tool aisle. Veiovis

purchased a wrench/multi-tool for $8.53, which had various bits to fit automotive screw heads. They left the store at 6:53:30. [Tr. **4**, 154-176].

Katelyn Carmin began dating Hall at age thirteen. After they stopped dating, they remained friends. He would take her to Hells Angels functions. On Friday, August 26, 2011, Hall picked her up in the Buick. Veiovis, who she knew as "Trash", and Chalue were with him. They went to various local bars and ended up at the Hells Angels clubhouse in Lee. They went outside and started driving ATVs. Hall told Carmin to be careful, that he needed Chalue and Veiovis for a job. Later that night, Hall went into a tirade about someone named Drummer Dave, who had robbed and then snitched on him. He said he was "going to kill that motherfucker." Either Veiovis or Chalue or both responded, that it was going to be all right, that "[y]ou'll get him" or "[w]e'll get him." Hall also complained that David Casey would not give him the keys to his backhoe. Carmin became nervous about Hall's behavior and called a friend for a ride home. [Tr. **4**, 176-200; Tr. **5**, 14-17].

The following morning, Saturday August 27, Nancy Amuso, who lived in the same building as Abigail Elwood, looked out the window just before 10:00 and saw Hall arrive on a motorcycle. She then saw him sitting in Elwood's pickup truck talking to Veiovis, Elwood's boyfriend. [Tr. **4**, 219-227].

From about 1:00 to 7:00 that day, officers from the Springfield Police Department Gang and Narcotics Units observed a party at the Hells Angels clubhouse in Springfield. They photographed Hall, Chalue and Veiovis as they entered a Buick early in the afternoon. The car left and returned to the area at about 4:30. The three men went into McKinney Tavern. They came out at 6:30 and left in the Buick. [Tr. **4**, 233-238, 241-248].

Later that evening, Allyson Scace and Kayla Sewell met Hall, Chalue and Veiovis at the Hells Angels clubhouse in Lee and then went to Veiovis' house. Hall went in his own car, stopping at Steve Hinman's house on the way. He showed Hinman a Glock .45 automatic, which he had in his vest, and a dog food bag containing a .44 Magnum stainless revolver, a sawed-off AR15-type

weapon, and a small revolver. The two women, Chalue and Veiovis went in Sewell's silver Jeep Grand Cherokee, stopping at a liquor store on the way. At Veiovis' apartment, they all had drinks. Veiovis took a shower. While he was in the shower, Hall arrived. He pulled some guns out of a dog food bag. He then asked Veiovis when he had finished showering where he kept the brake cleaner and gloves. Veiovis directed him to a cabinet and then went upstairs with Sewell. He and Sewell remained upstairs for an hour. During that time, Hall and Chalue disassembled and cleaned the guns. Scace also saw a really big knife in the apartment. Veiovis asked Sewell to stay, but Sewell declined. Sewell and Scace left shortly thereafter, leaving the three men in the apartment. [Tr. **5**, 19-42, 47-53, 76-77, 88-100, 103].

### 4. The Three Men Disappear

Tropical storm Irene was forecast to hit Western Massachusetts on the weekend of August 27-28, 2011. On the evening of the 27th, Andrew Johnson had Glasser drive him to the grocery store. During the ride and at other times, Glasser expressed concern about testifying

15

against Hall. They arranged for Glasser to drive Johnson to work Monday morning, but he never showed up and did not answer Johnson's calls and texts. Johnson went by the house, but no one answered the door. [Tr. **3**, 34-42].

Lisa Archembault lived upstairs from Glasser and Frampton. At 3:00 or 4:00 in the afternoon of the 27th, she saw Glasser, Frampton and Robert Chadwell, from across the street. At 10:30 that night, she had Glasser move his truck so her mother could park in the shared driveway. She saw the three men and a fourth man—someone other than Veiovis—in the kitchen. Sometime after midnight, she heard banging from the front hallway downstairs. She heard Glasser's, Frampton's, and a couple of unfamiliar voices. The next morning, she went downstairs to have Glasser move his truck. No one answered then or later that day. [Tr. **2**, 13-23, 28-29, 31, 33].

Social Worker Erin Forbush had made an appointment for Frampton on Monday the 29th. She came to work that day and was surprised to find no voicemail from him. She could not reach him by phone and went to his apartment. She heard the TV, but no one answered

the door. She saw Glasser's truck parked out back. She returned to the office, called Frampton a few more times, and then returned to the apartment with coworker Heather Ethier. They discovered that the door was open and found Frampton's cat. Nothing appeared to be amiss. They found his pill box. He had not taken his Sunday and Monday pills. After checking with the local hospitals on Tuesday, Forbush filed missing persons reports on both men. [Tr. **2**, 97-116, 119-124].

Leslie Chadwell lived at 247 Linden Street in August of 2011 with his girlfriend and his brother Robert. Robert planned to spend the weekend of the storm at his daughter's house, so Leslie did not expect to see him. On Sunday night, Robert's friend Willie Haywood called Leslie and asked if he had seen Robert. He had not. He went across the street to Frampton and Glasser's apartment. He heard the TV, but no one answered the door. He and Haywood tried to call Robert a number of times. He did not answer. [Tr. **2**, 130-133]. The last call made from Robert's cell phone was at 11:21 p.m. on Saturday the 27th. [Tr. **3**, 50-51].

On Wednesday, August 31, 2011, officers from the Massachusetts State Police and the Pittsfield Police Department entered 254 Linden Street and searched for evidence in connection with the three missing men. They also canvassed the neighborhood. [Tr. **3**, 62-83].

### 5. Events Following The Disappearance

Alexandra Ely stayed overnight with Rose Sutton at 122 Madison Avenue on the night of August 27-28, 2011. At about 1:30 a.m., Hall appeared, and Edwin Sutton, Rose's father, let him in to speak with Ely. Hall was typically abusive but was surprisingly affectionate that night. He borrowed Rose's phone and said he would be back soon. On the way out, he touched Edward's shoulder and looked "surreal". He got into the passenger side of a jeep and left. [Tr. **5**, 125-133, 207-209; Tr. **6**, 18-19].

Shane Parrott opened the A-Mart convenience store in Pittsfield at 5:00 a.m. on August 28, 2011. At 5:30 a.m., Hall came in and bought three candy bars and a pack of cigarettes. His boots were untied and wet, his blue jeans were wet, and he had mud on his shirt. His cash was wet. Hall returned a few minutes later and bought a pack of

Black and Mild cigars. He left in a tan car with Vermont plates. [Tr. **5**, 139-150].

Ocean Sutton had been out all night and returned home to 122 Madison Avenue at around 5:00 a.m. Shortly after she arrived, Hall pulled up and parked his Buick on the front lawn. Veiovis' Jeep pulled in behind the Buick, and Hall left in the Jeep. She could not see who was driving. [Tr. **7**, 6-10].

At 9:30 a.m. when Ely woke up, she saw Hall's Buick parked on the front lawn. An hour later, Hall, Chalue, and Veiovis arrived in Veiovis' Jeep with Hall driving. He asked Ely and Rose to come to his house and make breakfast. Hall was wet and was not wearing shoes. He gave them money, which was soaking wet and "nasty". He told them to buy breakfast food and bleach. He also told them to wash their hands after handling the money. Ely and Rose drove the Buick to the Price Chopper in Pittsfield. Hall called Ely on the way and told her to skip the bleach and not to look in a McDonald's bag in the car. They looked anyway and saw some sort of gloves. [Tr. **5**, 209-219; Tr. **6**, 20-25].

When they arrived at Hall's house, Veiovis' Jeep was parked in front. Hall seemed jumpy and excited. He was talking to someone on Rose's phone, saying that he had furniture to move and needed a truck. He returned the phone to Rose and told her to delete her call log and not tell anyone that he took her phone. Chalue was in bed, and Veiovis was sitting in a recliner looking tired. Hall gave Ely some wet clothes and told her to wash them. Rose and Ely drove to Rose's house. Ely put the wet clothes on the floor but did not wash them. Hall, Chalue and Veiovis picked up the Buick later that day. [Tr. **5**, 219-221; Tr. **6**, 25-29].

In June of 2011, the City of Pittsfield installed automatic license plate readers on some of its police cars. Sergeant Mark Trapani queried whether the system recorded certain plate numbers between August 1 and November 1 of that year. The system recorded plate #581KM7, which was attached to a Jeep, on August 28, 2011 at 12:24 p.m. on West Housatonic Street about 1¾ miles from Veiovis' apartment. [Tr. **5**, 184-191].

In the late afternoon of August 28, Victoria Ross, the property manager of the building where Abigail Elwood lived, saw Veiovis, Hall and Chalue in the parking lot near Veiovis' Jeep. [Tr. **5**, 154-163].

David Casey lived in Canaan, New York in August of 2011. He did excavation work. He was taking a nap on Sunday on the weekend of the storm when Hall arrived at his house. Casey had excavated a pond on Hall's property and had also done work at the Hells Angels clubhouse. Hall said he was having car trouble and asked if he knew anyplace nearby where he could park overnight. Casey called Alan Pavoni, who agreed to let him park in his driveway. [Tr. **6**, 107-111].

Hall then said he had "offed" Glasser and that he had also killed a "fat guy and a nigger" who were with him. He explained that he had held Glasser down and pulled the trigger. The gun did not fire. While he chambered another round, Glasser ran into the woods. He had one of the guys with him go after him. He said, "Davey was on him real quick" and shot him but not fatally. Hall yelled, "Hey, he was for me." Davey then

brought him back. Glasser begged for his life and said he wouldn't testify. Hall shot him. He then stabbed the black guy. They left, assuming that all three men were dead. When they returned, they saw the black guy sitting on a log moaning. They stabbed and tortured him. Hall said he "didn't mind killing the nigger." He said that they chopped up the bodies. When he cut off Glasser's head, he held it up and observed how ugly he looked with no teeth. He said that one of the guys really enjoyed torturing and cutting them up. It was raining very hard that night, but Hall did not mind. He felt very good about what he had done. Afterward, he slept like a baby. [Tr. **6**, 112-119].

Hall then asked if Casey had any shovels. He lied and said he did not. Hall asked if he was still working at Dan Cole's property nearby in Beckett. Casey said he was and that his excavator was on the property. Hall then asked him to dig a hole on Cole's property. He said he knew that Langdon, who lived with Casey's sister Teresa Cunigan, was going to testify against him in the kidnapping case, but he agreed to leave both of them alone if Casey dug the hole. Casey agreed. Hall wanted the hole

dug that day, but Casey suggested the next day in case Cole was home. [Tr. **6**, 120-128].

Hall arrived at Pavoni's house in the Buick between 5:00 and 6:00 p.m. The car appeared to be running fine. A Jeep-type vehicle pulled in behind it and picked Hall up. The next morning, Hall and Chalue arrived as Pavoni's girlfriend Ellyn Smith was putting her granddaughter in her car. Casey then pulled into the driveway in his pickup truck. He walked up with his head down and would not make eye contact with Smith, which she found odd. Hall introduced Casey to Chalue saying, "You don't have to worry about him. You can trust him. He's an Aryan brother" and you have to kill someone to get in. Hall brought Casey to the Buick and showed him the contents of the trunk, which were beginning to smell. Hall had Chalue stay with the car, and he and Casey left in the truck. [Tr. **6**, 60-73, 76-83, 86-97, 100-105, 129-135].

After confirming that Cole was not home and jump starting the excavator, Casey drove Hall back to Pavoni's house. Hall drove the Buick to the Cole property. Casey drove the excavator to a clearing in a wooded area and

dug a hole about four feet deep, four feet wide and eight feet long. Hall transferred a number of trash bags from the trunk into the bucket of the excavator. Casey dropped them into the hole, covered them with dirt and large rocks, and returned the excavator to its previous spot. Hall then warned Casey to keep his mouth shut and said he can make things happen even if he is in jail. Later that week, Casey told Pavoni and Smith not to say anything. [Tr. **6**, 135-147].

Daniel Cole came home from work on Monday the 29th and noticed fresh muddy tracks leading into the woods. The excavator had mud on the tracks and appeared to have been moved. Casey denied moving it. When Cole pressed him, he stared at the ground and shook his head without making eye contact. [Tr. **7**, 42-48].

On Monday, August 29, Ely saw Hall and Rose at Rose's house hosing down the interior and exterior of the purple Hyundai. The water was a "gross" brownish color. [Tr. **5**, 222-223; Tr. **6**, 30-32; Tr. **7**, 10-11].

Late that afternoon, Hall and Chalue brought the Buick to Sayers Salvage Yard in Lanesborough.  He sold

the car for scrap and had it put into the car crusher. Jason Hassan, who processed the car, was surprised because it seemed to be in good shape and ran fine. He noted, however, that the interior carpets were coated with liquid, the back seat was mostly missing, and the carpet had been removed from the trunk. The men left in a Hyundai. [Tr. **6**, 172-195].

At about 9:00 that evening, Hall and Chalue bought a pair of boots and socks at the Walmart in Pittsfield. On the way out, employee Marsha Musiak asked Hall for his receipt after observing a tag on one of the boots. Hall explained that his boots and socks were soaked, and he put the new ones on in the store. [Tr. **7**, 49-64].

Later that evening, Hall and Chalue took Ely and Rose to the clubhouse. Hall and Chalue drank a lot. They acted out a scene where Hall ran from Chalue saying, "no, no, don't" in a high pitched scared voice while Chalue pointed a finger at him. Hall said, "[y]ou should have seen the look on his face" and "[t]he poor bastard had to watch." He referred to someone as a "retard". [Tr. **5**, 223-229; Tr. **6**, 37-45].

On Tuesday August 30, Hall told Scace not to say anything about what she saw on Saturday night because it never happened. [Tr. **5**, 42-44]. That day, Ocean Sutton spent the night with Hall and Chalue at the clubhouse in Lee. The following morning, Hall burned a pair of sweat pants, a t-shirt and a pair of socks on a metal sheet next to the building. The three of them drove to a diner in the Hyundai. On the way back, Hall stopped on a bridge and threw some things out the passenger window and over the railing. Chalue picked up anything that missed and tossed it over the railing. The items included some white socks, a few empty Price Chopper bags, an empty shoebox, and a pair of shoes. Several people were staring at them, but Hall did not care. Following the storm, the river was particularly fast. One of them said it should carry the things pretty far and that they would be hard to find. [Tr. **7**, 11-20, 30-47].

According to Ely, Hall did not smoke, Chalue smoked Black & Mild cigars and Marlboro Red cigarettes. She thought she saw Veiovis smoke Black & Mild cigars at some point. [Tr. **5**, 229-230].

On Wednesday, August 31, 2011 at about 5:15 to 5:30, Marcia Disbrow saw a purple Hyundai with two men circling around North Street in Pittsfield where the District Attorney's office was located. The passenger seemed to be taking notes. [Tr. **7**, 98-105]. On Friday, September 2, at about 6:45 p.m., Trooper Steven Jones, who was on the team investigating the disappearance of Glasser, Frampton, and Chadwell, came out of the District Attorney's office. He saw Eric Fox and Veiovis in a Honda Element in front of Hot Harry's Burritos. They appeared to be looking at him. Jones pointed out the two men to Trooper Stec as he came out of the building. The troopers jumped into a marked cruiser, photographed the vehicle, and followed it to an address about a mile and a half away. Veiovis appeared to be looking at them. [Tr. **7**, 106-120].

About ten days after the storm, Chalue told Rose not to talk to the police or she would pay for it for the rest of her life. [Tr. **6**, 45-50].

Hall's friend Todd Thompson attended a number of events at the Hells Angels clubhouse, including work

parties where people did maintenance and repairs around the building. Hall also had work parties at his house in Peru. Thompson had issues with these latter events—Hall wanted a lot of work done to his house, but Thompson thought the house was in such bad shape that it should have been condemned. [Tr. **8**, 11-21]. Thompson would sometimes see Hall, Chalue, and Veiovis at the clubhouse. He saw them on Wednesday, August 31. Hall said that he had been arrested many times and that based on an ongoing investigation, there may be more to follow. [Tr. **8**, 22-26].

### 6.    The Ongoing Investigation

On September 3, 2011, investigators searched the banks of the Housatonic River in Lenox Dale, south of Pittsfield and downstream from the Memorial Bridge. Among the items they found were two pieces of a shoe box that they matched to the boots that Hall had purchased at Walmart. [Tr. **7**, 65-86].

During a search of Hall's house, investigators found a Husky garbage bag in the bedroom and a roll of black trash bags behind a chair in the living room. During a

search of the Hells Angels clubhouse, they found a box of latex gloves in the cellar next to a meat slicer. Upstairs, they found a gun cleaning kit and an empty case for a Smith & Wesson 9 mm. pistol. [Tr. **7**, 87-94, 162-163; Tr. **9**, 95-102, 178-187].

On September 4, 2011, at about 11:00 a.m., Timothy Sayers, owner of Sayers Salvage Yard, saw Hall driving past his place of business toward Potter Mountain Road in a dark-colored Jeep and then drive back in the other direction. [Tr. **7**, 131-137]. At the time, troopers investigating the disappearance of the three men had set up a command post on Potter Mountain Road. Trooper Michael Goonan and a Pittsfield officer received a call and went to look for the Jeep. They spotted it and followed it into a gas station. They approached and asked one of the occupants, Chalue, to identify himself. He pointed at Hall and said, "I'm just his friend." Hall said he knew who they were. He said the Jeep belonged to a friend. Veiovis then came out of the gas station, filled the tank, and got in. When Goonan asked him his name, he pointed at Hall and said, "I'm with him." Goonan asked what they were doing.

Hall said they were checking out the washed out road. The officers asked the three men to exit the car and photographed and pat frisked them. Veiovis had a large folding knife and small white box cutter on his person. [Tr. **7**, 140-154, 160-164, 177-181, 207-211].

Other officers arrived. They told the three men that they were not under arrest. They then questioned Hall about his boots, which he said he bought at Walmart. They seized his boots and socks. They also seized the three men's phones and had the Jeep towed to the police station.  They looked for Hall's Buick but discovered it had been crushed and picked up from the salvage yard. [Tr. **7**, 181-195, 213-215].

At about 10:30 that night, the police stopped two cars, one driving behind the other, with Hall, Veiovis and Rose Dawson in a purple Hyundai and Chalue and Ocean Sutton in the second vehicle. They arrested Hall on charges unrelated to the disappearance of the three men. When they removed Hall and Veiovis from the Hyundai, it rolled forward with Dawson in the back seat. Trooper Boyer jumped in and stopped the car, inadvertently

popping the magazine from his weapon. When officers discovered the magazine, they arrested Veiovis and Dawson on an ammunition charge, detaining them for several hours until they realized their mistake. At the time of his arrest, the police seized a box cutter from Veiovis. They found a package of tube socks in the trunk of the car and a box of latex gloves in the glove box. [Tr. **7**, 215-223].

On Friday, September 9, after Casey told investigators where the bodies were, they contacted Daniel Cole in Florida, who gave them permission to search his property. The police quickly found the spot that had been excavated and observed tracks leading to the area. Investigators poked the area in order to aerate it. An oily liquid began rising and running off. They worked on the site the following day, removing soil by hand. They dug a trench to divert the water and used sump pumps to filter it. They also removed several large boulders. Under a particularly large boulder, they found multiple black plastic bags and a human hand embedded in the mud. The following day, they removed the bags from the pit and laid

them out. The medical examiner had the bags and a few loose body parts removed for autopsies. [Tr. **8**, 48-50, 52-87].

Dr. Jennifer Hammers performed the autopsy, supervised by Chief Medical Examiner Dr. Henry Nields. They X-rayed the bags, cut them open from the bottom and removed the contents. Trooper Chris Donohue took and analyzed the fingerprints from the body parts which he matched to Glasser, Chadwell, and Frampton. The body parts were wet and in various stages of decomposition. The troopers and medical examiners matched up the body parts and clothing, as well as certain bullet fragments. Two of the bodies had been cut through the torso. All had been cut through the neck, arms, and legs. [Tr. **8**, 92-108; Tr. **9**, 20-24].

Chadwell had been shot through the right side of the face and twice on the right front shoulder. He had also been stabbed twice in the neck, he had some superficial cuts to the left wrist, several deeper abdominal wounds, blunt force trauma to the face, and some crushed ribs. There were two gunshot wounds to the back, which could

have been fatal. [Tr. **9**, 24-45]. Frampton's body had multiple gunshot wounds, including one to the left cheek, one to the back of the left shoulder, one to the upper left arm, one to the left forearm, and one to the right forearm. There was also a stab wound to the neck, several to the left jaw and chin, a number of incised wounds to the back, and several other defects that could have been stab wounds. There was a large wound starting at the scrotum and ending at the rib cage. Most of the blood was gone from his body. [Tr. **9**, 45-70]. Glasser had a gunshot wound to the left ear that went into his skull, one to the neck, one to the left thigh, two stab wounds to the back, two to the upper torso, two to the lower torso, a blunt injury over the left eyebrow, and several head wounds consistent with blunt trauma. The gunshots to the head and neck would have been fatal. There was little blood in Glasser's body. [Tr. **9**, 70-85]. Some of the injuries to the decedents could have been inflicted post-mortem. [Tr. **9**, 91].

Lieutenant John Crane of the Massachusetts State Police examined the projectiles recovered during the

autopsies. They all came from a Glock .45 caliber pistol, which he determined from the unique rifling pattern. [Tr. **9**, 107-111].

An examination of the trash bags did not reveal any identifiable characteristics indicating manufacturer, distributor, marketer, retailer, or origin. [Tr. **8**, 111-122].

Allison Jackobek, a forensic scientist at the State crime lab, examined a black Jeep belonging to Veiovis, which did not look like it had been cleaned recently. She found a Black and Mild cigar wrapper in the vehicle. Many areas inside and outside the Jeep tested negative for blood. A few areas inside the vehicle tested presumptively positive. She took samples from these areas for further testing. [Tr. **8**, 128-151, 153, 159]. Subsequent DNA testing failed to match any of the blood samples from the Jeep to any of the decedents. [Tr. **10**, 78-79].

On September 12, 2011, investigators executed two search warrants at 10 Cloverdale Street in Pittsfield, one covering Apartment 2R where Veiovis lived, and one for Apartment 1L from which he had just moved. In 1L, the police noted and photographed a collage on the wall

consisting of illustrations that appear to have been cut out of a medical book, as well as some similar images in a briefcase. They also found a can of Brakleen solvent, commonly used as a brake cleaner , and some latex gloves. [Tr. **8**, 163-177, 203-204]. In Apartment 2R, they found several replica skulls and bones that appeared to be carved out of wood. In a bedroom, they found several knives, cleavers, a machete, a sickle, a cattle prod, a bat with nails, other edged weapons, and several hatchets. The walls and windows were painted black. There was some sort of weapon on the mantle. Inside a metal box, they found a newspaper article from the September 6, 2011 edition of the Berkshire Eagle describing the disappearance of the three men. Elsewhere in the room, the found an article dated two days later describing the ongoing search for the missing men. On the coffee table, they observed a machete. They found a scrapbook with a sticker that said, "Support your local Hells Angels Berkshire County". In a storage container, they found additional knives. They found four or five Black and Mild cigar wrappers in a duffle bag on the credenza. [Tr. **8**, 177-

202]. They observed some blood stains in a common hallway leading to a bathroom, which were ultimately linked to a mishap by another tenant unrelated to the investigation. [Tr. **8**, 205-206]. The police did not seize the weapons found in the apartment, since they all tested negative for blood.  They seized various items, including pins and patches affiliated with the Hells Angels, a pack of Black and Mild cigars, a list of phone numbers which included Hall's and Chalue's numbers, and a bill of sale for a 1989 Jeep. During the search of his apartment, Veiovis arrived and was arrested on various accessory charges. The police seized a knife from his person with a two-and-a-half-inch blade. They booked him and advised him of his Miranda rights. [Tr. **8**, 215-216; Tr. **9**, 120-124, 139-159]. DNA testing of blood found on a pair of boots included Veiovis as a potential contributor but excluded the three decedents. [Tr. **10**, 77].

Following his arrest, Lieutenant David Foley of the State Police had Veiovis brought to the Detective Bureau at the Pittsfield police station. He told him they found the bodies, that the charges were now murder, kidnapping,

and intimidation. He asked Veiovis to talk about Hall. Veiovis said, "I didn't do anything. I'm not a rat." Foley said he was protecting a rat because Hall had offered to set up the clubhouse to the FBI the year before. Veiovis said he was not a rat and would not cooperate. Foley had him brought back to his cell. As he walked away, Veiovis said to Chalue something to the effect of, "Hey, you hear what they're saying about our partner? They're saying he's a stoolie." Chalue responded, "Yes." [Tr. **10**, 145-151].

Trooper Michael O'Neil tested numerous items for fingerprints. With the exception of prints belonging to Hall, Chalue and Veiovis on water bottles found in Veiovis' Jeep, he found no usable prints. [Tr. **9**, 164-174].

Forensic anthropologist Dr. James Pokines examined bone specimens related to the deaths of Frampton, Glasser, and Chadwell, focusing on areas of dismemberment. He concluded that most of the damage to the specimens from all three men was caused by chopping or hacking trauma, meaning the use of force to swing a heavy, sharp implement. Such an implement could have included a butcher knife or something of the sort but

would not have included a small knife. Because the object made V shaped cuts and must have been sharp, he could exclude a sledgehammer. He also excluded cutting tools, such as saws and chainsaws, which would have made U shaped cuts. Many areas had multiple hacks from different directions, and the damage went in the same direction in some samples. A single implement could have caused the damage he observed, but he could not be sure. It is unclear whether the trauma was inflicted pre or post mortem. The cuts were made while the bone was still fresh and could have happened at or near the time of death or days or weeks later. [Tr. **10**, 17-43].

Trooper Kevin Hart from the Massachusetts State Police Digital Evidence and Multimedia Section, examined Chalue's cell phone. On Monday, August 29, 2011, he sent two texts to Hall's phone, the first just before 7:00 p.m. and the second at 7:33 p.m. [Tr. **10**, 81-86]. FBI Special Agent Eric Perry reviewed cell phone records of Hall and Chalue and was able to track their movements during portions of August 27 to 29, 2011. Calls on the morning of August 29 placed them on Woodmere Road in Beckett. [Tr.

**10**, 88-117]. Perry also examined Veiovis' cell phone records for that weekend. On Friday the 26th, there was one call between Veiovis and Hall. He made no calls from midnight on Saturday to 1:00 p.m. on Sunday. There was some limited activity on the phone on the 29th. [Tr. **10**, 118-120].

### B.    Veiovis' Evidence

Leonard Adams sold a black Jeep to Veiovis on August 23, 2011. It had both a hard top and a soft top. Changing tops requires a hex bit to unscrew the bolts. The ignition was worn, and the vehicle could be started without the key. [Tr. **11**, 13-16].

Mathew Larkin and his wife own a design firm doing high-end residential interiors and gardens. Veiovis worked for him for a year and a half until his arrest. Veiovis was in a relationship with Abigail Elwood, who worked for Larkin as a gardener. Veiovis worked from 10:00 to 5:00 five days a week, handling gardening and topiary. He also welded, cut glass, cleaned furniture, and applied patinas to metal. Both the shop work and outside work required the use of cutting tools. [Tr. **11**, 17-20, 26].

Larkin loaned Veiovis money to buy his Jeep, which he would use to go to and from work. [Tr. **11**, 21].

Larkin knew that Veiovis had gone to the Hells Angels clubhouse. He saw newspaper articles about Hall when the three men went being missing. He sometimes gave the newspapers to Veiovis and probably discussed the articles with him. [Tr. **11**, 22-26]. Veiovis worked a full week both before and after the storm, and his demeanor was perfectly normal. [Tr. **11**, 26-27].

William O'Connell, a security officer at Greylock Federal Savings Bank, introduced records indicating that on September 2, 2011, Eric Fox made a purchase at Hot Harry's in Pittsfield at 6:52 p.m. [Tr. **11**, 33-35].

Gerald Garner, the Building Commissioner for the Town of Peru, learned that during the winter of 2010/2011, the ridge board of Hall's house failed after a heavy snowstorm. He posted a hazard notice on the house, requiring that he make it structurally sound, board it up, or demolish it. He had a dozen or more conversations with Hall about making the premises safe, the latest of which was the Monday before Tropical Storm Irene. Hall

complied to a point, but things did not happen quickly enough. [Tr. **11**, 35-40].

Abigail Elwood lived at 105 Housatonic Street in Pittsfield. The beginning of the week before the storm, she was with Veiovis. She then decided to hike the Appalachian Trail. Veiovis dropped her off at the trail head on Thursday morning. On Friday morning when she heard about the storm, she had her father pick her up. She was home on Saturday night and did not see Veiovis that night.  He spent Sunday night with her. He often used latex gloves when he worked with metal or glass. [Tr. **11**, 41-49].

### C.    The Commonwealth's Rebuttal

Todd Briggs, a former Lee police officer, examined the phone records of Veiovis and Abigail Elwood. There was a call at 12:09 a.m. from her phone to his that went to voicemail. She made another call that also went to voicemail at 1:40 a.m. He then called her at 8:14 Sunday evening. [Tr. **11**, 55-58].

## Summary of the Argument

The Commonwealth failed to support its theory of the case that Veiovis was present during the incident and participated in the killing. Notably absent was any physical or forensic evidence tying him to the crimes, any witness identifying him as a participant, any incriminating admissions, any evidence of consciousness of guilt. In fact, the Commonwealth based its theory of the case solely on evidence that Veiovis spent time with the two perpetrators during the general time period of the murders. Where his conviction rested on speculation, the trial court should have allowed his motion for a required finding of not guilty on all charges, and the Supreme Judicial Court of Massachusetts should have vacated the conviction and dismissed the charges. His conviction on less than sufficient evidence denied him his right to due process. The District Court should have granted him habeas relief on this basis, and he is entitled to such relief on appeal.

## Standard of Review

The standards that a Federal court must follow in deciding a habeas petition are set forth in 28 U.S.C. § 2254(d). Under those standards, where (as in this case) a state court has addressed the merits of the claims in some manner, the petitioner is entitled to relief upon a showing that "the state court decision: 1) 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States' or 2) 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *DiBenedetto v. Hall*, 272 F.3d 1, 6 (1st Cir. 2001), quoting 28 U.S.C. § 2254(d). *See Hodge v. Mendonsa,* 739 F.3d 34, 41 (1st Cir. 2013); *Rosenthal v. O'Brien,* 713 F.3d 676, 682-683 (1st Cir. 2013); *Leftwich v. Maloney*, 532 F.3d 20, 23 (1st Cir. 2008).

"A state court's ruling is contrary to federal law either when it adopts a rule that 'contradicts the governing law set forth in the Supreme Court's cases' or when it reaches a

different result from a Supreme Court decision under 'a set of facts that are materially indistinguishable.'" *Rosenthal v. O'Brien,* 713 F.3d at 683, quoting *John v. Russo*, 561 F.3d 88, 96 (1st Cir. 2009). "Even if the state court correctly identifies the law, it may unreasonably apply the law to the facts of the case." *Id*. An unreasonable application of federal law requires a showing that such application is "more than incorrect or erroneous." *Yeboah-Sefah v. Ficco*, 556 F.3d 53, 65 (1st Cir. 2009). *See Id*. "In other words, 'some increment of incorrectness beyond error is required.'" *Morgan v. Dickhaut*, 677 F.3d 39, 47 (1st Cir. 2012) (quotations and citations omitted).

Where the state court has applied the wrong standard in addressing a federal constitutional claim, the habeas court can address the claim de novo. *Cooper-Smith v. Palmateer*, 397 F.3d 1236 (9th Cir. 2005).

Findings of fact made by a state court will be accepted unless clearly erroneous or unreasonable in light of the

record. *Rosenthal v. O'Brien,* 713 F.3d at 683; *DiBenedetto v. Hall*, 272 F.3d at 6.

Finally, on appeal, this Court must "review the district court's denial of habeas relief de novo." *Nadeau v. Matesanz*, 289 F.3d 13, 15 (1st Cir. 2002). *See Hensley v. Roden*, 755 F.3d 724, 730 (1st Cir. 2014); *Morgan v. Dickhaut*, 677 F.3d at 46.

**Argument**

I.     **The District Court Should Have Granted Veiovis Habeas Relief Where The Evidence Was Legally Insufficient To Support His Conviction For First Degree Murder Or The Related Offenses In The Absence Of Any Physical Or Forensic Evidence Tying Him To The Crimes, In The Absence Of Any Witness Identifying Him As A Participant, In The Absence Of Any Incriminating Admissions, In The Absence Of Evidence Of Consciousness Of Guilt, And Based Solely On Evidence That He Spent Time With The Two Perpetrators During The General Time Period Of The Murders**

The jurors found Veiovis guilty of the charged offenses after six days of deliberations. The trial court allowed that verdict to stand, as did the Supreme Judicial Court. Notably absent, however, was any physical or forensic evidence tying him to the crimes, any witness identifying him as a participant in the crimes, any incriminating admissions, and any evidence of consciousness of guilt. In fact, the only evidence suggesting his possible involvement in the crimes was evidence that he spent time with the two perpetrators before and after the murders. Even viewed in the light most favorable to the Commonwealth, such evidence simply failed to establish Veiovis' guilt beyond a reasonable doubt. By allowing his conviction to stand in the absence of sufficient

46

proof, the Massachusetts courts violated his right to due process and unreasonably applied federal constitutional law. The District Judge should have granted him habeas relief, and he asks that this Court correct the error and grant him such relief.

### A. The Standards For Evaluating A Habeas Claim Addressing The Sufficiency Of The Evidence

If "upon the record evidence adduced at the [petitioner's state] trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt" a petitioner is entitled to habeas relief as a matter of law. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). Indeed, "[t]he Due Process Clause of the Fourteenth Amendment 'protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" *Francis v. Franklin*, 471 U.S. 307, 313 (1985), quoting *In re Winship*, 397 U.S. 358, 364 (1970). *See Jackson v. Virginia*, 443 U.S. at 319; *Vachon v. New Hampshire*, 414 U.S. 478, 480 (1974).

"In determining the evidentiary sufficiency of a guilty verdict, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Czubinski*, 106 F.3d 1069, 1073 (1st Cir. 1997), quoting *Jackson v. Virginia*, 443 U.S. at 319. *See also United States v. Hernandez*, 109 F.3d 13, 15 (1st Cir. 1997); *United States v. Valle*, 72 F.3d 210, 216 (1st Cir. 1995). In considering the sufficiency of the evidence, it is not enough for a reviewing court to find that there was some slight record evidence to support each essential element of the offense. The Court must "take a hard look at the record" and "reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative." *United States v. Spinney*, 65 F.3d 231, 234 (1st Cir. 1995).

A court considering "'a state conviction on habeas review . . . presume[s] the state court's factual findings to be correct.'" *Gomes v. Silva*, 958 F.3d 12, 16 (1st Cir. 2020),

quoting *Dorisca v. Marchilli*, 941 F.3d 12, 14 (1st Cir. 2019) and *Hensley v. Roden*, 755 F.3d 724, 727 (1st Cir. 2014). *See Parker v. Matthews*, 567 U.S. 37, 43 (2012) (describing this standard as a "twice-deferential standard."). *See also* 28 U.S.C. § 2254(e)(1). Nevertheless, the key to determining whether the state court unreasonably applied the *Jackson* standard remains the sufficiency of the evidence. *Hurtado v. Tucker*, 245 F.3d 7, 18 (1st Cir. 2001). Thus, where a state court allows a conviction to stand on less than the required quantum of proof, the decision of the state court is objectively unreasonable, and the petitioner is entitled to habeas relief. *Id.*

> **B. Where The Evidence At Trial Failed To Establish Veiovis' Guilt On The Charged Offenses, The Decision Of The Massachusetts Courts Allowing His Conviction To Stand Meets The Standards For Habeas Relief**

The standards set forth above are obviously difficult to meet. *See Id. See also Winfield v. O'Brien*, 775 F.3d 1, 8 (1st Cir. 2014); *Housen v. Gelb*, 744 F.3d 221, 225-227 (1st Cir. 2014). But again, regardless of the degree of deference, if the

Massachusetts courts have allowed a conviction to stand on less than the required quantum of proof, the petitioner is entitled to habeas relief. *Id*.

In this case, Veiovis assumes that a proper application of the tests traditionally applied by the Massachusetts courts in determining the sufficiency of the evidence will satisfy the requirements of *Jackson v. Virginia,* 443 U.S. 307 (1979). *See Housen v. Gelb*, 744 F.3d at 225. He contends, however, that the Massachusetts courts misapplied those tests, allowing his conviction to stand on less than proof beyond a reasonable doubt. The state courts therefore reached a result "so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes." *O'Brien v. DuBois,* 145 F.3d 16, 25 (1st Cir. 1998). *See O'Laughlin v. O'Brien,* 568 F.3d 287, 308-309 (1st Cir. 2009).

### 1. The Joint Venture Standards In Massachusetts

Generally, "[t]o succeed on a theory of deliberately premeditated murder as a joint venture . . . , the Commonwealth was required to prove that the defendant

was '(1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement [was] willing and available to help the other if necessary." *Commonwealth v. Zanetti*, 454 Mass. 449, 455, 910 N.E.2d 869, 875 (2009) quoting *Commonwealth v. Longo*, 402 Mass. 482, 486, 524 N.E.2d 67, 70 (1988). A defendant's presence at the scene speaks for itself, but as to his state of mind, in determining whether he had the requisite intent to commit the crime, the Commonwealth "needed to prove the defendant shared the mental state or intent for deliberate premeditated murder, which is malice, and, in particular, an intent to kill." *Commonwealth v. Zanetti*, 454 Mass. at 455, 910 N.E.2d at 875, citing *Commonwealth v. Jenks*, 426 Mass. 582, 585, 689 N.E.2d 820, 822 (1998).

> **2. Even Viewed In The Light Most Favorable To The Commonwealth, The Evidence At Trial Fell Far Short Of Proof Beyond A Reasonable Doubt That Veiovis Participated In The Kidnapping And Killings**

Even viewed in the light most favorable to Commonwealth, the evidence failed to establish that Veiovis participated in the murders and related crimes. Specifically,

the Commonwealth produced no physical or forensic evidence tying him to the crimes. Investigators found nothing of any evidentiary significance in his Jeep or in either of the apartments he had occupied. The police never found the scene where the murder took place and found no evidence linking him to the crimes at the scene where the bodies were recovered. Further, no witness identified Veiovis as a participant in the crimes. Ultimately, the jurors were left to speculate as to whether he participated in the murders, and the six days that it took the jurors to convict him reflected the dearth of any meaningful evidence that he had done so. *See O'Laughlin v. O'Brien,* 568 F.3d 287, 305-308 (1st Cir. 2009) (state court unreasonably applied federal due process law, requiring habeas relief, by determining that evidence was sufficient to show identity of perpetrator beyond reasonable doubt where no physical or forensic evidence linked defendant to crime scene). *See also Juan H. v. Allen*, 408 F.3d 1262, 1277-1279 (9th Cir. 2005) (finding evidence to be insufficient to support verdict where mere speculation, rather than reasonable inference, supports the government's case). *Contrast Trimble v. Bobby*, 804 F.3d 767,

771 (6th Cir. 2015) ("Overwhelming evidence established Trimble's guilt, including his admissions of guilt to two family members and the police, significant forensic evidence tying him to the murders, and eyewitness testimony."); *Woods v. Sinclair*, 655 F.3d 886, 910 (9th Cir. 2011), cert. granted, judgment vacated sub nom. *Woods v. Holbrook*, 566 U.S. 902 (2012) ("the evidence against Woods was overwhelming, including eyewitness testimony . . . and a multitude of forensic and circumstantial evidence").

The evidence overwhelmingly established that Hall and Chalue participated in the killing. Hall described his own role to David Casey in great detail. He also discussed things that "Davey" Chalue had done—how he chased down Glasser, shot him, and brought him back to Hall. In his statement to Casey, Hall referenced a third participant in the killing and had said that the third person "really enjoyed torturing and cutting up" the victims. [Tr. **6**, 118-119]. However, when asked if he remembered Hall "making some comment about somebody else who was involved", Casey said, "Langdon?" [Tr. **6**, 118]. While the prosecutor immediately attempted to redirect him [Tr. **6**, 118], Casey

did not retract this statement or say that Hall identified Veiovis or anyone other than Scott Langdon as the third participant.[2]

The Commonwealth argued at trial that because Veiovis hung out with Hall and Chalue in the days before and after the killing, and indeed, the night before and early in the morning after the killing, he must have been the third accomplice. The Commonwealth's argument overlooks a number of significant facts.

First, Hall showed no reluctance to involve other people in his attempts to avoid having Glasser testify against him. He recruited or attempted to involve Alicia Tatro, Justina Cole, Steven Hinman, Ocean Sutton, Nicole Brooks, Teresa Cunigan, Alexandra Ely, Bryan Johnson, David Casey, Rose Sutton, Alan Pavoni, Scott Langdon, and Chalue in various efforts to discredit or bribe Glasser or in committing and covering up the killing. Veiovis did not

---

[2] According to Casey, Langdon had been living in Hall's basement prior to moving in with his (Casey's) sister. [Tr. **6**, 161]. As described above, Langdon had been heavily involved in the efforts to frame Glasser and had also attempted to bribe him on Hall's behalf.

participate in any of the efforts to discredit or bribe Glasser, as he did not meet Hall until shortly before the killing.

Second, the night before the killing, while Hall and Chalue were cleaning guns in his apartment, Veiovis was upstairs with Kayla Sewell. No one saw him cleaning or handling any guns, and thereafter, no one saw him leave with Hall and Chalue. He did not make or receive any phone calls. Although the Commonwealth argued that the fact that he turned off his phone indicated that he was too busy participating in the murders, that fact is at least as consistent with him having stayed home and gone to bed.

Third, that night at about 1:30 A.M., Hall left the Sutton house got into the passenger side of a yellow jeep. Sometime after 5:30 a.m., Hall arrived back at the Sutton house in the Buick, and left it on the front lawn. He then entered Veiovis' black Jeep, which had pulled up after the Buick, and left. Hall subsequently returned to the Sutton house and then went to his own house. Ely and Rose described Hall as soaking wet and shoeless. They described Veiovis as tired, but no one testified that his clothes or shoes were wet. While his presence at the Sutton house shortly

after the killing may have been consistent with his having participated in the killing—aside from the fact that his clothes were not wet—it was at least as consistent with a theory that Hall stopped by Veiovis' apartment after he had killed and dismembered the victims and asked him for a ride. The fact that this event occurred sometime around 5:00 a.m. would explain why Veiovis would have looked tired.

Fourth, following the killing, Veiovis did not participate in the disposal of evidence, such as burying the bodies, dumping evidence into the river, burning clothing and having the car crushed. Only Hall and Chalue did these things, supporting the defense theory that Veiovis did not participate in the killing and therefore had no reason to dispose of evidence. *Contrast Linton v. Saba*, 812 F.3d 112, 124 (1st Cir. 2016) (strong evidence of consciousness of guilt); *Leftwich v. Maloney*, 532 F.3d 20, 27 (1st Cir. 2008) (petitioner's request for habeas relief undercut where he admitted he had disposed of victim's body, where there was evidence of a furtive attempt to clean up telltale blood, and where he had lied to police).

At trial, the Commonwealth focused on a couple of rather ambiguous events in an effort to tie Veiovis to the killing. His reference to Hall as "our partner" when brought into the police lockup falls far short of establishing that he participated in the killing and/or the dismemberment. Assuming his statement referred to the killing, Veiovis may simply have referenced the fact that they were arrested together or were all friends.[3] Hall also made a statement to Katelyn Carmin that he needed Chalue and Veiovis for a job. A week later, both men were fixing his roof, but even if Hall was referring to the planned killing, there was no evidence that Veiovis knew about the killing and agreed to participate in it. The description of Veiovis' so-called counter-surveillance, where he stared at a plain clothes state trooper when his friend stopped for a burrito does not establish or in any way suggest that he participated in the murder.

---

[3] At trial, the Commonwealth also attempted to elicit from Katelyn Carmin that Veiovis or Chalue or both said about Glasser, "[w]e'll get him," which would certainly have implied that Veiovis had agreed to join in on a scheme to harm Glasser. However, Carmin in her direct testimony could not recall whether the phrasing was "we'll get him" or "you'll get him." On cross-examination, she recalled it as "You'll get him. You'll get him." [Tr. **4**, 204]. In his closing statement, the Commonwealth conceded that Veiovis said, "[d]on't worry, you'll get him". [Tr. **12**, 83, 96-97].

Finally, the Commonwealth focused at some length on Hall's statement, made in the presence of Veiovis, that he (Veiovis) was thinking of buying a motorcycle and becoming a Hells Angels prospect. Assuming that that was indeed true, the Commonwealth offered no evidence that killing three people would have been necessary or helpful to advance his membership. *See* ONEPERCENTERBIKERS, Hells Angels Membership Requirements, August 31, 2015, http://www.onepercenterbikers.com/hells-angels-membership-requirements/ ("We could start off this article by saying that the Hells Angels Membership Requirements included needing to do 12 drug deals, commit 1 murder and then bludgeon 4 baby harp seals … but then we would be lying, that's not how to become a Hells Angel.").

Ultimately, the evidence failed to show beyond speculation that Veiovis was present during the kidnappings and killing or otherwise participated in the crimes. *See O'Laughlin v. O'Brien,* 568 F.3d at 305-308 (evidence failed to place petitioner at crime scene); *Newman v. Metrish*, 543 F.3d 793, 797 (6th Cir. 2008) ("conspicuously absent is any evidence placing Newman at the scene of the crime", and

absent such evidence, "there is only a reasonable speculation that Newman himself was present").

Especially where Hall identified the third person involved as Scott Langdon in confessing to Casey, the evidence supported no more than a questionable hunch that Veiovis participated in the kidnapping and killings. The Massachusetts trial court should have granted Veiovis a required finding of not guilty, and the Supreme Judicial Court acted contrary to his right to due process by affirming his convictions in the absence of sufficient evidence. The District Court should have granted him habeas relief on this basis, and he asks that this Court remand the case to that court with directions to grant the writ.

## II.  Conclusion

Based on the authorities cited and the reasons stated above, Veiovis respectfully requests that this Court vacate the dismissal of his petition and order the District Court to grant him habeas relief. In the alternative, he asks that this Court grant him such other relief as he may be entitled.

Respectfully submitted,

**Caius Veiovis,**
*By his attorney,*


/s/ Dana A. Curhan _____
**Dana A. Curhan**
Bar # 44690
45 Bowdoin Street
Boston, MA 02114
(617) 267-3800
dana.curhan@gmail.com

## United States Court Of Appeals
## For The First Circuit
_____

No. 22-1216

### Caius Veiovis,
*Petitioner-Appellant*

**v.**

### Collette Goguen, Superintendent
*Respondent–Appellee*

_____

### Certificate of Compliance Under Rule 32(a)(7)
_____

Pursuant to Rule 32(a)(7), I certify that the brief complies with the type-volume limitation set forth in the rule. The brief contains 11,008 words.

**Caius Veiovis**,
*By his attorney,*

/S/ Dana Alan Curhan

Dana Alan Curhan
First Circuit Bar # 44690
45 Bowdoin Street
Boston, MA 02114
(617) 267-3800
dana.curhan@gmail.com

## United States Court Of Appeals
## For The First Circuit

_____

**No. 22-1216**

**Caius Veiovis,**
*Petitioner-Appellant*

**v.**

**Collette Goguen, Superintendent**
*Respondent–Appellee*

_____

## Certificate of Service
_____

I hereby certify that on April 29, 2022, I served an electronic copy of the attached brief via the court's ECF system to all counsel of record.

**Caius Veiovis**,
*By his attorney,*

/S/ Dana Alan Curhan

Dana Alan Curhan
First Circuit Bar # 44690
45 Bowdoin Street
Boston, MA 02114
(617) 267-3800
dana.curhan@gmail.com

# United States Court Of Appeals
# For The First Circuit

**No. 22-1216**

---

## Caius Veiovis,
### *Petitioner-Appellant*


v.


## Collette Goguen, Superintendent
### *Respondent–Appellee*

---

**Addendum**

---

# Table of Contents

1.  Memorandum and Order (Hillman, D.J.)          1

2.  Order of Dismissal                            15

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **CAIUS VEIOVIS,** ) | |
| ) | **CIVIL ACTION** |
| ) | **NO.  4:18-11632-TSH** |
| **Petitioner,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **SUPERINTENDENT COLETTE** ) | |
| **GOGUEN,** ) | |
| ) | |
| **Respondent.** ) | |
| ) | |

<u>**ORDER AND MEMORANDUM ON PETITIONER'S PETITION FOR A WRIT OF**</u>
<u>**HABEAS CORPUS (Docket No. 1)**</u>

**March 23, 2022**

**HILLMAN, D.J.**

A jury convicted petitioner Caius Veiovis of three counts of murder in the first degree, three counts of kidnapping, and three counts of witness intimidation, in connection with the killings of David Glasser, Edward Frampton, and Robert Chadwell.  The prosecution's theory was that Veiovis, along with Adam Hall and David Chalue, killed Glasser to prevent Glasser from testifying against Hall at an upcoming criminal trial.  When Hall, Chalue, and Veiovis arrived at Glasser's home to do so, Frampton and Chadwell were there too.  Hall, Chalue, and Veiovis killed Frampton and Chadwell to silence them as well.

Following his convictions, Veiovis appealed to the Massachusetts Supreme Judicial Court ("SJC").  He argued, *inter alia*, that the evidence was insufficient to support his convictions.  The SJC affirmed.  *See Commonwealth v. Veiovis*, 477 Mass. 472, 474 (2017).  Veiovis now petitions

for a writ of habeas corpus in accordance with 28 U.S.C. § 2254.  (Docket No. 1).  For the following

reasons, the Court ___**denies**___ his petition.

<u>**Background**</u>

The following facts are drawn from the SJC's decision affirming Veiovis's convictions,

supplemented by facts from the record consistent with the SJC's findings.  *See Pina v. Maloney*,

565 F.3d 48, 50 (1st Cir. 2009).

In July 2009, Hall beat Glasser with a baseball bat because Hall believed that Glasser had

stolen from him.  Glasser went to the police, and Hall was arrested and charged with assault and

battery by means of a dangerous weapon.  In July 2010, while that charge was pending, Hall

attempted to discredit Glasser by framing him for kidnapping.  One of Hall's friends, Nicole

Brooks, falsely reported to police that Glasser had kidnapped her and shot at her while she escaped.

Another of Hall's friends, Scott Langdon, planted a gun in Glasser's truck.  Police eventually saw

through Hall's scheme and brought additional charges against him and his friends.

In August 2011, Hall began spending time with Chalue and Veiovis.  Hall was a ranking

member of the Hells Angels motorcycle club.  Veiovis was not a member, but he wore a vest with

the club's insignia and kept a club sticker in his car (a Jeep) and apartment.  In Veiovis's presence,

Hall told a witness something about Veiovis "possibly getting a motorcycle and becoming a

prospect for the Hells Angels."

On Friday, August 26, 2011, Hall, Chalue, Veiovis, and Katelyn Carmin were driving in

Hall's car (a Buick) as Hall ranted about a person who had robbed him and "snitched" on him.

Hall said he was "going to kill that motherfucker."  Veiovis and Chalue assured Hall that he was

going to "get him."  The group eventually made their way to the Hells Angels clubhouse in Lee,

Addendum 2

Massachusetts.  As Chalue, Veiovis, and Carmin were riding all-terrain vehicles, Hall told Carmin to be careful because he needed Chalue and Veiovis for "a job."

The following morning, Saturday, August 27, 2011, Hall was seen speaking with Veiovis outside of Veiovis's girlfriend's apartment.  In the early afternoon, Hall, Chalue, and Veiovis went to a Hells Angels party in Springfield, Massachusetts.  Hall and Veiovis left together and returned around 4:30 P.M.  Hall, Chalue, and Veiovis left together at 6:30 P.M.

That evening, Hall, Chalue, and Veiovis met Allyson Scace and Kayla Sewell at the Hells Angels clubhouse before going to Veiovis's apartment in Pittsfield, Massachusetts.  Chalue, Veiovis, Scace, and Sewell drove to Pittsfield in Scace's car.  Hall drove separately, stopping at Steven Hinman's house on the way.  Hall showed Hinman a .45 semiautomatic pistol in his vest, as well as a "dog food bag" that contained a .44 Magnum revolver, a sawed-off AR-15-type weapon, and a small revolver.  When Hall arrived at Veiovis's apartment, Hall pulled the guns out of the bag and asked Veiovis where he kept brake cleaner and gloves.  Veiovis directed him to a cabinet and went upstairs with Sewell.  While Veiovis and Sewell were upstairs, Hall and Chalue disassembled and cleaned the guns.  Although Veiovis asked Sewell to stay longer, Sewell and Scace left Veiovis's apartment around 9 P.M.

Glasser, Frampton, and Chadwell also lived in Pittsfield.  Around 10:30 P.M., Glasser's upstairs neighbor asked Glasser to move his truck, which was in the shared driveway of their building.  The upstairs neighbor saw Glasser, Frampton, Chadwell, and a fourth man in Glasser's apartment.  At 11:21 P.M., a call was made from Chadwell's cell phone.  Shortly after midnight, the upstairs neighbor heard banging from the front downstairs hallway.  She could hear Glasser's voice, Frampton's voice, and some unfamiliar voices.

Addendum 3

Early Sunday morning, Veiovis's girlfriend tried to contact Veiovis on his cell phone.  She called and left a message at 12:09 A.M.; she texted at 1:20 A.M.; and she called and left another message at 1:40 A.M.  Veiovis did not respond.

Around 1:30 A.M., Hall appeared at Rose Dawson's house in Pittsfield.  Hall borrowed Dawson's cell phone and said that he would be back soon.  Hall got into a vehicle described as a Jeep Wrangler and left.  One witness described the Jeep as yellow; another witness described the Jeep as green.  Veiovis owned a black Jeep Wrangler.

Around 5:30 A.M., Hall purchased three candy bars and a pack of cigarettes from a convenience store in Pittsfield.  Hall had mud on his shirt, and his boots and jeans were wet, as was the cash he used to pay for the items.  A tropical storm had hit western Massachusetts that night.  Hall left the convenience store and returned a few minutes later to purchase a pack of Black and Mild cigars.  Police later found Black and Mild cigar wrappers in Veiovis's apartment and Jeep.

Shortly thereafter, Hall returned to Dawson's house and parked his Buick on the front lawn.  Hall got out of the Buick and walked to Veiovis's Jeep, which was waiting out in the road.  Hall got into the passenger side of the Jeep, and the Jeep drove off.

Around 10:30 A.M., Hall returned to Dawson's house in Veiovis's Jeep with Chalue and Veiovis; Hall was driving.  Hall was wet and not wearing shoes.  Hall asked Dawson and another friend, Alexandra Ely, who was staying at Dawson's house, to go to Hall's house in Peru, Massachusetts to make breakfast.  He gave them money, which was soaking wet, and told them to wash their hands after handling it.  He also told them to buy bleach and not to touch or look inside a bag on the passenger-side floor of the Buick.  Taking the Buick to get food and to go to Peru, the women looked inside the bag and saw what looked like a "batting glove or golf glove."

4

Addendum 4

When Dawson and Ely arrived at Hall's house, Chalue was in bed, and Veiovis was sitting in a recliner "sleeping" and looking "tired." Hall was "exited" and "jumpy." Hall returned Dawson's cell phone to her, telling her to delete the call log and not to tell anyone that he had borrowed it. Dawson and Ely left in the Buick to return to Dawson's house. Hall, Chalue, and Veiovis retrieved the Buick from Dawson's house later that day.

Around 2 P.M., Hall arrived at David Casey's house in Canaan, New York, which is approximately eighteen miles from Pittsfield. Hall told Casey that he was looking for a spot to park his car overnight. Casey arranged for Hall to park at Al Pavoni's house in Becket, Massachusetts.

Hall then told Casey that he had killed Glasser, "a fat guy," and a black man. In recounting the killings, Hall described that Glasser took off into the woods. Hall "told one of the other guys to go after him." After "Davey" did so and brought Glasser back, Hall shot Glasser. They "chopped them up," and "one of the guys really enjoyed torturing and cutting them up." It was "raining very hard" while this was happening.

Hall asked Casey if he was still working with an excavator at a property in Becket, and Casey said that he was. Hall told Casey that if he dug a hole for him to bury the bodies, he would not harm Langdon, who was engaged to and living with Casey's sister. Casey also knew that Langdon was cooperating with police regarding Hall's criminal charges. Hall wanted to dig the hole that day, but Casey worried that the property owner in Becket might be home, so he suggested waiting a day. Casey said he would meet Hall at the property on Monday morning.

Hall parked the Buick at Pavoni's house in Becket between 5 P.M. and 6 P.M. Someone was with Hall in the Buick. A "Jeep-like vehicle" arrived to pick Hall up. Late in the afternoon,

Addendum 5

Hall, Chalue, and Veiovis were seen standing near Veiovis's Jeep in the parking lot of Veiovis's girlfriend's apartment in Pittsfield.

On Monday morning, Hall and Casey met at Pavoni's house.  Hall was with a man he called "Davey."   Hall told Casey he could trust "Davey" because he was a member of the Aryan Brotherhood, and a person had to kill someone to become a member.  At trial, Casey identified the man as Chalue.  Hall opened the trunk of the Buick and said that it was "starting to smell."  Hall drove the Buick to the other property in Becket, where Casey used his excavator to dig a large hole.  Hall took a number of large plastic garbage bags from the Buick and dropped them into the hole.

That afternoon, Hall and Chalue brought the Buick to a salvage yard and sold it for scrap.  The interior carpets were coated with liquid, the back seat was mostly missing, and the carpet had been removed from the trunk.  The car was later crushed.

On Sunday, September 4, Hall, Chalue, and Veiovis drove past the salvage yard in Veiovis's Jeep, and then drove back in the other direction.  Police stopped the Jeep at a nearby gas station; they seized and searched the Jeep but found nothing of evidentiary value.

On Friday, September 9, Casey told police the location of the bodies.  Police uncovered the bodies, which were confirmed to be those of Glasser, Frampton, and Chadwell.  An autopsy revealed that all three victims had been shot and stabbed, and that their neck, arms, and legs had been removed.  Two of the bodies also had been cut through the torso.  The dismemberment was largely the result of chopping or hacking with a sharp instrument such as a butcher knife.

On September 10, Veiovis was arrested.  At the Pittsfield police station, an officer told Veiovis that Hall was a "rat" because Hall had offered to cooperate with the FBI regarding the

Addendum 6

Hells Angels.  As Veiovis was walking back to his cell, he said to Chalue, "[Y]ou hear what they're saying about our partner?  They're saying he's a stoolie."

On September 12, police searched Veiovis's apartment.  They found two newspaper articles describing the disappearance of Glasser, Frampton, and Chadwell.  They also found anatomical drawings from a medical textbook with images of human dissections and amputation of body parts.  They further found a machete, a cleaver, hatchets, various knives, and a baseball bat with spikes.  None of the items tested positive for blood, so they were not seized.

Veiovis was charged with three counts of murder, three counts of kidnapping, and three counts of witness intimidation.[1]  A jury found him guilty on all counts.[2]  As to murder, the jury found him guilty on a theory of deliberate premeditation.  Veiovis appealed.  He argued, *inter alia*, that the evidence was insufficient to support his convictions.  The SJC affirmed.[3]  Veiovis subsequently petitioned for habeas relief.  He argues that his convictions violate his right to due process because they are based on insufficient evidence.

### **Standard of Review**

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a federal court shall not grant a petition for habeas relief "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the state court proceedings "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based

---

[1] Hall and Chalue also were charged.  Each defendant was tried separately.

[2] Juries also convicted Hall and Chalue of three counts of murder in the first degree.

[3] Two judges dissented, disagreeing with the majority's analysis of an evidentiary issue. The dissenting judges agreed, however, that the evidence was legally sufficient to support Veiovis's convictions.  *See Veiovis*, 78 N.E.3d at 774.

7

on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

## Discussion

Veiovis asserts one ground for habeas relief: that the evidence presented at his trial was legally insufficient to support his convictions. Veiovis focuses specifically on his murder convictions. The federal constitutional standard for measuring the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). The prosecution proceeded on a theory of joint venture liability. "At its core, joint venture criminal liability has two essential elements: that the defendant knowingly participated in the commission of the crime charged, and that the defendant had or shared the required criminal intent." *Commonwealth v. Zanetti*, 454 Mass. 449, 467 (2009). Veiovis was convicted of deliberately premeditated murder, the elements of which are that the defendant caused the death of the victims, intended to kill the victims, and acted with deliberate premeditation. *Commonwealth v. Tejada*, 484 Mass. 1, 4 (2020).

The SJC applied the correct standard. The SJC sought to determine whether, "after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Veiovis*, 477 Mass. at 479 (citing *Commonwealth v. St. Hilaire*, 470 Mass. 338, 343 (2015) (emphasis in original)). "The SJC relied on Massachusetts case law that has expressly adopted the federal constitutional standard in *Jackson*." *O'Laughlin v. O'Brien*, 568 F.3d 287, 299 n.15 (1st Cir. 2009).

The SJC's application of the law was not unreasonable. In the SJC's view, the evidence suggested that Veiovis had knowledge of Hall's plan to kill Glasser and a motive to assist Glasser

in the killing. *Veiovis*, 477 Mass. at 480. Veiovis "did not dispute that there was abundant evidence that Hall and Chalue participated in the killings," and there was "credible evidence" that a third person participated in the killings with them. *Id.* at 474, 481. The evidence put Veiovis with Hall and Chalue immediately before and immediately after the killings. *Id.* at 480-81. Had Veiovis not participated in the killings, moreover, it is unlikely that Veiovis would have referred to Hall as "our partner" in a comment to Chalue or kept newspaper articles mentioning the victims' disappearance. *Id.* at 481. The SJC concluded that "the evidence was sufficient to support a finding beyond a reasonable doubt that [Veiovis], with the intent to kill, knowingly participated in the premeditated murder of the three victims." *Id.* at 480 (citing *Zanetti*, 454 Mass. at 467).

Veiovis contends that the SJC misapplied the *Jackson* standard and allowed his convictions to stand on less than proof beyond a reasonable doubt. Veiovis notes that no physical or forensic evidence connected him to the crimes; that the murder scene was never found; that no evidence linked him to the burial scene; and that there was no percipient witness to the crimes. He argues that the only link between him and the crimes was his association with Hall and Chalue before and after the killings. The evidence against Veiovis was entirely circumstantial, as the SJC acknowledged. *Id.* at 480. But circumstantial evidence alone may be sufficient to establish guilt beyond a reasonable doubt. *See Morgan v. Dickhaut*, 677 F.3d 39, 47 (1st Cir. 2012).

Veiovis understates the circumstantial evidence against him. *See Housen v. Gelb*, 744 F.3d 221, 225 (1st Cir. 2014). As the SJC noted, a jury reasonably could have inferred that Veiovis had knowledge of Hall's plan to kill Glasser. On the Friday before the killings, Veiovis was driving with Hall and others when Hall, referring to Glasser, said he was "going to kill that motherfucker." Veiovis assured Hall that Hall was going to "get him." A reasonable jury also could have inferred that Veiovis wanted to curry favor with Hall. Veiovis had a demonstrated interest in the Hells

Addendum 9

Angels, and Hall was a ranking member of the Hells Angels.  Hall apparently saw Chalue as trustworthy; Hall told Casey that Casey could "trust" Chalue because Chalue was "an Aryan brother," and "you [have] to kill someone to get in."  A reasonable jury could have inferred that Veiovis similarly wanted to gain Hall's trust, and that Veiovis believed that assisting Hall in the killings was one way to do so.

A reasonable jury could have inferred that the killings occurred early Sunday morning. Glasser's upstairs neighbor last saw the victims at around 10:30 P.M. on Saturday night, and she heard banging and voices shortly after midnight.  The SJC noted that there was "credible evidence" that a third person participated in the killings with Hall and Chalue.  *Veiovis*, 477 Mass. at 481. Indeed, when Hall described the killings to Casey, Hall at times mentioned "one of the other guys" and "one of the guys," suggesting that at least two people were with him.  At 5:30 A.M. on Sunday morning, moreover, Hall bought three candy bars from a convenience store, cigarettes, and a brand of cigars smoked by Veiovis.

Veiovis was with Hall and Chalue at least as of 9 P.M. on Saturday night, when Scace and Sewell left the three men in Veiovis's apartment.  Between midnight and 2 A.M., Veiovis's girlfriend tried contacting Veiovis's cell phone three times; Veiovis did not respond.  At 1:30 A.M., Hall arrived at Dawson's house in a Jeep.  A reasonable jury could have inferred that it was Veiovis's Jeep, and that Veiovis was in it.  Soon after 5 A.M., Hall arrived at Dawson's house, followed by Veiovis's Jeep.  Hall left in Veiovis's Jeep and later returned with Chalue and Veiovis. That morning at Hall's house, Veiovis appeared to be tired.  A reasonable jury could have inferred that Veiovis was with Hall and Chalue when the victims were killed, or in other words, that Veiovis was "one of the other guys."

Addendum 10

Finally, Veiovis's actions after the killing -- his collection of two articles on the victims' disappearance, and his comment to Chalue that Hall was their "partner" -- were probative of his involvement in the killings.  The facts recited above, when taken together, support a finding of guilt beyond a reasonable doubt.  Hall admitted to Casey that he had killed the victims; Hall implicated Chalue and a third assailant.  The SJC's conclusion that, viewing the evidence in the light most favorable to the prosecution, Veiovis could have been found to be that third assailant beyond a reasonable doubt was not unreasonable.[4]

Veiovis next argues that while Casey referred to a third assailant, Casey did not identify Veiovis, and the only name Casey mentioned other than "Davey" was "Langdon."  Veiovis asserts that this renders his involvement in the killings speculative.  At trial, when the prosecutor asked Casey whether he remembered Hall making a comment "relative to a third person that was with him . . . making some comment about somebody else who was involved," Casey responded, "Langdon?"  The prosecutor then said, "No.  In talking about the -- when he was . . . talking about the killing . . . do you remember him talking about another guy, the way that guy acted?"  The prosecutor then showed Casey something to refresh his memory, at which point Casey recounted that Hall had said "that one of the guys really enjoyed torturing and cutting them up."  Later, Casey testified that Hall told him that he would not harm Langdon, who was engaged to and living with Casey's sister, if Casey helped him bury the bodies.

The SJC did not mention Casey's "Langdon" comment in its decision, although the SJC did explain Casey's connection to Langdon, and Hall's comment that no harm would come to Langdon if Casey helped bury the bodies.  Casey's testimony reasonably can be read as not

---

[4] The circumstantial evidence here is more compelling than the circumstantial evidence in *O'Laughlin v. O'Brien*, 568 F.3d 287 (1st Cir. 2009).

implicating Langdon in the killings, and the SJC's recitation of the facts suggests an implicit understanding of that reading.  *See Teti v. Bender*, 507 F.3d 50, 59 (1st Cir. 2007).  In any event, even if Casey's testimony can be understood to implicate Langdon in some way, the "Langdon" comment does not exculpate Veiovis in a way that renders unsupported a finding that Veiovis knowingly and intentionally participated in the killings.

Veiovis last argues that the SJC overlooked several significant facts suggesting that he was not the third accomplice.  First, Veiovis was not involved in Hall's previous schemes to discredit Glasser.  Second, while Hall and Chalue were cleaning guns in Veiovis's apartment on Saturday night, Veiovis was upstairs with Sewell.  Third, while witnesses described Hall as wet early on Sunday morning, no one described Veiovis as wet.  Fourth, unlike Hall and Chalue, Veiovis did not dispose of any evidence after the killings.  Fifth, Veiovis's "our partner" comment to Chalue could have been about the three men being arrested together or friends.  Sixth, Hall's statement to Carmin that he needed Veiovis for "a job" could have been about a construction project at Hall's house.  Finally, even if Veiovis wanted to join the Hells Angels, the prosecution presented no evidence to suggest that killing three people would have advanced his membership in the club.

Veiovis reasonably explains why, contrary to the prosecution's theory, some of the evidence presented at trial might not have implicated him in the crimes.  But the standard for measuring the sufficiency of the evidence, as applied by the SJC and required by the federal constitution, requires viewing the evidence <u>in the light most favorable to the prosecution</u>.  *Jackson*, 443 U.S. at 319.  And here, the SJC explicitly considered that Hall and Chalue cleaned guns at Veiovis's apartment, that Veiovis appeared tired on Sunday morning, that Veiovis referred to Hall as "our partner," and that Veiovis wanted to join the Hells Angles.  The SJC reasonably concluded that a jury could have drawn reasonable inferences from this evidence implicating Veiovis in the

killings.  Even if some evidence was neutral or pointed the other way, it was not unreasonable for the SJC to determine that a jury could have found Veiovis guilty of first-degree murder beyond a reasonable doubt.  Accordingly, Veiovis's petition for a writ of habeas corpus must be denied.

### **Conclusion**

For the reasons stated, Veiovis's petition for a writ of habeas corpus is ***denied***, and the case will be dismissed.

13

**Certificate of Appealability**

The statute governing appeals of final orders in habeas proceedings provides that an appeal is not permitted "[u]nless a circuit justice or judge issues a certificate of appealability."  28 U.S.C. § 2253(c)(1).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To make a "substantial showing," a petitioner must demonstrate that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks omitted).  This is a low bar; a claim can be considered "debatable" even if every reasonable jurist would agree that the petitioner will not prevail.  *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003).

Given the circumstantial nature of this case, reasonable jurists could debate the significance of various aspects of the trial record, on which Veiovis's insufficiency of the evidence claim depends.  Accordingly, the Court grants a certificate of appealability.

**SO ORDERED**

/s/ *Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**

14

Addendum 14

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

Caius Veiovis,

        Petitioner,        CIVIL ACTION

    V.                    NO. <u>18-11632-TSH</u>

Colette Goguen,

        Respondent,

### <u>ORDER OF DISMISSAL</u>

HILLMAN, D.J.

    In accordance with the Court's Order, dated <u>3/23/22</u> dismissing the petition for writ of habeas corpus under 28 U.S.C. §2254, it is hereby ORDERED that the above-entitled action be and hereby is dismissed.

                       By the Court,

<u> 3/23/22 </u>                  <u>/s/ Martin Castles </u>

    Date                   Deputy Clerk

Addendum 15