# United States Court Of Appeals
# For The First Circuit

### No. 22-1216

---

## Caius Veiovis,
## *Petitioner-Appellant*

### v.

## Collette Goguen, Superintendent
## *Respondent–Appellee*

---

### On Appeal From A Judgment Of The
### United States District Court
### For The District Of Massachusetts

---

### Appendix for the Petitioner-Appellant

---

**Dana A. Curhan**
Bar # 44690
45 Bowdoin Street
Boston, MA 02114
(617) 267-3800

**Attorney for the
Petitioner/Appellant**

# Table of Contents

1.  Docket Entries                                          1

2.  Petitioner's Habeas Petition                            5

3.  Habeas Answer                                          20

4.  Memorandum and Order (Hillman, D.J.)                   26

5.  Order of Dismissal                                     40

6.  Application for Certificate of Appealability           41

7.  Notice of Appeal                                       44

8.  *Commonwealth v. Veiovis,* 477 Mass. 472,
    78 N.E.3d 757 (2017)                                   45

# United States District Court
## District of Massachusetts (Worcester)
## CIVIL DOCKET FOR CASE #: 4:18-cv-11632-TSH

Veiovis v. Goguen
Assigned to: District Judge Timothy S. Hillman
Case in other court:  USCA - First Circuit, 22-01216
Cause: 28:2254 Petition for Writ of Habeas Corpus (State)

Date Filed: 08/02/2018
Date Terminated: 03/23/2022
Jury Demand: None
Nature of Suit: 530 Habeas Corpus
(General)
Jurisdiction: Federal Question

**Petitioner**

**Caius Veiovis**                           represented by **Dana A. Curhan**
45 Bowdoin Street
Boston, MA 02114
617-267-3800
Fax: 617-261-3805
Email: dana.curhan@gmail.com
*ATTORNEY TO BE NOTICED*

V.

**Respondent**

**Superintendent Colette Goguen**          represented by **David F. Capeless**
Massachusetts Attorney General's Office
McCormack Building
One Ashburton Place
Boston, MA 02108
413-447-5530
Email: david.f.capeless@state.ma.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gabriel T. Thornton**
Massachusetts Attorney General's Office
One Ashburton Place, 18th Flr.
Boston, MA 02108
617-963-2225
Email: gabriel.thornton@mass.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Appendix 1

| Date Filed | # | Docket Text |
|---|---|---|
| 08/02/2018 | 1 | PETITION for Writ of Habeas Corpus pursuant to 28:2254 Fee Status: IFP requested., filed by Caius Veiovis. (Attachments: # 1 Civil Cover Sheet)(Curhan, Dana) (Entered: 08/02/2018) |
| 08/02/2018 | 2 | MOTION for Leave to Proceed in forma pauperis by Caius Veiovis.(Curhan, Dana) (Entered: 08/02/2018) |
| 08/02/2018 | 3 | MOTION to Appoint Counsel by Caius Veiovis.(Curhan, Dana) (Entered: 08/02/2018) |
| 08/03/2018 | 4 | Case transferred to Central Division (Worcester). (Pacho, Arnold) (Entered: 08/03/2018) |
| 08/03/2018 | 5 | Case transferred in from Eastern Division (Boston) on 8/3/2018 Case Number 1:18-cv-11632. (Alba, Robert) (Entered: 08/03/2018) |
| 08/03/2018 | 6 | ELECTRONIC NOTICE of Case Assignment. District Judge Timothy S. Hillman assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Chief Magistrate Judge David H. Hennessy. (Alba, Robert) (Entered: 08/03/2018) |
| 08/10/2018 | 7 | District Judge Timothy S. Hillman: ORDER entered granting in part and denying in part 2 Motion for Leave to Proceed in forma pauperis and granting 3 Motion to Appoint Counsel. Appointed Dana Curhan (Castles, Martin) (Entered: 08/10/2018) |
| 09/24/2018 | 8 | Filing fee/payment: $ 5, receipt number WOR001704 for 1 Petition for Writ of Habeas Corpus (28:2254). (Burgos, Sandra) (Entered: 09/24/2018) |
| 09/24/2018 | 9 | Filing fee/payment: $ 5, receipt number WOR001705 for 1 Petition for Writ of Habeas Corpus (28:2254). (Burgos, Sandra) (Entered: 09/24/2018) |
| 07/02/2020 | 10 | District Judge Timothy S. Hillman: ORDER entered. SERVICE ORDER re 2254 Petition. Order entered pursuant to R.4 of the Rules governing Section 2254 cases for service on respondents. Answer/responsive pleading due w/in 21 days of receipt of this order.(Castles, Martin) (Entered: 07/02/2020) |
| 07/20/2020 | 11 | NOTICE of Appearance by Gabriel T. Thornton on behalf of Colette Goguen (Thornton, Gabriel) (Entered: 07/20/2020) |
| 07/22/2020 | 12 | Assented to MOTION for Extension of Time to August 18, 2020, to File Response/Reply as to 1 Petition for Writ of Habeas Corpus (28:2254) by Colette Goguen.(Thornton, Gabriel) (Entered: 07/22/2020) |
| 07/28/2020 | 13 | District Judge Timothy S. Hillman: ELECTRONIC ORDER entered granting 12 Motion for Extension of Time to August 18, 2020, to File Response/Reply as to 1 Petition for Writ of Habeas Corpus. Response due by 8/18/2020. (Castles, Martin) (Entered: 07/28/2020) |
| 08/17/2020 | 14 | Assented to MOTION for Extension of Time to September 17, 2020, to File Response/Reply *to Petition* by Colette Goguen.(Thornton, Gabriel) (Entered: 08/17/2020) |

Appendix 2

| 08/18/2020 | 15 | District Judge Timothy S. Hillman: ELECTRONIC ORDER entered granting 14 Motion for Extension of Time to September 17, 2020 to File Response/Reply to Petition.(Castles, Martin) (Entered: 08/18/2020) |
|---|---|---|
| 09/15/2020 | 16 | RESPONSE/ANSWER to *Petitioner's Petition for a Writ of Habeas Corpus* by Colette Goguen. (Thornton, Gabriel) (Entered: 09/15/2020) |
| 09/15/2020 | 17 | RESPONSE/ANSWER to *Petitioner's Petition for a Writ of Habeas Corpus* by Colette Goguen. (Attachments: # 1 Exhibit #1 - Superior Court Docket Sheet, # 2 Exhibit #2 - SJC Docket Sheet, # 3 Exhibit #3 - Petitioner's SJC Brief, # 4 Exhibit #4 - Commonwealth's SJC Brief, # 5 Exhibit #6 - Trial Transcript - Day 1, # 6 Exhibit #7 - Trial Transcript - Day 2, # 7 Exhibit #8 - Trial Transcript - Day 3, # 8 Exhibit #9 - Trial Transcript - Day 4, # 9 Exhibit #10 - Trial Transcript - Day 5, # 10 Exhibit #11 - Trial Transcript - Day 6, # 11 Exhibit #12 - Trial Transcript - Day 7, # 12 Exhibit #13 - Trial Transcript - Day 8, # 13 Exhibit #14 - Trial Transcript - Day 9, # 14 Exhibit #15 - Trial Transcript - Day 10, # 15 Exhibit #16 - Trial Transcript - Day 11, # 16 Exhibit #5 - SJC Decision)(Thornton, Gabriel) (Entered: 09/15/2020) |
| 09/15/2020 | 18 | NOTICE by Colette Goguen *Regarding Existence of Victims* (Thornton, Gabriel) (Entered: 09/15/2020) |
| 09/17/2020 | 19 | NOTICE of Change of Address or Firm Name by Dana A. Curhan (Curhan, Dana) (Entered: 09/17/2020) |
| 09/18/2020 | 20 | Assented to MOTION for Scheduling Order by Colette Goguen.(Thornton, Gabriel) (Entered: 09/18/2020) |
| 09/24/2020 | 21 | District Judge Timothy S. Hillman: ELECTRONIC ORDER entered granting 20 Motion for Scheduling Order. Petitioner to file memorandum in support of the petition for a writ of habeas corpus no later than November 17, 2020. Respondent to file a memorandum of law in opposition to the petition no later than January 6, 2021, or 45 days from the filing of the petitioner's memorandum. (Castles, Martin) (Entered: 09/24/2020) |
| 11/15/2020 | 22 | MEMORANDUM OF LAW by Caius Veiovis in Habeas Petition. (Curhan, Dana) (Entered: 11/15/2020) |
| 12/31/2020 | 23 | MEMORANDUM OF LAW by Colette Goguen in Opposition to Petition for Habeas Corpus. (Thornton, Gabriel) (Entered: 12/31/2020) |
| 01/11/2021 | 24 | NOTICE of Appearance by David F. Capeless on behalf of Colette Goguen (Capeless, David) (Entered: 01/11/2021) |
| 03/23/2022 | 25 | District Judge Timothy S. Hillman: ORDER entered. ORDER AND MEMORANDUM. The petition for a writ of habeas corpus is denied, and the case will be dismissed. (Castles, Martin) (Entered: 03/23/2022) |
| 03/23/2022 | 26 | District Judge Timothy S. Hillman: ORDER entered. ORDER DISMISSING CASE. (Castles, Martin) (Entered: 03/23/2022) |
| 03/23/2022 | 27 | NOTICE OF APPEAL re 25 ORDER AND MEMORANDUM, 26 ORDER OF DISMISSAL by Caius Veiovis Fee Status: IFP granted. NOTICE TO COUNSEL: A |

Appendix 3

| | | Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf.** US District Court Clerk to deliver official record to Court of Appeals by 4/12/2022. (Curhan, Dana) **Modified on 3/23/2022 to Correct Docket Text and Add CM/ECF Document Links to orders Being Appealed as Counsel Failed to Follow the CM/ECF NextGen Prompts When Filing the Notice of Appeal (Paine, Matthew).** **(Entered: 03/23/2022)** |
|---|---|---|
| 03/23/2022 | 28 | MOTION for Certificate of Appealability by Caius Veiovis.(Curhan, Dana) (Entered: 03/23/2022) |
| 03/24/2022 | 29 | District Judge Timothy S. Hillman: ELECTRONIC ORDER entered granting 28 Motion for Certificate of Appealability. (Castles, Martin) (Entered: 03/24/2022) |
| 03/24/2022 | 30 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 27 Notice of Appeal. (Paine, Matthew) (Entered: 03/24/2022) |
| 03/24/2022 | 31 | USCA Case Number 22-1216 for 27 Notice of Appeal, filed by Caius Veiovis. (Paine, Matthew) (Entered: 03/24/2022) |

Appendix 4

## PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
## HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| United States District Court | | District: Massachusetts | |
|---|---|---|---|
| Name (under which you were convicted): <br> Caius Veiovis | | | Docket or Case No.: |
| Place of Confinement : NCCI Gardner <br> 500 Colony Road <br> Gardner, MA 01440 | | Prisoner No.: <br> W105269 | |
| Petitioner (include the name under which you were convicted) <br> Caius Veiovis | v. | Respondent (authorized person having custody of petitioner) <br> Colette Goguen, Superintendent | |
| The Attorney General of the State of: Massachusetts | | | |

### PETITION

1.   (a) Name and location of court that entered the judgment of conviction you are challenging:

   Berkshire Superior Court, Pittsfield, MA

    

   (b) Criminal docket or case number (if you know): **11-141**

2.   (a) Date of the judgment of conviction (if you know): September

   (b) Date of sentencing: September

3.   Length of sentence: Three consecutive life sentences, with concurrent sentences of eight to ten years

4.   In this case, were you convicted on more than one count or of more than one crime? ☑ Yes    ☐ No

5.   Identify all crimes of which you were convicted and sentenced in this case:

   First degree murder (three counts)

   Kidnapping (three counts)

   Intimidating a witness (three counts)

    

6.   (a) What was your plea? (Check one)

       ☑ (1)    Not guilty      ☐ (3)    Nolo contendere (no contest)

       ☐ (2)    Guilty         ☐ (4)    Insanity plea

Appendix 5

(b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to?

_____

_____
_____
_____
_____
_____
_____

(c) If you went to trial, what kind of trial did you have? (Check one)

      ☑ Jury     ☐ Judge only

7.    Did you testify at a pretrial hearing, trial, or a post-trial hearing?

       ☐ Yes    ☑ No

8.    Did you appeal from the judgment of conviction?

      ☑ Yes    ☐ No

9.    If you did appeal, answer the following:

(a) Name of court:    Supreme Judicial Court

(b) Docket or case number (if you know):    SJC-12017

(c) Result:    Judgments affirmed

(d) Date of result (if you know):   July 19, 2

(e) Citation to the case (if you know):    Commonwealth v. Veiovis, 477 Mass. 472 (2017)

(f) Grounds raised:   1. Evidence insufficient to support conviction; 2. Erroneous admission of highly

inflammatory evidence; 3. Erroneous admission of highly prejudicial testimony; 4. Improper closing

statement referencing facts not in evidence; 5. Challenge to weight of the evidence under G.L. c. 278,

§ 33E.

_____
_____
_____
_____

(g) Did you seek further review by a higher state court?     ☐ Yes    ☑ No

     If yes, answer the following:

     (1) Name of court: _____

     (2) Docket or case number (if you know): _____

     (3) Result: _____

_____

Appendix 6

(4) Date of result (if you know): _____

(5) Citation to the case (if you know): _____

(6) Grounds raised: _____

_____

_____

_____

(h) Did you file a petition for certiorari in the United States Supreme Court?　　□ Yes　　☑ No

If yes, answer the following:

(1) Docket or case number (if you know): _____

(2) Result: _____

_____

(3) Date of result (if you know): _____

(4) Citation to the case (if you know): _____

10. Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court?　　□ Yes　　☑ No

11. If your answer to Question 10 was "Yes," give the following information:

(a)　(1) Name of court: _____

(2) Docket or case number (if you know): _____

(3) Date of filing (if you know): _____

(4) Nature of the proceeding: _____

(5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

□ Yes　　□ No

(7) Result: _____

Appendix 7

(8) Date of result (if you know): _____

(b) If you filed any second petition, application, or motion, give the same information:

    (1) Name of court: _____

    (2) Docket or case number (if you know): _____

    (3) Date of filing (if you know): _____

    (4) Nature of the proceeding: _____

    (5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

_____

    (6) Did you receive a hearing where evidence was given on your petition, application, or motion?

        ☐ Yes    ☐ No

    (7) Result: _____

    (8) Date of result (if you know): _____

(c) If you filed any third petition, application, or motion, give the same information:

    (1) Name of court: _____

    (2) Docket or case number (if you know): _____

    (3) Date of filing (if you know): _____

    (4) Nature of the proceeding: _____

    (5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

_____

_____

Appendix 8

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

    ☐ Yes    ☐ No

(7) Result: _____

(8) Date of result (if you know): _____

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application,

or motion?

    (1) First petition:    ☑ Yes    ☐ No

    (2) Second petition:    ☐ Yes    ☐ No

    (3) Third petition:    ☐ Yes    ☐ No

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

_____

_____

12.    For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground. Any legal arguments must be submitted in a separate memorandum.

    **CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.**

**GROUND ONE:** Conviction violated the petitioner's right to due process where the evidence was legally

insufficient to support the verdict of guilty.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

No witness identified the petitioner as a participant in the charged offenses. No circumstantial or forensic evidence

linked him to the crimes. The verdict was based entirely on speculation that fell far short of establishing his guilt

on the charged offenses.

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground One, explain why: _____

_____

_____

_____

_____

Appendix 9

(c)     **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?     ☑ Yes     ☐ No

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐ Yes     ☑ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion or petition?     ☐ Yes     ☐ No

(4) Did you appeal from the denial of your motion or petition?     ☐ Yes     ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?     ☐ Yes     ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

_____

Appendix 10

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground One: _____

_____

**GROUND TWO:** _____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Two, explain why: _____

_____

_____

(c)   **Direct Appeal of Ground Two:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?    ☐   Yes    ☐   No

    (2) If you did <u>not</u> raise this issue in your direct appeal, explain why: _____

_____

_____

(d)   **Post-Conviction Proceedings:**

    (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

        ☐   Yes    ☐   No

    (2) If your answer to Question (d)(1) is "Yes," state:

    Type of motion or petition: _____

    Name and location of the court where the motion or petition was filed: _____

_____

    Docket or case number (if you know): _____

Appendix 11

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

| (3) Did you receive a hearing on your motion or petition? | ☐ Yes | ☐ No |
|---|---|---|
| (4) Did you appeal from the denial of your motion or petition? | ☐ Yes | ☐ No |
| (5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? | ☐ Yes | ☐ No |

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

_____

(e)  **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Two : _____

_____

_____

_____

**GROUND THREE:** _____

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

Appendix 12

(b) If you did not exhaust your state remedies on Ground Three, explain why: _____

_____

_____

_____

(c)     **Direct Appeal of Ground Three:**

      (1) If you appealed from the judgment of conviction, did you raise this issue?      ☐  Yes     ☐ No

      (2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(d)     **Post-Conviction Proceedings:**

      (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

          ☐ Yes     ☐  No

      (2) If your answer to Question (d)(1) is "Yes," state:

      Type of motion or petition: _____

      Name and location of the court where the motion or petition was filed: _____

_____

      Docket or case number (if you know): _____

      Date of the court's decision: _____

      Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

      (3) Did you receive a hearing on your motion or petition?      ☐  Yes     ☐ No

      (4) Did you appeal from the denial of your motion or petition?      ☐  Yes     ☐ No

      (5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ☐  Yes     ☐ No

      (6) If your answer to Question (d)(4) is "Yes," state:

      Name and location of the court where the appeal was filed: _____

_____

      Docket or case number (if you know): _____

      Date of the court's decision: _____

      Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

_____

Appendix 13

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Three: _____

_____

_____

**GROUND FOUR:** _____

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Four, explain why: _____

_____

_____

_____

(c) **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?　　　□ Yes　　□ No

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

　　　□ Yes　　□ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Appendix 14

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion or petition?    ☐ Yes    ☐ No

(4) Did you appeal from the denial of your motion or petition?    ☐ Yes    ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?    ☐ Yes    ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

_____

_____

_____

(e)    **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Four: _____

_____

_____

_____

_____

_____

_____

Appendix 15

13.    Please answer these additional questions about the petition you are filing:

(a)    Have all grounds for relief that you have raised in this petition been presented to the highest state court
having jurisdiction?      ☑ Yes      ☐    No
If your answer is "No," state which grounds have not been so presented and give your reason(s) for not
presenting them: _____

_____

_____

_____

(b)    Is there any ground in this petition that has not been presented in some state or federal court? If so, which
ground or grounds have not been presented, and state your reasons for not presenting them:
No. _____

_____

_____

14.    Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction
that you challenge in this petition?      ☐    Yes      ☑ No
If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues
raised, the date of the court's decision, and the result for each petition, application, or motion filed. Attach a copy
of any court opinion or order, if available. _____

_____

_____

_____

_____

_____

_____

_____

15.    Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for
the judgment you are challenging?      ☐    Yes      ☑ No
If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues
raised. _____

_____

_____

_____

_____

Appendix 16

16. Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing:

(b) At arraignment and plea: James Gavin Reardon, currently an associate justice of the Massachusetts Superior Court

(c) At trial: James Gavin Reardon

(d) At sentencing: James Gavin Reardon

(e) On appeal: Dana Curhan, 45 Bowdoin Street, Boston, MA 02114

(f) In any post-conviction proceeding:

(g) On appeal from any ruling against you in a post-conviction proceeding:

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?     ☐ Yes  ☑ No

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future?     ☐ Yes  ☐ No

18. TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*

The petition is timely.

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

---

\* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

(1)    A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of -

    (A)    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

    (B)    the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

    (C)    the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

    (D)    the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

Appendix 18

(2)    The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Therefore, petitioner asks that the Court grant the following relief:    Vacate the judgment of conviction and order that

all counts of the indictment be dismissed

or any other relief to which petitioner may be entitled.

/s/ Dana A. Curhan

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on          (month, date, year).

Executed (signed) on    AUG. 2, 2018   (date).

Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition.

Appendix 19

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| **CAIUS VEIOVIS,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 4:18-cv-11632-TSH** |
| ) | |
| **COLETTE M. GOGUEN,** ) | |
| ) | |
| **Respondent.** ) | |
| _____ ) | |

## RESPONDENT'S ANSWER TO THE PETITIONER'S
## PETITION FOR A WRIT OF HABEAS CORPUS

Pursuant to Rule 5 of the Rules Governing Habeas Corpus Cases Under Section 2254, the

respondent, Colette M. Goguen, hereby answers the petition for a writ of habeas corpus filed by

the petitioner, Caius Veiovis.

1.   (a)-(b) Admitted.

2.  (a). Denied.  Answering further, the respondent states that the date on which the

judgment of conviction entered was September 26, 2014.

(b). Denied. Answering further, the respondent states that the date on which the sentence

entered was September 29, 2014.

3.  Admitted.

4.  Admitted.

5.  Admitted.

6.  (a). Admitted.

(b). Left blank by the petitioner.

(c). Admitted.

1

**Appendix 20**

7.  Agreed.

8.  Admitted.

9.  (a)-(c). Admitted.

   (d).    Denied.  Answering further, the respondent states that the date on which the

           Massachusetts Supreme Judicial Court issued its decision that affirmed the

           petitioner's conviction was July 19, 2017.

   (e).    Admitted.

   (f).    The grounds for the petitioner's appeal are set forth in his brief, which was filed

           in the Massachusetts Supreme Judicial Court, and speak for themselves.  To the

           extent the petitioner's summary of those grounds differs from his actual filings,

           the respondent denies his allegations.

   (g).    Admitted.

   (h).    Admitted.

10. Admitted.

11. (a)-(c). Left blank by the petitioner.

    (d)(1).  Admitted.

    (d)(2)-(3). Left blank by the petitioner.

    (e). Left blank by the petitioner.

12.    **<u>GROUND ONE</u>:**

       (a).    The respondent states that paragraph 12 of the petition contains legal

               arguments and conclusions of law to which no response is required.  To the

               extent that a response is deemed necessary, the respondent denies the factual

               allegations contained in paragraph 12 of the petition insofar as they are

2

    inconsistent with the state-court record, or are inconsistent with the facts found by the Massachusetts Supreme Judicial Court in <u>Commonwealth v. Veiovis</u>, 477 Mass. 472, 78 N.E. 3rd 757 (2017).

(b).    Left blank by the petitioner.  To the extent the petitioner's failure to offer allegations is intended or construed as an assertion that the claim in Ground One is exhausted, the respondent denies that a federal claim coextensive with Ground One was presented to the state courts.

(c)(1).  Denied.

(c)(2).  Left blank by the petitioner.

(d)(1).  Admitted.

(d)(2)-(7).  Left blank by the petitioner.

(e).    Left blank by the petitioner.


**GROUND TWO:**

    Left blank by the petitioner.

**GROUND THREE:**

    Left blank by the petitioner.

**GROUND FOUR:**

    Left blank by the petitioner.

13.    (a). Admitted.

       (b). Admitted.

14.    Admitted.

15.    Admitted.

16.     (a) Left blank by the petitioner.

        (b)-(e).     Admitted.

        (f)-(g) Left blank by the petitioner.

17.     Admitted.

18.     This paragraph contains a conclusion of law to which no response is required.

        Pursuant to Rule 5(b) of the Rules Governing Habeas Corpus Cases Under Section 2254, the respondent states that the petitioner's action is defective for the reasons stated in the Affirmative Defenses listed below.  The information and/or materials required by Rules 5(c) and 5(d), and this Court's order of November 1, 2019, are contained in the respondent's Supplemental Answer, filed on the same day as this Answer.

## First Affirmative Defense

        The state court's adjudication of the petitioner's claims was not contrary to or an unreasonable application of clearly-established Supreme Court law; nor was it based upon an unreasonable determination of facts in light of the evidence presented in the state court proceedings.  See 28 U.S.C. § 2254(d).

## Second Affirmative Defense

        The petitioner cannot rebut the presumption of correctness accorded to the state court's factual determinations underlying his purportedly federal constitutional claims.  See 28 U.S.C. § 2254(e)(1).

## Third Affirmative Defense

        The petition should be denied to the extent that the decision of the state court below rests on a state-law ground that is both independent of the federal questions the petitioner presents here and adequate to support the judgment.

4

Appendix 23

## Fourth Affirmative Defense

The petition should be dismissed to the extent it fails to state a claim upon which habeas corpus relief may be granted.

## Fifth Affirmative Defense

The petition should be dismissed to the extent one or more of its claims are harmless under the standards set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993).

## Sixth Affirmative Defense

The petition should be denied if and to the extent that the relief sought would create or apply a new rule of constitutional law that cannot be applied retroactively on collateral review.

## Seventh Affirmative Defense

The petition should be denied to the extent that any of its grounds for relief are premised solely on matters of state law.

## Eighth Affirmative Defense

The petition should be denied to the extent one or more of its grounds for relief are unexhausted.

## Ninth Affirmative Defense

The petitioner is not in custody in violation of the Constitution, laws, or treaties of the United States.  See 28 U.S.C. §§ 2241(c), 2254(a).

The respondent respectfully reserves the right to amend or supplement this Answer and the Supplemental Answer in the future should that need arise.

5

Respectfully submitted,

MAURA HEALEY
Attorney General

 /s/ David F. Capeless
David F. Capeless (BBO # 072570)
Special Assistant Attorney General
Criminal Bureau
One Ashburton Place
Boston, Massachusetts  02108
(617) 727-2200
david.f.capeless@state.ma.us

Dated:  September 15, 2020

## **CERTIFICATE OF SERVICE**

I hereby certify that this document was filed through the ECF system on September 15, 2020, and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), including Dana Curhan, Esq., counsel for the petitioner in this matter. There are no non-registered participants involved in this case.

Dated:  September 15, 2020                    /s/ David F. Capeless
                                             David F. Capeless

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CAIUS VEIOVIS,                    ) | |
| )| CIVIL ACTION |
| Petitioner,        )| NO.  4:18-11632-TSH |
| )| |
| v.                        )| |
| )| |
| SUPERINTENDENT COLETTE    )| |
| GOGUEN,                    )| |
| )| |
| Respondent.       )| |
| )| |

ORDER AND MEMORANDUM ON PETITIONER'S PETITION FOR A WRIT OF
HABEAS CORPUS (Docket No. 1)

March 23, 2022

HILLMAN, D.J.

A jury convicted petitioner Caius Veiovis of three counts of murder in the first degree,
three counts of kidnapping, and three counts of witness intimidation, in connection with the
killings of David Glasser, Edward Frampton, and Robert Chadwell.  The prosecution's theory was
that Veiovis, along with Adam Hall and David Chalue, killed Glasser to prevent Glasser from
testifying against Hall at an upcoming criminal trial.  When Hall, Chalue, and Veiovis arrived at
Glasser's home to do so, Frampton and Chadwell were there too.  Hall, Chalue, and Veiovis killed
Frampton and Chadwell to silence them as well.

Following his convictions, Veiovis appealed to the Massachusetts Supreme Judicial Court
("SJC").  He argued, *inter alia*, that the evidence was insufficient to support his convictions.  The
SJC affirmed.  *See Commonwealth v. Veiovis*, 477 Mass. 472, 474 (2017).  Veiovis now petitions

for a writ of habeas corpus in accordance with 28 U.S.C. § 2254.  (Docket No. 1).  For the following

reasons, the Court ___**denies**___ his petition.

## Background

The following facts are drawn from the SJC's decision affirming Veiovis's convictions,

supplemented by facts from the record consistent with the SJC's findings.  *See Pina v. Maloney*,

565 F.3d 48, 50 (1st Cir. 2009).

In July 2009, Hall beat Glasser with a baseball bat because Hall believed that Glasser had

stolen from him.  Glasser went to the police, and Hall was arrested and charged with assault and

battery by means of a dangerous weapon.  In July 2010, while that charge was pending, Hall

attempted to discredit Glasser by framing him for kidnapping.  One of Hall's friends, Nicole

Brooks, falsely reported to police that Glasser had kidnapped her and shot at her while she escaped.

Another of Hall's friends, Scott Langdon, planted a gun in Glasser's truck.  Police eventually saw

through Hall's scheme and brought additional charges against him and his friends.

In August 2011, Hall began spending time with Chalue and Veiovis.  Hall was a ranking

member of the Hells Angels motorcycle club.  Veiovis was not a member, but he wore a vest with

the club's insignia and kept a club sticker in his car (a Jeep) and apartment.  In Veiovis's presence,

Hall told a witness something about Veiovis "possibly getting a motorcycle and becoming a

prospect for the Hells Angels."

On Friday, August 26, 2011, Hall, Chalue, Veiovis, and Katelyn Carmin were driving in

Hall's car (a Buick) as Hall ranted about a person who had robbed him and "snitched" on him.

Hall said he was "going to kill that motherfucker."  Veiovis and Chalue assured Hall that he was

going to "get him."  The group eventually made their way to the Hells Angels clubhouse in Lee,

Massachusetts.  As Chalue, Veiovis, and Carmin were riding all-terrain vehicles, Hall told Carmin to be careful because he needed Chalue and Veiovis for "a job."

The following morning, Saturday, August 27, 2011, Hall was seen speaking with Veiovis outside of Veiovis's girlfriend's apartment.  In the early afternoon, Hall, Chalue, and Veiovis went to a Hells Angels party in Springfield, Massachusetts.  Hall and Veiovis left together and returned around 4:30 P.M.  Hall, Chalue, and Veiovis left together at 6:30 P.M.

That evening, Hall, Chalue, and Veiovis met Allyson Scace and Kayla Sewell at the Hells Angels clubhouse before going to Veiovis's apartment in Pittsfield, Massachusetts.  Chalue, Veiovis, Scace, and Sewell drove to Pittsfield in Scace's car.  Hall drove separately, stopping at Steven Hinman's house on the way.  Hall showed Hinman a .45 semiautomatic pistol in his vest, as well as a "dog food bag" that contained a .44 Magnum revolver, a sawed-off AR-15-type weapon, and a small revolver.  When Hall arrived at Veiovis's apartment, Hall pulled the guns out of the bag and asked Veiovis where he kept brake cleaner and gloves.  Veiovis directed him to a cabinet and went upstairs with Sewell.  While Veiovis and Sewell were upstairs, Hall and Chalue disassembled and cleaned the guns.  Although Veiovis asked Sewell to stay longer, Sewell and Scace left Veiovis's apartment around 9 P.M.

Glasser, Frampton, and Chadwell also lived in Pittsfield.  Around 10:30 P.M., Glasser's upstairs neighbor asked Glasser to move his truck, which was in the shared driveway of their building.  The upstairs neighbor saw Glasser, Frampton, Chadwell, and a fourth man in Glasser's apartment.  At 11:21 P.M., a call was made from Chadwell's cell phone.  Shortly after midnight, the upstairs neighbor heard banging from the front downstairs hallway.  She could hear Glasser's voice, Frampton's voice, and some unfamiliar voices.

Early Sunday morning, Veiovis's girlfriend tried to contact Veiovis on his cell phone. She called and left a message at 12:09 A.M.; she texted at 1:20 A.M.; and she called and left another message at 1:40 A.M. Veiovis did not respond.

Around 1:30 A.M., Hall appeared at Rose Dawson's house in Pittsfield. Hall borrowed Dawson's cell phone and said that he would be back soon. Hall got into a vehicle described as a Jeep Wrangler and left. One witness described the Jeep as yellow; another witness described the Jeep as green. Veiovis owned a black Jeep Wrangler.

Around 5:30 A.M., Hall purchased three candy bars and a pack of cigarettes from a convenience store in Pittsfield. Hall had mud on his shirt, and his boots and jeans were wet, as was the cash he used to pay for the items. A tropical storm had hit western Massachusetts that night. Hall left the convenience store and returned a few minutes later to purchase a pack of Black and Mild cigars. Police later found Black and Mild cigar wrappers in Veiovis's apartment and Jeep.

Shortly thereafter, Hall returned to Dawson's house and parked his Buick on the front lawn. Hall got out of the Buick and walked to Veiovis's Jeep, which was waiting out in the road. Hall got into the passenger side of the Jeep, and the Jeep drove off.

Around 10:30 A.M., Hall returned to Dawson's house in Veiovis's Jeep with Chalue and Veiovis; Hall was driving. Hall was wet and not wearing shoes. Hall asked Dawson and another friend, Alexandra Ely, who was staying at Dawson's house, to go to Hall's house in Peru, Massachusetts to make breakfast. He gave them money, which was soaking wet, and told them to wash their hands after handling it. He also told them to buy bleach and not to touch or look inside a bag on the passenger-side floor of the Buick. Taking the Buick to get food and to go to Peru, the women looked inside the bag and saw what looked like a "batting glove or golf glove."

Appendix 29

When Dawson and Ely arrived at Hall's house, Chalue was in bed, and Veiovis was sitting in a recliner "sleeping" and looking "tired." Hall was "exited" and "jumpy." Hall returned Dawson's cell phone to her, telling her to delete the call log and not to tell anyone that he had borrowed it. Dawson and Ely left in the Buick to return to Dawson's house. Hall, Chalue, and Veiovis retrieved the Buick from Dawson's house later that day.

Around 2 P.M., Hall arrived at David Casey's house in Canaan, New York, which is approximately eighteen miles from Pittsfield. Hall told Casey that he was looking for a spot to park his car overnight. Casey arranged for Hall to park at Al Pavoni's house in Becket, Massachusetts.

Hall then told Casey that he had killed Glasser, "a fat guy," and a black man. In recounting the killings, Hall described that Glasser took off into the woods. Hall "told one of the other guys to go after him." After "Davey" did so and brought Glasser back, Hall shot Glasser. They "chopped them up," and "one of the guys really enjoyed torturing and cutting them up." It was "raining very hard" while this was happening.

Hall asked Casey if he was still working with an excavator at a property in Becket, and Casey said that he was. Hall told Casey that if he dug a hole for him to bury the bodies, he would not harm Langdon, who was engaged to and living with Casey's sister. Casey also knew that Langdon was cooperating with police regarding Hall's criminal charges. Hall wanted to dig the hole that day, but Casey worried that the property owner in Becket might be home, so he suggested waiting a day. Casey said he would meet Hall at the property on Monday morning.

Hall parked the Buick at Pavoni's house in Becket between 5 P.M. and 6 P.M. Someone was with Hall in the Buick. A "Jeep-like vehicle" arrived to pick Hall up. Late in the afternoon,

Appendix 30

Hall, Chalue, and Veiovis were seen standing near Veiovis's Jeep in the parking lot of Veiovis's girlfriend's apartment in Pittsfield.

On Monday morning, Hall and Casey met at Pavoni's house. Hall was with a man he called "Davey." Hall told Casey he could trust "Davey" because he was a member of the Aryan Brotherhood, and a person had to kill someone to become a member. At trial, Casey identified the man as Chalue. Hall opened the trunk of the Buick and said that it was "starting to smell." Hall drove the Buick to the other property in Becket, where Casey used his excavator to dig a large hole. Hall took a number of large plastic garbage bags from the Buick and dropped them into the hole.

That afternoon, Hall and Chalue brought the Buick to a salvage yard and sold it for scrap. The interior carpets were coated with liquid, the back seat was mostly missing, and the carpet had been removed from the trunk. The car was later crushed.

On Sunday, September 4, Hall, Chalue, and Veiovis drove past the salvage yard in Veiovis's Jeep, and then drove back in the other direction. Police stopped the Jeep at a nearby gas station; they seized and searched the Jeep but found nothing of evidentiary value.

On Friday, September 9, Casey told police the location of the bodies. Police uncovered the bodies, which were confirmed to be those of Glasser, Frampton, and Chadwell. An autopsy revealed that all three victims had been shot and stabbed, and that their neck, arms, and legs had been removed. Two of the bodies also had been cut through the torso. The dismemberment was largely the result of chopping or hacking with a sharp instrument such as a butcher knife.

On September 10, Veiovis was arrested. At the Pittsfield police station, an officer told Veiovis that Hall was a "rat" because Hall had offered to cooperate with the FBI regarding the

Hells Angels.  As Veiovis was walking back to his cell, he said to Chalue, "[Y]ou hear what they're saying about our partner?  They're saying he's a stoolie."

On September 12, police searched Veiovis's apartment.  They found two newspaper articles describing the disappearance of Glasser, Frampton, and Chadwell.  They also found anatomical drawings from a medical textbook with images of human dissections and amputation of body parts.  They further found a machete, a cleaver, hatchets, various knives, and a baseball bat with spikes.  None of the items tested positive for blood, so they were not seized.

Veiovis was charged with three counts of murder, three counts of kidnapping, and three counts of witness intimidation.[1]  A jury found him guilty on all counts.[2]  As to murder, the jury found him guilty on a theory of deliberate premeditation.  Veiovis appealed.  He argued, *inter alia*, that the evidence was insufficient to support his convictions.  The SJC affirmed.[3]  Veiovis subsequently petitioned for habeas relief.  He argues that his convictions violate his right to due process because they are based on insufficient evidence.

## Standard of Review

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a federal court shall not grant a petition for habeas relief "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the state court proceedings "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based

---

[1] Hall and Chalue also were charged.  Each defendant was tried separately.

[2] Juries also convicted Hall and Chalue of three counts of murder in the first degree.

[3] Two judges dissented, disagreeing with the majority's analysis of an evidentiary issue. The dissenting judges agreed, however, that the evidence was legally sufficient to support Veiovis's convictions.  *See Veiovis*, 78 N.E.3d at 774.

on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

**<u>Discussion</u>**

Veiovis asserts one ground for habeas relief: that the evidence presented at his trial was legally insufficient to support his convictions.  Veiovis focuses specifically on his murder convictions.  The federal constitutional standard for measuring the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  The prosecution proceeded on a theory of joint venture liability.  "At its core, joint venture criminal liability has two essential elements: that the defendant knowingly participated in the commission of the crime charged, and that the defendant had or shared the required criminal intent."  *Commonwealth v. Zanetti*, 454 Mass. 449, 467 (2009).  Veiovis was convicted of deliberately premeditated murder, the elements of which are that the defendant caused the death of the victims, intended to kill the victims, and acted with deliberate premeditation.  *Commonwealth v. Tejada*, 484 Mass. 1, 4 (2020).

The SJC applied the correct standard.  The SJC sought to determine whether, "after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Veiovis*, 477 Mass. at 479 (citing *Commonwealth v. St. Hilaire*, 470 Mass. 338, 343 (2015) (emphasis in original)).  "The SJC relied on Massachusetts case law that has expressly adopted the federal constitutional standard in *Jackson*."  *O'Laughlin v. O'Brien*, 568 F.3d 287, 299 n.15 (1st Cir. 2009).

The SJC's application of the law was not unreasonable.  In the SJC's view, the evidence suggested that Veiovis had knowledge of Hall's plan to kill Glasser and a motive to assist Glasser

8

in the killing. *Veiovis*, 477 Mass. at 480. Veiovis "did not dispute that there was abundant evidence that Hall and Chalue participated in the killings," and there was "credible evidence" that a third person participated in the killings with them. *Id.* at 474, 481. The evidence put Veiovis with Hall and Chalue immediately before and immediately after the killings. *Id.* at 480-81. Had Veiovis not participated in the killings, moreover, it is unlikely that Veiovis would have referred to Hall as "our partner" in a comment to Chalue or kept newspaper articles mentioning the victims' disappearance. *Id.* at 481. The SJC concluded that "the evidence was sufficient to support a finding beyond a reasonable doubt that [Veiovis], with the intent to kill, knowingly participated in the premeditated murder of the three victims." *Id.* at 480 (citing *Zanetti*, 454 Mass. at 467).

Veiovis contends that the SJC misapplied the *Jackson* standard and allowed his convictions to stand on less than proof beyond a reasonable doubt. Veiovis notes that no physical or forensic evidence connected him to the crimes; that the murder scene was never found; that no evidence linked him to the burial scene; and that there was no percipient witness to the crimes. He argues that the only link between him and the crimes was his association with Hall and Chalue before and after the killings. The evidence against Veiovis was entirely circumstantial, as the SJC acknowledged. *Id.* at 480. But circumstantial evidence alone may be sufficient to establish guilt beyond a reasonable doubt. *See Morgan v. Dickhaut*, 677 F.3d 39, 47 (1st Cir. 2012).

Veiovis understates the circumstantial evidence against him. *See Housen v. Gelb*, 744 F.3d 221, 225 (1st Cir. 2014). As the SJC noted, a jury reasonably could have inferred that Veiovis had knowledge of Hall's plan to kill Glasser. On the Friday before the killings, Veiovis was driving with Hall and others when Hall, referring to Glasser, said he was "going to kill that motherfucker." Veiovis assured Hall that Hall was going to "get him." A reasonable jury also could have inferred that Veiovis wanted to curry favor with Hall. Veiovis had a demonstrated interest in the Hells

Appendix 34

Angels, and Hall was a ranking member of the Hells Angels.  Hall apparently saw Chalue as trustworthy; Hall told Casey that Casey could "trust" Chalue because Chalue was "an Aryan brother," and "you [have] to kill someone to get in."  A reasonable jury could have inferred that Veiovis similarly wanted to gain Hall's trust, and that Veiovis believed that assisting Hall in the killings was one way to do so.

A reasonable jury could have inferred that the killings occurred early Sunday morning. Glasser's upstairs neighbor last saw the victims at around 10:30 P.M. on Saturday night, and she heard banging and voices shortly after midnight.  The SJC noted that there was "credible evidence" that a third person participated in the killings with Hall and Chalue.  *Veiovis*, 477 Mass. at 481. Indeed, when Hall described the killings to Casey, Hall at times mentioned "one of the other guys" and "one of the guys," suggesting that at least two people were with him.  At 5:30 A.M. on Sunday morning, moreover, Hall bought three candy bars from a convenience store, cigarettes, and a brand of cigars smoked by Veiovis.

Veiovis was with Hall and Chalue at least as of 9 P.M. on Saturday night, when Scace and Sewell left the three men in Veiovis's apartment.  Between midnight and 2 A.M., Veiovis's girlfriend tried contacting Veiovis's cell phone three times; Veiovis did not respond.  At 1:30 A.M., Hall arrived at Dawson's house in a Jeep.  A reasonable jury could have inferred that it was Veiovis's Jeep, and that Veiovis was in it.  Soon after 5 A.M., Hall arrived at Dawson's house, followed by Veiovis's Jeep.  Hall left in Veiovis's Jeep and later returned with Chalue and Veiovis. That morning at Hall's house, Veiovis appeared to be tired.  A reasonable jury could have inferred that Veiovis was with Hall and Chalue when the victims were killed, or in other words, that Veiovis was "one of the other guys."

10

Appendix 35

Finally, Veiovis's actions after the killing -- his collection of two articles on the victims' disappearance, and his comment to Chalue that Hall was their "partner" -- were probative of his involvement in the killings.  The facts recited above, when taken together, support a finding of guilt beyond a reasonable doubt.  Hall admitted to Casey that he had killed the victims; Hall implicated Chalue and a third assailant.  The SJC's conclusion that, viewing the evidence in the light most favorable to the prosecution, Veiovis could have been found to be that third assailant beyond a reasonable doubt was not unreasonable.[4]

Veiovis next argues that while Casey referred to a third assailant, Casey did not identify Veiovis, and the only name Casey mentioned other than "Davey" was "Langdon."  Veiovis asserts that this renders his involvement in the killings speculative.  At trial, when the prosecutor asked Casey whether he remembered Hall making a comment "relative to a third person that was with him . . . making some comment about somebody else who was involved," Casey responded, "Langdon?"  The prosecutor then said, "No.  In talking about the -- when he was . . . talking about the killing . . . do you remember him talking about another guy, the way that guy acted?"  The prosecutor then showed Casey something to refresh his memory, at which point Casey recounted that Hall had said "that one of the guys really enjoyed torturing and cutting them up."  Later, Casey testified that Hall told him that he would not harm Langdon, who was engaged to and living with Casey's sister, if Casey helped him bury the bodies.

The SJC did not mention Casey's "Langdon" comment in its decision, although the SJC did explain Casey's connection to Langdon, and Hall's comment that no harm would come to Langdon if Casey helped bury the bodies.  Casey's testimony reasonably can be read as not

---

[4] The circumstantial evidence here is more compelling than the circumstantial evidence in *O'Laughlin v. O'Brien*, 568 F.3d 287 (1st Cir. 2009).

implicating Langdon in the killings, and the SJC's recitation of the facts suggests an implicit understanding of that reading.  *See Teti v. Bender*, 507 F.3d 50, 59 (1st Cir. 2007).  In any event, even if Casey's testimony can be understood to implicate Langdon in some way, the "Langdon" comment does not exculpate Veiovis in a way that renders unsupported a finding that Veiovis knowingly and intentionally participated in the killings.

Veiovis last argues that the SJC overlooked several significant facts suggesting that he was not the third accomplice.  First, Veiovis was not involved in Hall's previous schemes to discredit Glasser.  Second, while Hall and Chalue were cleaning guns in Veiovis's apartment on Saturday night, Veiovis was upstairs with Sewell.  Third, while witnesses described Hall as wet early on Sunday morning, no one described Veiovis as wet.  Fourth, unlike Hall and Chalue, Veiovis did not dispose of any evidence after the killings.  Fifth, Veiovis's "our partner" comment to Chalue could have been about the three men being arrested together or friends.  Sixth, Hall's statement to Carmin that he needed Veiovis for "a job" could have been about a construction project at Hall's house.  Finally, even if Veiovis wanted to join the Hells Angels, the prosecution presented no evidence to suggest that killing three people would have advanced his membership in the club.

Veiovis reasonably explains why, contrary to the prosecution's theory, some of the evidence presented at trial might not have implicated him in the crimes.  But the standard for measuring the sufficiency of the evidence, as applied by the SJC and required by the federal constitution, requires viewing the evidence in the light most favorable to the prosecution.  *Jackson*, 443 U.S. at 319.  And here, the SJC explicitly considered that Hall and Chalue cleaned guns at Veiovis's apartment, that Veiovis appeared tired on Sunday morning, that Veiovis referred to Hall as "our partner," and that Veiovis wanted to join the Hells Angles.  The SJC reasonably concluded that a jury could have drawn reasonable inferences from this evidence implicating Veiovis in the

Appendix 37

killings.  Even if some evidence was neutral or pointed the other way, it was not unreasonable for the SJC to determine that a jury could have found Veiovis guilty of first-degree murder beyond a reasonable doubt.  Accordingly, Veiovis's petition for a writ of habeas corpus must be denied.

**<u>Conclusion</u>**

For the reasons stated, Veiovis's petition for a writ of habeas corpus is **_<u>denied</u>_**, and the case will be dismissed.

## Certificate of Appealability

The statute governing appeals of final orders in habeas proceedings provides that an appeal is not permitted "[u]nless a circuit justice or judge issues a certificate of appealability."  28 U.S.C. § 2253(c)(1).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To make a "substantial showing," a petitioner must demonstrate that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks omitted).  This is a low bar; a claim can be considered "debatable" even if every reasonable jurist would agree that the petitioner will not prevail.  *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003).

Given the circumstantial nature of this case, reasonable jurists could debate the significance of various aspects of the trial record, on which Veiovis's insufficiency of the evidence claim depends.  Accordingly, the Court grants a certificate of appealability.

**SO ORDERED**

*/s/ Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**

14

Appendix 39

UNITED STATES DISTRICT COURT
**DISTRICT OF MASSACHUSETTS**

Caius Veiovis,
              Petitioner,       CIVIL ACTION

      V.                 NO. <u>18-11632-TSH</u>

Colette Goguen,
              Respondent,

<u>ORDER OF DISMISSAL</u>

HILLMAN, D.J.

    In accordance with the Court's Order, dated<u> 3/23/22 </u>
dismissing the petition for writ of habeas corpus under 28 U.S.C.
§2254, it is hereby ORDERED that the above-entitled action be and
hereby is dismissed.

                                  By the Court,

<u> 3/23/22 </u>                     <u>/s/ Martin Castles </u>
   Date                    Deputy Clerk

Appendix 40

United States District Court
District of Massachusetts

———————————————

Civil Action No. 4:18-cv-11632-TSH

**Caius Veiovis,**
*Petitioner*

v.

**Colette Goguen, et al,**
*Respondents*

———————————————

## Application For A Certificate Of Appealability
———————————————

Now comes the petitioner Caius Veiovis, and requests that this Court issue a certificate of appealability ("COA") under 28 U.S.C. § 2253. In support thereof, Veiovis states that he has made a substantial showing in his habeas petition that the trial and appellate process in the Massachusetts courts has been impaired to the point where his constitutional rights were compromised. *See* 28 U.S.C. § 2253(c)(2) (COA should issue "if the applicant has made a substantial showing of the denial of a constitutional right"). Specifically, in his habeas petition, Veiovis challenged the sufficiency of the evidence. While Veiovis respects the decision of this Court, he nevertheless contends that his sufficiency challenge is "debatable among jurists of reason[.]" *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983). *See Miller-*

*El v. Cockrell*, 537 U.S. 322, 330 (2003). *Compare Ouimette v. Moran*, 942 F.2d 1, 9-12 (1991).

This Court's decision reflects a familiarity with the record and a careful analysis of his sufficiency challenge. Veiovis will not repeat his arguments, as this Court is certainly familiar with them. But as both this Court and the Supreme Judicial Court of Massachusetts acknowledged, the case against Veiovis was entirely circumstantial. Further, as this Court acknowledged, some of this circumstantial evidence points to someone other than Veiovis as the third person involved in the killing. Notwithstanding this Court's decision, an appellate court reviewing his challenge could come to a different conclusion than this Court did as to the sufficiency of the evidence. Veiovis therefore asks for an opportunity to address his challenge before the Court of Appeals and requests that this Court issue a certificate of appealability.

Respectfully submitted,

Caius Veiovis,
*By his attorney,*

/s/ Dana Alan Curhan
Dana Alan Curhan
B.B.O. # 544250
45 Bowdoin Street
Boston, MA 02114
(617) 267-3800
dana.curhan@gmail.com

United States District Court
District of Massachusetts

_____

Civil Action No. 4:18-cv-11632-TSH

**Caius Veiovis,**
*Petitioner*

v.

**Colette Goguen, et al,**
*Respondents*

_____

**Certificate of Service**

_____

I hereby certify that I filed this document through the ECF system, whereby it will be sent electronically to the registered participants as identified on the Notice of Electronic filing, including:

David F. Capeless
38 West Center Road
West Stockbridge, MA 01266

Caius Veiovis,
*By his attorney,*

<u>/s/ Dana Alan Curhan</u>
Dana Alan Curhan
B.B.O. # 544250
45 Bowdoin Street
Boston, MA 02114
(617) 267-3800
dana.curhan@gmail.com

United States District Court
District of Massachusetts

_____

Civil Action No. 4:18-cv-11632-TSH

**Caius Veiovis,**
*Petitioner*

v.

**Colette Goguen, et al,**
*Respondents*
_____

## Notice of Appeal
_____

Pursuant to FED. R. APP. P. 3 and 4, notice is hereby given that Caius Veiovis, the petitioner in the above case, hereby appeals the denial of his petition for a writ of habeas corpus.

Respectfully submitted,

Caius Veiovis,
*By his attorney,*

/s/ Dana Alan Curhan
Dana Alan Curhan
B.B.O. # 544250
45 Bowdoin Street
Boston, MA 02114
(617) 267-3800
dana.curhan@gmail.com

NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12017

COMMONWEALTH  vs.  CAIUS VEIOVIS.


Berkshire.     November 10, 2016. - July 19, 2017.

Present:  Gants, C.J., Lenk, Hines, Gaziano, & Lowy, JJ.


Homicide.  Evidence, Photograph, Relevancy and materiality,
     Inflammatory evidence, Prior misconduct, Identity, State of
     mind, Motive.  Practice, Criminal, Capital case, Argument
     by prosecutor, Instructions to jury.



     Indictments found and returned in the Superior Court
Department on October 6, 2011.

     The cases were tried before C. Jeffrey Kinder, J.


     Dana Alan Curhan (Christie L. Nader also present) for the
defendant.
     David F. Capeless, District Attorney for the Berkshire
District, for the Commonwealth.


     GANTS, C.J.  The defendant was found guilty by a Superior

Court jury on three indictments charging murder in the first

degree on the theory of deliberate premeditation for the grisly

killing of David Glasser, Edward Frampton, and Robert Chadwell.[1]
The Commonwealth's theory of the case was that the defendant
participated in these killings with Adam Lee Hall and David
Chalue to prevent Glasser from testifying against Hall in two
criminal cases. They kidnapped Frampton, who was Glasser's
roommate, and Chadwell, who was Glasser's neighbor, simply
because Frampton and Chadwell had the misfortune of being in
Glasser's apartment when they entered to kidnap and later kill
Glasser, and then killed Frampton and Chadwell to ensure their
silence regarding the kidnapping and killing of Glasser. After
the three victims were killed, the defendant, Hall, and Chalue
dismembered their bodies and placed the body parts in plastic
bags, and Hall arranged for the burial of the plastic bags.[2]

The defendant presents four primary claims on appeal: (1)
that the evidence of his knowing participation in these crimes
was insufficient as a matter of law to support his convictions;
(2) that the judge abused his discretion in admitting evidence
of other acts the probative value of which was outweighed by the
risk of unfair prejudice; (3) that the judge abused his
discretion in admitting in evidence a statement by the defendant

---

[1] The defendant was also found guilty on three indictments
charging kidnapping and three indictments charging witness
intimidation.

[2] Adam Lee Hall and David Chalue were found guilty of the
three murders in separate trials that preceded the defendant's
trial.

regarding the scars on his right arm; and (4) that the
prosecutor presented facts in closing argument that were not
supported by the evidence at trial.  We affirm the convictions
and conclude that the defendant is not entitled to relief under
G. L. c. 278, § 33E.

Background.  Because the defendant challenges the
sufficiency of the evidence at trial, "we recite the evidence in
the Commonwealth's case-in-chief . . . in the light most
favorable to the Commonwealth."  Commonwealth v. Penn, 472 Mass.
610, 611-612 (2015), cert. denied, 136 S. Ct. 1656 (2016).  We
focus primarily on the evidence implicating the defendant in the
joint venture, because the defendant does not dispute that there
was abundant evidence that Hall and Chalue participated in the
killings.

The circumstances leading up to the killings began in July,
2009, when Hall beat Glasser with a baseball bat because he
believed that Glasser had stolen and sold motor vehicle parts
that belonged to Hall.  While Glasser was being interviewed by a
State police trooper two days later, Hall threatened Glasser in
a telephone call.  The State police arrested Hall that day and
recovered a baseball bat from Hall's vehicle.

In July, 2010, while the charge against Hall of assault and
battery by means of a dangerous weapon was pending, Hall
concocted a scheme to discredit Glasser by framing him on a

false kidnapping charge.  As part of this scheme, a friend of Hall, Nicole Brooks, falsely reported to the police that Glasser kidnapped her and shot at her when she escaped; another friend of Hall, Scott Langdon, planted Brooks's wallet and a revolver in Glasser's truck, where they were found by police during a search of the truck.  The scheme resulted in Glasser's arrest, but the police soon exonerated Glasser and brought criminal charges against Hall and those who participated with him in the scheme.

The defendant began spending time with Hall and Chalue in the latter half of August, 2011.  Hall was a "sergeant [at] arms" in a local chapter of the Hells Angels motorcycle club and was described as an "enforcer."  The defendant was not a member of the Hells Angels, but there was evidence that he wanted to be.  He began to wear a vest with a Hells Angels insignia on the front and kept a Hells Angels sticker in his Jeep and apartment. Hall told a witness in the defendant's presence of the possibility that the defendant would get a motorcycle and become a prospective member of the Hells Angels.  The defendant's employer told the police that the defendant had wanted to establish credit because he wanted to buy a motorcycle and that "you cannot be in the Hells Angels without buying the motorcycle."

The time line of events before and after the killings is important in evaluating the weight of the evidence implicating the defendant as a participant in the killings.  On Friday, August 26, 2011, Hall picked up a friend, Katelyn Carmin, in the tan Buick vehicle[3] he had purchased earlier that month; the defendant and Chalue were with him.  While driving around to various bars, Hall went into a tirade about a person he called "Drummer Dave,"[4] who he said had robbed him and then "snitched" on him.  Hall said he was "going to kill that motherfucker." The defendant, along with Chalue, responded to Hall by assuring him that Hall will "get him."  Later that evening, they drove to the Hells Angels clubhouse in Lee, where they rode in an all-terrain vehicle.  Hall told Carmin to be careful because he needed the defendant and Chalue for "a job."

On Saturday, Hall was seen outside the building where the defendant's girl friend resided, talking to the defendant while sitting in the girl friend's pickup truck.  In the early

---

[3] The Buick at other times during the trial was described as gold in color.

[4] Andrew Johnston, a childhood friend of Robert Chadwell, testified that people often referred to David Glasser by his nickname, "Drummer Dave."     [5] There was some confusion as to the color of the vehicle that was at Rose Dawson's residence at 1:30 A.M.  Edwin Sutton, Rose's father described it as a Jeep Wrangler and testified that, although he was not sure, he thought it might have been yellow.  Ocean Sutton, one of Edwin's daughters, described it as a green Jeep Wrangler.  The defendant's Jeep is black.

afternoon, Hall, Chalue, and the defendant went to a party held by the Springfield chapter of the Hells Angels at a tavern in Springfield; Hall and the defendant left the party together early in the afternoon and returned at approximately 4:30 P.M. Hall, Chalue, and the defendant left the tavern together at approximately 6:30 P.M., and drove away in Hall's Buick. Later that evening, Hall, Chalue, and the defendant were at the Hells Angels clubhouse in Lee; they left later to go to the defendant's house in Pittsfield. Hall drove to the defendant's home in his own vehicle but first stopped at Steven Hinman's home in Lenox. Hall showed Hinman a .45 semiautomatic pistol that he had in his vest, as well as a "dog food bag" that contained a .44 Magnum revolver, a sawed-off AR-15-type weapon, and a small revolver.

The defendant and Chalue traveled to the defendant's home with two women, Allyson Scace and Kayla Sewall, in Sewall's vehicle after stopping at a liquor store. When Hall arrived at the defendant's home, he pulled the firearms out of the dog food bag and asked the defendant where he kept brake cleaner and gloves. The defendant directed him to a cabinet and went upstairs with Sewall. While they were upstairs, Hall and Chalue disassembled and cleaned the firearms. The defendant asked Sewall to stay, but she declined and left with Scace at

approximately 9 P.M., leaving Hall, Chalue, and the defendant alone in the apartment.

The kidnapping of the three victims in Glasser's apartment in Pittsfield occurred shortly before midnight that Saturday or early Sunday morning.  Glasser's upstairs neighbor asked Glasser to move his truck at approximately 10:30 P.M. that Saturday, and saw the three victims (and a fourth man) in the kitchen of Glasser's apartment at that time.  The last telephone call made from Chadwell's cellular telephone was at 11:21 P.M.  Shortly after midnight, the upstairs neighbor heard banging from the front downstairs hallway, and heard the voices of Glasser and Frampton, as well as some unfamiliar voices.  Hall later told a friend, Rose Dawson, that, when they arrived at Glasser's apartment, one of the victims was using a computer and another was playing a video game.

The defendant's girl friend had returned from a hiking trip on Friday night and was at her home on Saturday night.  She made a telephone call to the defendant's cellular telephone at 12:09 A.M. on Sunday, but the defendant did not answer and she left a voicemail message.  She sent him a text message on his cellular telephone at 1:20 A.M., but received no reply.  She telephoned him again at 1:40 A.M., and again left a voicemail message after the call was not answered.

At approximately 1:30 A.M. on Sunday, Hall appeared at Dawson's home in Pittsfield. He asked to borrow Dawson's cellular telephone, which she gave to him; he said he would be back soon. He entered the passenger seat of a vehicle described as a Jeep Wrangler[5] and left; the defendant owned a Jeep Wrangler.

Hall was next seen at a convenience store in Pittsfield at approximately 5:30 A.M., where he purchased three candy bars and a pack of cigarettes. Hall returned a few minutes later and purchased a pack of Black and Mild cigars. The police seized the defendant's Jeep seven days later and subsequently searched it; they found a Black and Mild cigar wrapper inside. On September 12, in a search of the defendant's apartment, to which he had recently moved, the police found four or five Black and Mild cigar wrappers in a duffle bag.

The store clerk observed that Hall had mud on his shirt and that his boots and blue jeans were wet, as was the cash he handed over to pay for the items. Tropical Storm Irene had reached western Massachusetts during the night, bringing heavy rain and high winds for much of the night and into the morning.

---

[5] There was some confusion as to the color of the vehicle that was at Rose Dawson's residence at 1:30 A.M. Edwin Sutton, Rose's father described it as a Jeep Wrangler and testified that, although he was not sure, he thought it might have been yellow. Ocean Sutton, one of Edwin's daughters, described it as a green Jeep Wrangler. The defendant's Jeep is black.

Shortly thereafter, Hall returned to the Dawson residence and parked his Buick on the front lawn. The defendant's Jeep arrived behind the Buick. Hall walked from the Buick to the Jeep and left in the Jeep.

At approximately 10:30 A.M., Hall returned to the Dawson residence with Chalue and the defendant in the defendant's Jeep, which Hall was driving. Hall, who was wet and not wearing shoes, asked Dawson and her friend, Alexandra Ely, who was staying overnight with Dawson, to come to Hall's home to make breakfast. Hall gave them money, which was soaking wet, and told them to buy breakfast food and bleach; he also told them to wash their hands after handling the money. As Dawson and Ely drove to a supermarket in Hall's Buick, Hall telephoned Ely and told her to skip the bleach and not look in a bag in the vehicle. They looked inside the bag and saw what looked like a "batting glove or golf glove."

When they arrived at Hall's house, the defendant's Jeep was parked in front; Hall, Chalue, and the defendant were inside. Hall returned Dawson's cellular telephone to her and told her to delete her call log and tell no one that he had borrowed it. Chalue was in bed, and the defendant sat in a recliner "sleeping" and looking "tired." Dawson and Ely left later in Hall's Buick to return home. Hall, Chalue, and the defendant retrieved the Buick from Dawson's home later that day.

At approximately 2 $\underline{P}$.$\underline{M}$., Hall arrived at the home of David Casey in Canaan, New York, approximately eighteen miles from Pittsfield, in the Buick.  Hall said that he was having trouble with his vehicle and asked Casey if he knew anywhere nearby where he could park it overnight.  Casey called a friend, Alan Pavoni, who agreed to let Hall park the vehicle in Pavoni's driveway in Becket.  Hall then told Casey that he had killed Glasser, as well as "a fat guy" and a black man who were with Glasser.  He explained that he had held Glasser down and pulled the trigger, but the gun misfired.  As he tried to rechamber another round, Glasser ran into the woods.  "Davey" ran after him and shot him, but did not kill him.  "Davey" brought Glasser back to Hall, who then shot him.  Hall said the other two men were stabbed to death.  He said they thought the black man was dead and left him but, when they came back, they saw him sitting on a log, moaning.  Hall also said that they "chopped [the victims] up," and added that "one of the guys really enjoyed torturing and cutting them up."  Hall noted that it was "raining very hard" while this was happening.

Hall asked if Casey was still working with an excavator at a property in Becket, and Casey said that he was.  Hall then asked if Casey would do him a favor; he wanted Casey to dig a hole to bury the bodies.  Hall added that, if Casey did this

favor for him, he would not harm Langdon.[6]  Hall wanted to go

with him to dig the hole that day, but Casey said he would meet

him there on Monday morning.

Between 5 and 6 P.M., Hall drove his Buick to Pavoni's

property and parked it there; another person was with him in the

Buick.  A "Jeep-like vehicle" also arrived and picked up Hall.

Hall, Chalue, and the defendant were seen late in the

afternoon standing near the defendant's Jeep in the parking lot

of the apartment building in Pittsfield where the defendant's

girl friend resided.

Casey met Hall as scheduled at approximately 8:30 A.M. on

Monday at Pavoni's property.[7]  Hall was with a man he identified

as "Davey," whom Hall assured Casey he could trust because the

man was a member of the Aryan Brotherhood, and a person had to

kill someone to become a member; Casey identified this man at

trial as Chalue.  Hall opened the trunk of the Buick and said

that it was "starting to smell."  Hall later drove the Buick to

the property where Casey kept the excavator.  Casey used the

excavator to dig a large hole, and Hall opened the trunk and

_____

[6] David Casey testified that Scott Langdon was living with
and planned to marry Casey's sister.  Casey knew that Langdon
was cooperating with the police regarding the pending charges
against Hall.
[7] The defendant arrived for work as usual on Monday morning
at the design firm where he was employed as a gardener.

dropped a number of plastic garbage bags, which Hall said contained body parts, into the hole.

On Monday afternoon, Hall and Chalue brought the Buick to a salvage yard and sold it for scrap, where it was later placed in a crusher. The interior carpets were coated with liquid, the back seat was mostly missing, and the carpet had been removed from the trunk. On Sunday, September 4, Hall, Chalue, and the defendant drove past the salvage yard in the defendant's Jeep, and then drove back in the other direction, arguably for the purpose of checking to see that Hall's Buick had actually been crushed. After they were stopped by police at a nearby gasoline station, the police seized and searched the Jeep, but found nothing of evidentiary value.

On Friday, September 9, after Casey had revealed to police the location of the bodies, the police dug up the plastic bags containing the victims' body parts. The autopsy of the body parts revealed that all of the victims had been shot and stabbed; their neck, arms, and legs had been removed, and two of the bodies had been cut through the torso. Most of the dismemberment had been accomplished by chopping or hacking with a sharp instrument such as a butcher knife.

On September 10, the defendant was arrested and brought to the Pittsfield police station. At the station, a State police lieutenant told the defendant that he was protecting a "rat,"

referring to Hall, because Hall had offered to cooperate with the Federal Bureau of Investigation regarding the Hells Angels clubhouse in Lee a year earlier.  As the defendant was walking back to his cell, the defendant said to Chalue, "[Y]ou hear what they're saying about our partner?  They're saying he's a stoolie."

On September 12, the police executed search warrants at two apartments in the same building in Pittsfield:  an apartment where the defendant lived and an apartment from which he had recently moved.  In the apartment where he lived, among other items that will be described later in this opinion, the police found a September 6 edition of a newspaper with an article describing the disappearance of the three victims, and an article dated September 8, describing the search for the missing men.

Discussion.  1.  Sufficiency of the evidence.  In reviewing a claim of insufficiency of the evidence, we determine whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original).  Commonwealth v. St. Hilaire, 470 Mass. 338, 343 (2015), quoting Commonwealth v. Latimore, 378 Mass. 671, 677 (1979).  The defendant notes accurately that there was no percipient witness who testified to the defendant's

participation in the killing and dismemberment of the three victims, and no forensic evidence that linked him to the crimes. Circumstantial evidence, however, "alone may be sufficient to meet the burden of establishing guilt." Commonwealth v. Woods, 466 Mass. 707, 713, cert. denied, 134 S. Ct. 2855 (2014). We conclude that the evidence was sufficient in this case to support a finding beyond a reasonable doubt that the defendant, with the intent to kill, knowingly participated in the premeditated murder of the three victims. See Commonwealth v. Zanetti, 454 Mass. 449, 467 (2009).

A reasonable jury could have found that the defendant was aware on the Friday before the killings that Hall planned to kill Glasser in order to silence him as a witness. They also could find that the defendant had a motive to assist Hall in killing Glasser, because he wanted to be a member of the Hells Angels chapter where Hall served as sergeant at arms, and helping Hall in the killing would curry favor with Hall and cause Hall to believe him worthy of trust.

On Saturday evening, shortly before the victims were kidnapped and killed, the defendant was with Hall and Chalue at the defendant's home when they disassembled and cleaned multiple firearms that Hall had just brought. At approximately the time of the kidnappings and killings, the defendant failed to answer two telephone calls and a text message from his girl friend. As

described by Hall in his conversation with Casey, Hall, Chalue, and a third assailant brought the victims to the woods in the heavy downpour of the tropical storm, killed them, and dismembered their bodies.[8]  It can reasonably be inferred that the dismemberment of the victims took a substantial period of time to accomplish and that it would have been bloody and messy work in a tropical storm.  It is therefore probative that Hall was a passenger in what reasonably could be inferred to be the defendant's Jeep at approximately 1:30 A.M., when Hall stopped at the Dawson residence.  It can also reasonably be inferred that Chalue and the defendant were still with Hall at approximately 5:30 A.M., because Hall purchased three candy bars at the convenience store and a brand of cigars smoked by the defendant.  This inference grows stronger when one considers that the defendant's Jeep followed Hall when he dropped the Buick off at the Dawson residence shortly after leaving the convenience store, and that Hall immediately left in the Jeep.  Because nothing of evidentiary value was found in the Jeep, it can be inferred that the victims' dismembered bodies by this time were in the trunk of the Buick.  The defendant was still

---

[8] Hall's statements to Casey were admissible for their truth against the defendant because they were made to induce Casey's cooperation in burying the bodies and therefore were made in the course of and in furtherance of the joint venture.  See Commonwealth v. Winquist, 474 Mass. 517, 522 (2016), and cases cited.

with Hall and Chalue when they returned to the Dawson residence
at 10:30 A.M., with Hall now driving the defendant's Jeep, and
continued with them to Hall's house later that morning in the
Jeep, where the defendant appeared to be sleepy.

There was credible evidence that a third person
participated in the killings and dismemberments with Hall and
Chalue, and that the defendant was the only third person with
Hall and Chalue immediately before and immediately after the
killings.  Moreover, Hall was seen in the defendant's Jeep at or
around the time period when the bodies were likely being
dismembered.  If the defendant had not participated in the
killings, it is unlikely that he would have chosen to keep
newspaper articles about the disappearance and the search for
the victims in his apartment or that he would have referred to
Hall in a conversation with Chalue as "our partner."  In light
of this evidence, a reasonable jury could have found beyond a
reasonable doubt that the defendant was the third person who
participated in the killings and subsequent dismemberments.

2.  Admission of photographs of items found in defendant's
apartment.  The defendant argues that the judge abused his
discretion in admitting photographs of items found during the
search of the defendant's apartments because their probative
value was outweighed by the risk of unfair prejudice.  The
defendant moved in limine to bar these items from evidence, but

the judge denied the motion.  The objected-to photographs show
(1) anatomical drawings from a medical textbook with images of
human dissections and amputation of body parts, some of which
were presented as a collage hung on the wall; and (2) a machete,
a cleaver, hatchets, various knives, and a baseball bat with
spikes.

The nature of so-called prior bad act (or other act)
evidence under Mass. G. Evid. § 404(b) (2017) is that it
reflects badly on the character of the defendant and might show
a propensity to commit the crime charged, which poses a risk of
unfair prejudice to the defendant.  If it is offered solely for
that purpose, it is not admissible.  But if it is offered for a
purpose other than character or propensity, such as to establish
motive, opportunity, intent, preparation, plan, knowledge,
identity, or pattern of operation, the evidence is admissible
where its probative value is not outweighed by the risk of
unfair prejudice to the defendant.  See Commonwealth v. Crayton,
470 Mass. 228, 249 (2014).  See also Commonwealth v. Drew, 397
Mass. 65, 79 (1986), S.C., 447 Mass. 635 (2006), quoting
Commonwealth v. Bradshaw, 385 Mass. 244, 269 (1982) (prosecution
may not introduce evidence that defendant previously misbehaved
for purpose of showing his or her bad character or propensity to
commit crime charged, but such evidence may be admissible if
"relevant for some other purpose"); Commonwealth v. Trapp, 396

Mass. 202, 206 (1985) (prior bad act admissible where it is not offered to demonstrate that defendant acted in conformity with his or her past actions but rather to "prove a relevant subsidiary fact").  See generally Mass. G. Evid. § 404(b).  We give great deference to a trial judge's exercise of discretion in deciding whether to admit a prior bad act, and we will reverse for an abuse of discretion only where the judge made "'a clear error of judgment in weighing' the factors relevant to the decision, . . . such that the decision falls outside the range of reasonable alternatives."  L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014), quoting Picciotto v. Continental Cas. Co., 512 F.3d 9, 15 (1st Cir. 2008).

Here, there were three relevant, noncharacter purposes to the admission of the amputation drawings and the collage of anatomical drawings.  First, their admission was probative of the identity of the defendant as the third man who participated in the killings.  A critical piece of evidence in this case was the statement made by Hall in furtherance of the joint venture that "one of the guys really enjoyed torturing and cutting [the victims] up."  Evidence that the defendant chose to put on his wall anatomical drawings showing the dissection of the human body and chose to possess drawings depicting the amputations of arms and legs tends to identify the defendant as the person who likely fit Hall's description of the third accomplice as someone

who enjoyed "cutting [the victims] up."  If Hall had said that
the third person who participated in the killings was fascinated
by medieval weapons, it would have been highly probative of
identity if one of his friends had photographs of such weapons
on his wall and a collection of such weapons on his mantel.  The
collage and drawings in the defendant's apartment are no less
probative of identity.

     Generally, we characterize other act evidence that is
admissible to show identity as "modus operandi" evidence and
allow its admission only where "the prior events and the
circumstances of the crime charged have such similarities as to
be meaningfully distinctive" (citation omitted).  Commonwealth
v. Jackson, 417 Mass. 830, 836 (1994).  See, e.g., Commonwealth
v. Holliday, 450 Mass. 794, 815, 555, cert. denied sub. nom
Mooltrey v. Massachusetts, 555 U.S. 947 (2008); Commonwealth v.
Montez, 450 Mass. 736, 743-746 (2008).  The theory underlying
its admission is that the distinctive commonality between the
prior or subsequent conduct and the charged act creates "a
sufficient nexus to render the conduct relevant and probative"
on the issue of identity (citation omitted).  Commonwealth v.
Walker, 442 Mass. 185, 202 (2004).  We require a tight nexus
because modus operandi evidence poses a high risk of unfair
prejudice in that it allows the jury to learn about prior or
subsequent bad acts of the defendant that are similar in nature

to the crime charged.  The commonalities among the crimes,
therefore, need to be so distinctive that their probative value
in identifying the defendant as the perpetrator of the crime
charged outweighs the substantial risk of unfair prejudice.

We do not suggest that the anatomical drawings found in the
defendant's apartment are admissible as modus operandi evidence.
The method or location of the amputations shown in the drawings
in the defendant's apartment are not so similar to the method or
location of the actual dismemberment of the victims as to permit
a finding that the drawings demonstrate the method of operation
of the dismemberment.  See Crayton, 470 Mass. at 251
(pornographic drawings found in defendant's jail cell not
admissible as evidence of modus operandi "where the drawings had
only a general similarity to the child pornography" found on
public library computer he was charged with having possessed).

Rather, the anatomical drawings are admissible as a
different species of identity evidence:  evidence of
idiosyncratic conduct by a defendant that, in light of the
specific evidence in a case, tends to identify the defendant as
the perpetrator of a crime.  Generally, the probative weight of
such identity evidence need not be as great as modus operandi
evidence because it does not involve the commission of similar
crimes, and therefore poses less risk of unfair prejudice
(although we do not minimize the risk of such prejudice arising

from the drawings in this case).  The probative weight of this type of identity evidence depends on its connection to the other evidence in the case that ties the idiosyncratic conduct to the identity of the perpetrator, as in our medieval weaponry example.[9]  Here, the anatomical drawings would not be admissible as identity evidence if Hall had not identified the third assailant as someone who enjoyed "cutting [the victims] up."  The drawings have probative weight as to identity only because the drawings tend to identify the defendant as a person well known to Hall who appeared to have an unusual interest in the amputation and dissection of the human body.

Apart from identity, a second relevant, noncharacter purpose for admitting the drawings is to show state of mind.  One of the extraordinary features of these killings is the dismemberment of the victims, which appears to have had no

---

[9] In dissent, Justice Lowy argues that our decision to admit the anatomical drawings is improper because "the connection between the defendant's other conduct and the charged conduct is squarely based on an impermissible propensity inference."  Post at   .  While the admission of any evidence that suggests the defendant's bad character risks inviting the jury to draw the improper inference that the defendant acted in conformity with his past conduct, the admission of the drawings in this case is not premised on such an improper inference.  Rather, the drawings invite the jury to conclude that the defendant matched Hall's description of the third participant in the crime.  While it would be improper to admit the drawings for the purpose of demonstrating that the defendant was predisposed to commit the crime, there is nothing improper about asking the jury to infer that the uncommon trait Hall attributed to the crime's third participant is also attributable to the defendant.

pragmatic purpose and which must have taken a considerable amount of time to complete, especially in the midst of a tropical storm.  The collage and drawings in the defendant's apartment are probative of the defendant's state of mind as a person fascinated by amputation and human dissection, and of an intent to seize the opportunity of these killings to engage in actual amputations and human dissection.  Cf. Commonwealth v. Howard, 469 Mass. 721, 739-740 (2014) (confrontations between defendant and victim three months prior to workplace shooting and between defendant and another employee were relevant to defendant's motive and state of mind).

Third, the motive for the killings was to silence Glasser, who would have testified against Hall in two criminal cases, and to silence the other two victims, who would otherwise have been witnesses to Glasser's killing.  But these motives do not explain the victims' dismemberment.  We have admitted other act evidence where, without it, a crime may appear to be an inexplicable act of violence.  See Commonwealth v. Marrero, 427 Mass. 65, 68 (1998); Drew, 397 Mass. at 78-79.  The defendant's apparent fascination with amputation and human dismemberment offers an explanation for what would otherwise be inexplicable.

Where there were three relevant, noncharacter purposes for the admission of the anatomical drawings, the judge did not abuse his discretion in ruling that, "[i]n light of the other

evidence in the case, I do believe they have some probative value which outweighs the prejudicial effect."  In <u>Commonwealth</u> v. <u>Guy</u>, 454 Mass. 440, 443-444 (2009), we concluded that the trial judge did not abuse his discretion where the probative weight of the evidence was less compelling than it was here, and where the risk of unfair prejudice was equally significant. Where an apparently randomly chosen victim was murdered in a park by stabbing, strangulation, and blunt trauma, we found no abuse of discretion in the admission of evidence that the defendant "spoke to coworkers about serial killings, and that he often read books about murder and serial killings" (footnote omitted).  <u>Id</u>. at 441, 443.  We concluded that evidence of the defendant's fascination with murder "was relevant to the defendant's motive and state of mind and to explain what otherwise might be seen as an inexplicable act of violence." <u>Id</u>. at 443.  We reach a comparable conclusion as to the anatomical drawings in this case.

Our analysis is different with respect to the admission of the photographs depicting the cutting objects found in the defendant's apartment.  "A weapon that could have been used in the course of a crime is admissible, in the judge's discretion, even without direct proof that the particular weapon was in fact used in the commission of the crime," because "[s]uch evidence is relevant for demonstrating that the defendant had the 'means

of committing the crime.'"  Commonwealth v. Barbosa, 463 Mass.
116, 122 (2012), quoting Commonwealth v. Ashman, 430 Mass. 736,
744 (2000).  Based on the testimony of the medical examiner and
forensic anthropologist, the machete, cleaver, hatchets, and
various knives found in the defendant's apartment were
consistent with the types of tools used to dismember the
victims, and could have served as the means to accomplish the
dismemberment.  Although they tested negative for blood at the
time of the search of the defendant's apartment on September 12,
approximately two weeks after the killings, and therefore were
not seized for further testing, they could not reasonably be
excluded as weapons that were used in the commission of the
dismemberment.  Therefore, we conclude that the judge did not
abuse his discretion in admitting the photographs of the
machete, cleaver, hatchets, and knives.

In contrast, the judge did abuse his discretion in
admitting the spiked baseball bat, which had no probative value
and posed a needless risk of unfair prejudice.  "Where a weapon
definitively could not have been used in the commission of the
crime, we have generally cautioned against admission of evidence
related to it."  Barbosa, 463 Mass. at 122, citing Commonwealth
v. Toro, 395 Mass. 354, 357-358 (1985).  Because there was no
evidence that the baseball bat with spikes could have been used
in the commission of the killings or the dismemberments, we

conclude that the judge erred in admitting the photograph
depicting it.  We also conclude that, given the other admissible
evidence depicting what was found in the search of the
defendant's apartment, the error was not prejudicial.
Commonwealth v. Graham, 431 Mass. 282, 288, cert. denied, 531
U.S. 1020 (2000), quoting Commonwealth v. Flebotte, 417 Mass.
348, 353 (1994) (error not prejudicial "if we are sure that the
error did not influence the jury, or had but very slight
effect").

We note that the defendant, although he unsuccessfully
moved in limine to exclude this other act evidence and timely
objected to its admission, did not seek a limiting instruction
regarding the jury's consideration of this evidence, and the
judge did not give one.  As a result, the jury were not told
that this evidence may not be considered by them as evidence of
the defendant's bad character or his propensity to commit the
crimes charged.[10]  See Massachusetts Superior Court Criminal
Practice Jury Instructions §§ 7.7.2, 7.7.3 (Mass. Cont. Legal
Educ. 2013).  Because there was no motion for a new trial, we do
not know whether the absence of a request for a limiting
instruction arose from a tactical choice by defense counsel not
to focus the jury's attention on this evidence, or from an error

---

[10] The judge did instruct the jury that the defendant's
affiliation with the Hells Angels may not be considered as
evidence of a bad character or a criminal personality.

of judgment by counsel.  Regardless, we review the absence of
such a limiting instruction under G. L. c. 278, § 33E, to
determine whether it created a substantial likelihood of a
miscarriage of justice.  See Commonwealth v. Sullivan, 436 Mass.
799, 809 (2002) (substantial likelihood of miscarriage of
justice standard applied to absence of limiting instruction in
case of murder in first degree).  See also Commonwealth v.
Roberts, 433 Mass. 45, 48, 61 (2000).

The jury are always free to consider evidence without
limitation whenever a judge fails to give a limiting instruction
under Mass. G. Evid. § 404(b), but we do not always conclude
that the absence of such an instruction creates a substantial
likelihood of a miscarriage of justice.  See Commonwealth v.
Morgan, 460 Mass. 277, 290 (2011).  One factor in considering
whether its absence produced a substantial likelihood of a
miscarriage of justice is whether the prosecutor in his or her
closing argument misused the other act evidence to invite the
jury to consider it as proof of the defendant's bad character or
propensity to commit the crime.  Cf. Commonwealth v. McCowen,
458 Mass. 461, 479-480 (2010) (prior bad act evidence not
mentioned in prosecutor's closing argument).  In Guy, 454 Mass.
at 443-444, we noted that "[t]he prosecutor elicited the
testimony and referred to it in his closing in a technical,
analytical manner, without drama or undue emphasis that might

have released its potential for unfair prejudice."  The same

could be said here; the prosecutor did not speak of this

testimony in his closing argument, and alluded to it only when

he argued that the murders were not just an attempt to keep

three men from testifying in court "but of satisfying some

retribution and intent to take apart humanity piece by

piece. . . .  [T]he defendant, quote, really enjoyed torturing

and cutting them up."  In short, the prosecutor alluded to this

evidence for its relevant, noncharacter purposes.  Where those

purposes were themselves compelling, the absence of a limiting

instruction did not create a substantial likelihood of a

miscarriage of justice.

    3.  <u>Statement by defendant regarding scars on his right</u>

<u>arm</u>.  Hinman testified that, on an unspecified date, Hall

brought the defendant to Hinman's property, and Hinman stared at

the scars on the defendant's right arm.  Over objection, Hinman

testified that the defendant told him, "See these scars[;]

imagine what I can do to somebody else."  The defendant contends

that the judge abused his discretion in determining that the

probative weight of this statement outweighed the risk of unfair

prejudice, and consequently admitting it in evidence.

    We recognize that this statement generally would be

relevant only for the forbidden purpose of suggesting the

defendant's violent character and his propensity to commit acts

of violence, and therefore would be inadmissible.  But in the
unusual context of this case, it, like the collage of human
dissections on the defendant's apartment wall, is relevant to
identify the defendant as the third person participating in the
killings who Hall described as someone who "really enjoyed
torturing and cutting [the victims] up."  In essence, through
this statement, the defendant was describing himself as someone
who is capable of extraordinary acts of violence against other
persons, which tends to identify him as someone who would enjoy
torturing and dismembering other persons, and which therefore
permits the inference that he is the third person referred to by
Hall in speaking with Casey.  Where this statement is probative
of the defendant's identification as the third assailant, we
conclude that the judge did not abuse his discretion in
concluding that its probative weight outweighed the risk of
unfair prejudice.

4.  Prosecutor's closing argument.  The defendant contends
that the prosecutor in closing argument "argued a number of
points based on facts that do not appear in the record."  Where
there was no objection to the closing argument, we review the
record to determine whether there was a substantial likelihood
of a miscarriage of justice.  We conclude that there was not.

The defendant identifies four instances where the
prosecutor allegedly argued facts not in evidence.  First, he

claims that there was no evidence supporting the prosecutor's statement that the three assailants had "the instruments in bags available for the dismemberment," which the prosecutor argued showed that the killings and dismemberments were planned.  The defendant is correct that no witness testified to this fact, but the prosecutor is entitled to argue that it was a fair inference that the assailants had the tools with them when they killed the victims, even though it was also possible that they retrieved the tools after the killings based on Hall's statement that they left the scene believing that the black man was dead and were surprised to find him still alive when they returned.

Second, the defendant claims that the prosecutor improperly suggested that the cleaver found in the defendant's apartment was used to dismember the bodies.  The prosecutor properly noted that the three assailants had access to the types of tools that could have been used to dismember the victims, including the cleaver.  He also properly argued that the jury should not infer that the cleaver was <u>not</u> used in the killings because it did not test positive for blood, asking rhetorically, "Wouldn't you expect that [the cleaver] would test positive unless it was very carefully cleaned . . . ?"  Where a kitchen cleaver would routinely be used to cut meat, and therefore would be expected to have blood residue if not carefully cleaned, this was not an improper argument.

Third, the defendant takes issue with the prosecutor's suggestion to the jury that the defendant was the third assailant whom Hall said "really enjoyed torturing and cutting them up."  This was fair argument based on inferences from the evidence in the case.

Finally, the defendant claims that the prosecutor misstated the evidence by telling the jury that the defendant had "boasted to Steve Hinman that he had scarred himself."  This was a fair inference from the defendant's statement to Hinman in which he invited Hinman to imagine what he could do "to somebody else."

5.  Review under G. L. c. 278, § 33E.  As part of our plenary review of the case, we note that the judge, in defining reasonable doubt in his final jury instructions, told the jury that "the evidence must convince you of the defendant's guilt to a reasonable and moral certainty," but omitted the phrase from the reasonable doubt instruction in Commonwealth v. Webster, 5 Cush. 295, 320 (1850), that clarified the meaning of that phrase:  "a certainty that convinces and directs the understanding, and satisfies the reason and judgment, of those who are bound to act conscientiously upon it."  Because the defendant did not object, we review to determine whether the judge's deviation created a substantial likelihood of a miscarriage of justice.  See Commonwealth v. Figueroa, 468 Mass. 204, 220 (2014).

"A constitutionally deficient reasonable doubt instruction amounts to a structural error which defies analysis by harmless error standards." Commonwealth v. Russell, 470 Mass. 464, 468 (2015), quoting Commonwealth v. Pinckney, 419 Mass. 341, 342 (1995).  But "[t]he Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof." Russell, supra, quoting Pinckney, supra.  It suffices that the words used "impress[] upon the factfinder the need to reach a subjective state of near certitude of the guilt of the accused." Russell, supra, quoting Pinckney, supra at 344.[11]

The phrase "moral certainty" if used "in isolation, without further explanation, might amount to an erroneous instruction on reasonable doubt." Pinckney, supra at 345, citing Commonwealth v. Gagliardi, 418 Mass. 562, 571 (1994), cert. denied, 513 U.S. 1091 (1995).  But its use was not reversible error "where it was used with an additional instruction which impressed upon the factfinder the need to reach a subjective state of near certitude of the guilt of the accused." Pinckney, supra at 344, citing Victor v. Nebraska, 511 U.S. 1, 14-15 (1994).  Although

---

[11] In Commonwealth v. Russell, 470 Mass. 464, 477-478 (2015), we exercised "our inherent supervisory power to require a uniform instruction on proof beyond a reasonable doubt that uses more modern language, but preserves the power, efficacy, and essence of the Webster charge."  The trial in this case resulted in verdicts in 2014, before the new instruction was mandated.

the phrase must be linked with "language that lends content to
the phrase," Pinckney, supra at 345, "[w]e have never held that
'moral certainty' must be immediately followed by content-
lending language, only that it must be linked with such
language" (emphasis in original).  Commonwealth v. LaBriola, 430
Mass. 569, 573 (2000).  Additionally, we have said that use of
the phrase "abiding conviction" in conjunction with the moral
certainty language "does much to alleviate any concerns that the
phrase 'moral certainty' might be misunderstood in the
abstract."  Id. at 572-573, quoting Victor, 511 U.S. at 21.  The
judge's use of the phrase "abiding conviction" in conjunction
with "moral certainty," coupled with his fidelity to the Webster
instruction in every respect except for the noted omission,
convinces us that the omission did not create a risk that the
jury failed adequately to understand the reasonable doubt
standard, and therefore did not create a substantial likelihood
of a miscarriage of justice.  See Commonwealth v. Beldotti, 409
Mass. 553, 562 (1991) (no error where moral certainty language
used as part of Webster charge).

Having addressed this omission in the reasonable doubt
instruction, we conclude that the verdicts of murder in the
first degree are fully consonant with justice and we decline to
exercise our authority under G. L. c. 278, § 33E, to order a new

trial or to direct the entry of verdicts of a lesser degree of
guilt.

<u>Judgments affirmed</u>.

LOWY, J. (dissenting, with whom Lenk, J., joins).  I agree with the court that the evidence was legally sufficient to support the defendant's convictions.  Because I disagree with the court's analysis of the admission of photographs of items found in the defendant's apartment, however, I respectfully dissent.

Today, the court purports to announce a new brand of identity evidence, which involves the use of similar, but not distinctive, conduct of a defendant to infer that the defendant acted in conformity with that conduct on another occasion.  If this sounds like the language often used to describe the type of character inference that fact finders are roundly prohibited from making, that is because it is.

The court sets forth three "relevant, noncharacter purposes" for which it holds the photographs were admissible: (1) identity, (2) state of mind, and (3) motive.  I address each in turn, and finally, I assess the prejudicial effect in this case.

1.  <u>Identity evidence</u>.  I agree with the court that the posters hanging in the defendant's apartment were not sufficiently similar to the methods by which the victims' bodies were dismembered to qualify as modus operandi evidence.[1]  I also

---

[1] When asked whether the dismemberment of the victims was consistent with the surgical illustrations, the Commonwealth's

agree that evidence may be admissible to prove a defendant's identity, absent such similarity, when the evidence is ultimately relevant because the evidence makes it more likely than it would be without the evidence that the defendant is the individual responsible for the crime. This latter category of "identity" evidence, however, does not permit the use of the defendant's conduct "to prove [his] character in order to show that on a particular occasion [he] acted in accordance with the character." Mass G. Evid. § 404(b)(1) (2017). This rule limiting the use of a defendant's prior conduct applies without regard to the probative strength of the conduct.

"One of the oldest principles of Anglo-American law is that a person 'should not be judged strenuously by reference to the awesome spectre of his past'" (citation omitted). D.P. Leonard, The New Wigmore:  A Treatise on Evidence § 1.2, at 2 (2009)

---

expert said, "They do show amputation of limbs, so that portion is consistent.  I can't say if the exact location on the bone is consistent in some of them.  I can see at least one is inconsistent in terms of location.  Sometimes I just can't tell what part of the bone I'm looking at."  The prosecutor then asked whether the victims' limbs were dismembered at the site of the joint (as depicted in the illustrations), the witness responded, "They were chopped through sometimes near a joint but they were chopped through mostly right to the bone itself.  In terms of the vertebrae, a lot of the chopping was aimed between two bones, so both bones were damaged but they were separated where they normally separate."  Further, on cross-examination, defense counsel asked, "There's nothing in that diagram that's consistent with the multiple large chopping injuries which you just discussed, correct?"  The witness answered, "That's correct."

(Wigmore). "For nearly two centuries, courts have excluded the evidence not because of its lack of probative value but primarily because of the dangers it is thought to present. Most commonly cited is the danger of unfair prejudice." Id. at 6. This prohibition on character evidence includes using a defendant's other, relevant conduct to prove his or her "propensity" to commit the charged crime. Id. at 2-3. See Mass. G. Evid. § 404(b). The danger of admitting such character evidence against the defendant is not that it is irrelevant. Rather, the danger is that the jury will overvalue the evidence. Wigmore, supra at 5-7.

To say that other conduct is permissibly probative of "identity," rather than impermissibly probative of character, merely because a defendant's character makes him more likely to be guilty, is an exercise in circular logic that renders the prohibition on the character inference inert. Thus, the court's reasoning today, at best, dilutes the stringent requirements for modus operandi evidence, or, at worst, eviscerates the rule prohibiting use of a defendant's other conduct to show his propensity to commit the crime charged.

I would classify admissible evidence that is probative of identity into two categories: (1) modus operandi, and (2) what I will call "identity-based evidence." Unlike modus operandi, identity-based evidence does not require a high level of

distinctiveness shared between the defendant's other conduct and the charged conduct.[2]  Rather, such other conduct constitutes admissible identity-based evidence when introduced for a nonpropensity purpose, such as, motive, opportunity, knowledge, state of mind, or many other purposes, but the nonpropensity purpose is ultimately relevant to "identify" the defendant as the individual who committed the charged crime.  See P.C. Giannelli, Understanding Evidence 174-175 (4th ed. 2013) (Giannelli).

The following example of identity-based evidence is illustrative.  If shortly before committing armed robbery, a defendant steals a particular weapon to commit the armed robbery, evidence that the defendant stole the weapon would be admissible to establish that he had the means or opportunity -- because he had the particular weapon used to commit the crime. See Giannelli, supra at 174.  That the defendant had the means to commit the crime is relevant to his "identity" as the perpetrator of the armed robbery.  See id.  The judge, however, must still balance the probative value of the theft of the weapon against the danger of undue prejudice that the jury will

_____

[2] As the court notes, ante at    , a similarity that is merely general is a reason to exclude evidence of other conduct. The danger that a jury will consider prior conduct as propensity evidence is at its apex when the prior conduct resembles the charged conduct, but is not sufficiently similar for purposes of modus operandi.

consider the theft as evidence of bad character.  See Mass. G.
Evid. § 403.  Yet, there is minimal danger that a jury would
impermissibly consider the theft as indicative of the
defendant's propensity to commit armed robbery, i.e., that the
defendant showed his bad character by stealing a firearm, and
that it was more likely that he committed the crime due to this
bad character.  Rather, the more probable and logical inference
is that the evidence "identifies" the defendant as the
individual who committed the crime because he possessed the
weapon used in its commission.  The latter conclusion is not
based on an impermissible propensity inference.

In this case, the connection between the defendant's other
conduct and the charged conduct is squarely based on an
impermissible propensity inference.  The other conduct is
hanging posters depicting medical amputations.  The charged
conduct is chopping up three human beings.  The logical
connection between the two is that the defendant acted in
conformity with the character trait demonstrated by displaying
images of amputation by brutally chopping up the victims on a
subsequent occasion -- a stark contrast to the firearm example
above, which involves no such impermissible character inference.

The court conditions the admissibility of the drawings on
Adam Lee Hall's statement that "one of the guys really enjoyed"
chopping the victims up.  The court says that the anatomical

drawings are thus probative of identity in the same way that posters of medieval weapons would be admissible identity evidence if Hall had said one of the participants was fascinated by medieval weapons.

The court's example is not analogous to the present case. Unlike the present case, the court's example does not implicate a propensity inference, because the medieval weapons referred to in the hypothetical example do not relate to the commission of the crime.  Thus, the example does not ask the jury to conclude that, because the defendant had posters of medieval weapons, he is the type of person who would participate in three brutal murders.  In the hypothetical example, Hall's statement serves only to identify a person who has an interest in medieval weapons.  The medieval weapons posters are relevant because they show an interest of the accused, and the hypothetical statement identifies an individual who has that interest as a participant in the crime.  The posters in no way suggest that the defendant acted in accordance with that interest in killing the victims.

By contrast, in this case Hall stated that one of the participants enjoyed the act of torturing and chopping up people.  The anatomical drawings only corroborate this statement if one presumes that the defendant acted in accordance with his interest in anatomical dismemberment on a subsequent occasion by chopping up the victims in a manner that did not meaningfully

resemble the dissections depicted in the drawings.  Regardless
of whether the defendant's display of the posters makes it more
likely that he was the third participant than it would be
without such evidence, this is the quintessential, impermissible
propensity inference.

  2.  <u>State of mind</u>.  The court concludes that the fact that
the dismemberment of the victims "appears to have had no
pragmatic purpose and . . . must have taken a considerable
amount of time to complete" was an indication of the defendant's
state of mind.  <u>Ante</u> at .  Even setting aside the evidence
suggesting that there was in fact a pragmatic purpose for
dismembering the bodies,[3] this evidence still requires a jury to
assume that an individual who is "fascinated by amputation and
human dissection," demonstrated only by display of posters,
would "seize the opportunity of these killings to engage in
actual amputations and human dissection."  See <u>ante</u> at .

---

  [3] The court concludes that the dismembered bodies were
likely all placed in Hall's Buick.  <u>Ante</u> at .  Further, after
the killings, Rose Dawson and Alexandra Ely, who were not
alleged participants in the killings, drove in the Buick to a
supermarket.  They did not look in the trunk, but they also did
not testify that they saw any blood or body parts in the cabin
of the automobile.  Moreover, David Casey testified that he
later observed Hall open the trunk of the Buick and drop a
number of plastic garbage bags into the hole Casey had dug.
Accordingly, chopping up the bodies may well have been a
practical measure for purposes of transporting three bodies in
the trunk of the vehicle, while still retaining the vehicle for
limited use until the time it could be destroyed.  Whether the
dismemberment of the bodies had any practical purpose was not an
issue at trial and was not argued by the Commonwealth on appeal.

Under this rubric, the court's theoretical path of admissibility is "identity-based" evidence:  a person who is fascinated with amputation is more likely to engage in the act of physically dismembering people.  The court may be correct that displaying the posters is probative of the defendant's state of mind, which ultimately is relevant to identify him as the perpetrator of the crime.  But, we do not allow in evidence simply because it is relevant.  See <u>Wigmore</u>, <u>supra</u> at 5.  This theory still requires the quintessential prohibited inference, although labeled as "state of mind," in this application.  To be relevant to the defendant's state of mind, one must conclude that he acted in conformity with his other conduct of hanging the posters on a subsequent occasion by participating in the murders.

The Commonwealth itself described the state of mind only as "depraved."  This is a thin veil.  It is difficult to imagine an interpretation of this argument that is not a bald assertion that the defendant's bad or "depraved" character makes him more likely to be guilty of murder.  See <u>Commonwealth</u> v. <u>Crayton</u>, 470 Mass. 228, 251-252 (2014) (jury prohibited from inferring that defendant's interest in child pornography meant he must have been person who accessed child pornography in library).  Admitting the photographs as "state of mind" evidence where the photographs reflect only a general character trait of the

defendant eviscerates any distinction between evidence of a character trait and that of state of mind.

The admission of this evidence was coupled with testimony from one witness that she observed "a lot of creepy shit everywhere" inside the defendant's apartment.  On this theory of admissibility, the Commonwealth does not attempt to factually or temporally tie this so-called "state of mind" evidence to the crime at issue.  Contrast Commonwealth v. Drew, 397 Mass. 65, 78-79 (1986), S.C., 447 Mass. 635 (2006), (defendant's participation in Satanic rituals relevant to prove involvement in ritualistic killings).  Accordingly, I would conclude that the posters were not admissible to prove the defendant's state of mind.

3. Motive.  The court concludes that the posters were independently probative of the defendant's "motive."  The court relies on cases in which we have allowed the Commonwealth to establish a "context for the killing" when it would otherwise appear to the jury as an "inexplicable act of violence" (citation omitted).  Commonwealth v. Marrero, 427 Mass. 65, 68 (1998).  The circumstances of this case do not resemble those relied on by the court.  See, e.g., id. (Commonwealth allowed to introduce significant detail regarding defendant's relationship with victim and witnesses involved in drug business connected to murder); Commonwealth v. Bradshaw, 385 Mass. 244, 269-270 (1982)

(Commonwealth permitted to introduce evidence of defendant's activities on day of murder because they were "inextricably intertwined with the description of events on the [day] of the killing").  See also Commonwealth v. Guy, 454 Mass. 440, 443 (2009) (Commonwealth permitted to admit evidence of defendant's fascination with serial killings in absence of any other evidence of motive).

The court relies primarily on Guy, 454 Mass. at 443-444, which is not analogous.  In that case, the Commonwealth had significant physical evidence tying the defendant to the crime, but was faced with a peculiar situation of having no explanation for the jury as to why the defendant had committed the crime.[4] By contrast, Hall orchestrated David Glasser's death to prevent his testimony.  The other two victims were murdered to eliminate witnesses to Glasser's killing.  The defendant, as the Commonwealth argued at trial, was motivated to assist Hall because the defendant was aspiring to become a member of the Hells Angels motorcycle club.  The Commonwealth did not, and

---

[4] There was also a greater quantum of evidence that the defendant in Guy, 454 Mass. at 443-444 & n.3, had a significant fascination with serial killings, including a large number of books seized from his home (which were not themselves admitted in evidence, but were referenced) and testimony from his coworkers attesting to his ongoing fascination.  Here, the only evidence of the defendant's "fascination" was that he had placed posters on his wall, and the record suggests that the posters had not been displayed on the wall for a long period of time because the defendant was still in the process of moving his belongings from his previous residence into this residence.

Appendix 87

does not on appeal, argue that the defendant was motivated to participate in the crime to seize the opportunity to dismember human beings, or that the dismemberment had no practical purpose.

    4. <u>Prejudicial effect</u>.  For the reasons set forth above, I would conclude that the anatomical drawings were probative only of the defendant's character and were thus inadmissible. Accordingly, it is unnecessary to weigh the probative value against the danger of undue prejudice, since this evidence has no probative value other than propensity.  Instead, the relevant inquiry is whether the error created a "reasonable possibility that . . . might have contributed to the jury's verdict." <u>Commonwealth</u> v. <u>Alphas</u>, 430 Mass. 8, 23 (1999).  The Commonwealth bears not only the burden to show the lack of error, but also the "risk of doubt when any exists" as to whether the error influenced the jury's verdict.  <u>Id</u>.  The Commonwealth does not even argue that the evidence, if erroneously admitted, was not prejudicial.  That may well end the inquiry, but there are five factors that I believe enhanced the danger of prejudice in this case.

    First, even if the evidence had been admissible, it should have been accompanied by a limiting instruction.  No limiting instruction was requested or given at trial, despite the palpable danger of undue prejudice of the evidence.  Without a

limiting instruction, the photographs were before the jury for all purposes, including as impermissible propensity evidence. This danger created a substantial likelihood of a miscarriage of justice. G. L. c. 278, § 33E. See Crayton, 470 Mass. at 252 (illustrations too prejudicial to justify admission, even with limiting instruction).

Second, in other cases, we have found that the failure to give a limiting instruction did not warrant reversal, when other circumstances mitigated the danger of unfair prejudice. For example, in Guy, 454 Mass. at 443-444 & n.3, in which we did not discuss a limiting instruction, we noted that the prosecutor utilized evidence of the defendant's interest in books about serial killings -- which were not admitted in evidence -- in a "technical, analytical manner, without drama or undue emphasis that might have released its potential for unfair prejudice." Further, the prosecution in that case had compelling physical evidence connecting the defendant to the crime, reducing the probability that the jury would return a guilty verdict based on the defendant's macabre interest.

This case is distinguishable from Guy. Unlike the books in Guy, the posters themselves, depicting graphic images, were admitted in evidence. Also, the prosecutor was not especially cautious in avoiding drama or character-related implications in his closing argument, to mitigate the danger of unfair

prejudice. Rather, the prosecutor made a graphic emotional appeal to the jury, referring to the defendant's intent "not just . . . to keep three men from testifying in court but of satisfying some retribution and intent to take apart humanity piece by piece." The court concludes that this statement, clearly referring to the horrendous nature of the dismemberment and not any pertinent evidentiary point, is comparably "technical and analytic." I disagree.

Third, although the prosecutor did not explicitly refer to the photographs in his closing argument, defense counsel quite understandably addressed the evidence in his closing argument three times, in an effort to dampen its prejudicial force.

Fourth, the judge gave proper limiting instructions regarding the defendant's association with the Hells Angels and Hall's history with Glasser. By informing the jury that there was specific evidence that they should not consider as evidence of bad character, the jury were left to infer that the remainder of the evidence could be considered as evidence of the defendant's bad character.

Finally, the likelihood that the jury considered the evidence for a prohibited purpose was further enhanced by the entirely circumstantial nature of the case against the

defendant.[5]  As in <u>Crayton</u>, 470 Mass. at 250, the primary issue at trial was the defendant's identity.  Due to the lack of direct evidence and a limiting instruction, the jury were more apt to use the photographs as character evidence to infer the defendant's guilt.  Contrast <u>Guy</u>, 454 Mass. at 442-444, 447 (evidence of defendant's interest in serial killings used to establish his identity as killer, but also deoxyribonucleic acid evidence matched defendant).  Even with the impermissible character evidence, the issues were difficult enough to resolve that the jury deliberated nearly five full days before reaching verdicts.

I believe that the Commonwealth did not satisfy its burden to demonstrate that there was no "reasonable possibility" that the erroneous admission of these photographs contributed to the jury's verdicts.  Accordingly, I would have reversed the defendant's convictions and granted a new trial.

---

[5] Of course, the Commonwealth is entitled to prove its case entirely by circumstantial evidence.  <u>Commonwealth</u> v. <u>Woods</u>, 466 Mass. 707, 713, cert. denied, 134 S. Ct. 2855 (2014).

United States District Court
District of Massachusetts

_____

Civil Action No. 4:18-cv-11632-TSH

**Caius Veiovis,**
*Petitioner*

v.

**Colette Goguen, et al,**
*Respondents*
_____

**Certificate of Service**
_____

I hereby certify that I filed this document through the
ECF system, whereby it will be sent electronically to the
registered participants as identified on the Notice of
Electronic filing, including:

David F. Capeless
38 West Center Road
West Stockbridge, MA 01266

Caius Veiovis,
*By his attorney,*

/s/ Dana Alan Curhan
Dana Alan Curhan
B.B.O. # 544250
45 Bowdoin Street
Boston, MA 02114
(617) 267-3800
dana.curhan@gmail.com

## United States Court Of Appeals
## For The First Circuit
_____

No. 22-1216

### Caius Veiovis,
*Petitioner-Appellant*

**v.**

### Collette Goguen, Superintendent
*Respondent–Appellee*

_____

### Certificate of Service
_____

I hereby certify that on April 29, 2022, I served an electronic copy of the attached document via the court's ECF system to all counsel of record.

**Caius Veiovis**,
*By his attorney,*

/S/ Dana Alan Curhan

Dana Alan Curhan
First Circuit Bar # 44690
45 Bowdoin Street
Boston, MA 02114
(617) 267-3800
dana.curhan@gmail.com