No. 22-1216

# United States Court of Appeals
## for the First Circuit

—————————

CAIUS VEIOVIS,
*Petitioner-Appellant,*

*v.*

SUPERINTENDENT COLETTE GOGUEN,
*Respondent-Appellee.*

—————————

ON APPEAL FROM A FINAL JUDGMENT OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

—————————

## BRIEF OF RESPONDENT-APPELLEE

—————————

MAURA HEALEY
*Attorney General*
*of Massachusetts*

David F. Capeless, 1st Cir. No. 1194077
*Special Assistant Attorney General*
Criminal Bureau
One Ashburton Place
Boston, Massachusetts 02108
(413) 447-5530
email: david.f.capeless@state.ma.us

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... iii

JURISDICTIONAL STATEMENT ......................................................1

QUESTION PRESENTED ..................................................................1

STATEMENT OF THE CASE................................................................2

    I.     The Kidnappings and Murders .................................................3

    II.    The Petitioner's Prosecution and State-Court Appeal .........................9

    III.   The Petitioner's Habeas Corpus Action.............................................11

SUMMARY OF ARGUMENT ...............................................................11

ARGUMENT ....................................................................................12

    I.     The Legal Standard Governing Review of Habeas Corpus
         Petitions Sets a High Bar for Relief ....................................................12

         A.    Federal Habeas Review of State Convictions is Highly
             Deferential..................................................................................12

    II.    The SJC Reasonably and Correctly Rejected the Petitioner's
         Claim that There Was Insufficient Evidence to Support His
         Convictions Where There Was Evidence that the Petitioner
         Knowingly Participated in the Kidnappings and Murders with
         the Requisite Intent..................................................................16

         A.    Review of Claims of Insufficient Evidence Is Twice-
             Deferential..................................................................................17

         B.    The SJC's Conclusion that There Was Sufficient
             Evidence Was Neither Contrary to, Nor an Unreasonable
             Application of, the *Jackson* Standard ......................................18

         C.    Petitioner's Arguments Fail .....................................................25

   1. Alleged lack of particular types of evidence ..................26

   2. Alternative inferences....................................................27

CONCLUSION .........................................................................................30

Certificate of Compliance With Rule 32(a) ...........................................31

Certificate Of Service.............................................................................31

STATUTORY ADDENDUM ...................................................................32

## TABLE OF AUTHORITIES

**Cases**

*Aspen v. Bissonnette*,
480 F.3d 571 (1st Cir. 2007)..........13

*Bebo v. Medeiros*,
906 F.3d 129 (1st Cir. 2018)..........15

*Brown v. O'Brien*,
666 F.3d 818 (1st Cir. 2012)..........28

*Brumfield v. Cain*,
576 U.S. 305 (2015)..........15

*Coleman v. Johnson*,
132 S. Ct. 2060 (2012)..........29

*Commonwealth v. Semedo*,
456 Mass. 1, 921 N.E.2d 57 (2010)..........20

*Commonwealth v. Veiovis*,
477 Mass. 472, 78 N.E.3d 757 (2017).......... *passim*

*Commonwealth v. Woods*,
466 Mass. 707, 1 N.E.3d 762 (2014)..........20

*Commonwealth v. Zanetti*,
454 Mass. 449, 910 N.E.2d 883 (2009)..........20

*Cooper v. Brown*,
510 F.3d 870 (9th Cir. 2007)..........2

*Dennis v. Mitchell*,
354 F.3d 511 (6th Cir. 2003)..........15

*Desert Palace, Inc. v. Costa*,
    539 U.S. 90 (2003) ........................................................................20

*Evans v. Thompson*,
    518 F.3d 1 (1st Cir. 2008) ..............................................................2

*Foxworth v. St. Amand*,
    570 F.3d 414 (1st Cir. 2009) ........................................................19

*Gomes v. Silva*,
    958 F.3d 12 (1st Cir. 2020) ..........................................................27

*Harrington v. Richter*,
    562 U.S. 86 (2011) ........................................................................14

*Hensley v. Roden*,
    755 F.3d 724 (1st Cir. 2014) .................................................. 12, 15

*Hodge v. Mendonsa*,
    739 F.3d 34 (1st Cir. 2013) ..........................................................18

*Housen v. Gelb*,
    744 F. 3d 221 (1st Cir. 2014) ............................................ 26, 28, 29

*Howes v Fields*,
    565 U.S. 499 (2012) ......................................................................13

*Jackson v. Virginia*,
    443 U.S. 307 (1979) ............................................................ *passim*

*Johnson v. Williams*,
    568 U.S. 289 (2013) ......................................................................18

*King v. MacEachern*,
    665 F.3d 247 (1st Cir. 2011) ........................................................12

*Linton v. Saba*,
    812 F.3d 112 (1st Cir. 2016) .................................................. 18, 30

*Magraw v. Roden*,
    743 F.3d 1 (1st Cir. 2014)........................................................................... *passim*

*Mastracchio v. Vose*,
    274 F.3d 590 (1st Cir. 2001)................................................................................16

*Mays v. Stephens*,
    757 F.3d 211 (5th Cir. 2014) ..............................................................................2

*Miller-El v. Cockrell*,
    537 U.S. 322 (2003)............................................................................................15

*Morgan v. Dickhaut*,
    677 F.3d 39 (1st Cir. 2012)................................................................ 17, 28, 30

*O'Laughlin v. O'Brien*,
    568 F.3d 287 (1st Cir. 2009)............................................................... 16, 28, 29

*Ouber v. Guarino*,
    293 F.3d 19 (1st Cir. 2002)...................................................................... 16, 17

*Parker v. Matthews*,
    567 U.S. 37 (2012).............................................................................................18

*Price v. Vincent*,
    538 U.S. 634 (2003)...........................................................................................13

*Rashad v. Walsh*,
    300 F.3d 27 (1st Cir. 2002)................................................................................2

*Sanna v. Dipaolo*,
    265 F.3d 1 (1st Cir. 2001)................................................................................16

*Scott v. Gelb*,
    810 F.3d 94 (1st Cir. 2016)..............................................................................12

*Teti v. Bender*,
    507 F.3d 50 (1st Cir. 2007)............................................................................2, 3

*Tibbs v. Florida*,
    457 U.S. 31 (1982) ........................................................................21

*United States v. Berrios*,
    132 F.3d 834 (1st Cir. 1998) ........................................................26

*United States v. Bloch*,
    718 F.3d 638 (7th Cir. 2013). ......................................................17

*United States v. Lincoln*,
    630 F.2d 1313 (8th Cir. 1980) ......................................................21

*United States v. Machor*,
    879 F.2d 945 (1st Cir. 1989) ........................................................20

*White v. Woodall*,
    572 U.S. 415 (2014). ............................................................ 14, 15

*Williams v. Taylor*,
    529 U.S. 362 (2000). ............................................................ 14, 15

*Winfield v. O'Brien*,
    775 F.3d 1 (1st Cir. 2014). .................................................... 18, 28

*Woods v. Medeiros*,
    465 F. Supp. 3d 1 (D. Mass. 2020) ..............................................29

*Yarborough v. Alvorado*,
    541 U.S. 652 (2004). ....................................................................14

## Statutes

28 U.S.C. § 1291 ............................................................................1

28 U.S.C. § 2241 ...........................................................................1

28 U.S.C. § 2253 ...........................................................................1

28 U.S.C. § 2254 ................................................................ *passim*

28 U.S.C. § 2254(d)(1)................................................................ *passim*

28 U.S.C. § 2254(d)(2) .............................................................. *passim*

28 U.S.C. § 2254(e)(1)................................................................2, 3

M.G.L. c. 211A, § 10..................................................................10

M.G.L. c. 265, § 2(a)..................................................................10

M.G.L. c. 278, § 33E..................................................................10

## Other Authorities

K. O'Malley, J. Grenig, & W. Lee, *Federal Jury Practice and Instructions, Criminal* § 12.04 (5th ed. 2000) .......................................................21

## JURISDICTIONAL STATEMENT

The petitioner, Caius Veiovis, brought this petition for a writ of habeas corpus in the United States District Court for the District of Massachusetts pursuant to 28 U.S.C. § 2254, challenging his 2014 Massachusetts convictions for three counts each of murder in the first degree, kidnapping, and intimidation of a witness. The District Court had jurisdiction pursuant to 28 U.S.C. §§ 2241 and 2254. On March 23, 2022, the District Court (Hillman, J.) denied the petition for a writ of habeas corpus and entered final judgment dismissing the case. (USDC Doc. No. 25-26.)[1] On March 24, 2022, the District Court granted a certificate of appealability. (USDC Doc. No. 29.) Veiovis filed his notice of appeal on March 23, 2022. (USDC Doc. No. 27.) This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. §§ 1291 and 2253.

## QUESTION PRESENTED

Whether the Massachusetts Supreme Judicial Court (SJC) reasonably rejected the petitioner's claim that there was insufficient evidence to support his convictions, where the evidence at trial proved that he (1) was with co-defendants

---

[1] The Petitioner's Brief will be cited as "Pet.'s Br. --"; the Petitioner's Addendum will be cited as "P.Add. --"; documents filed in the District Court will be cited as "USDC Doc. No. --"; and the Supplemental Answer filed in the District Court (USDC Doc. No. 17), which contains the relevant state-court records, will be cited as "SA --."

Adam Hall and David Chalue immediately before, during, and after the killings of David Glasser, Edward Frampton, and Robert Chadwell; (2) had knowledge of Hall's plan to kill Glasser to silence Glasser as a witness against Hall; (3) assured Hall that Hall was "going to get him" when Hall stated that Hall intended to kill Glasser; (4) referred to Hall as "our partner" in a post-arrest comment to Chalue; (5) committed these crimes to curry favor with Hall in his effort to join the Hells Angels; and (6) knowingly participated with Hall and Chalue in the abduction and murder of Glasser and his two companions with the requisite intent.

## STATEMENT OF THE CASE

In federal habeas corpus proceedings, "a determination of a factual issue made by a state court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1); *see also Evans v. Thompson*, 518 F.3d 1, 3 (1st Cir. 2008). The statutory presumption extends to "findings [that] are made by a state appellate court as well as [those that] are made by a state trial court." *Rashad v. Walsh*, 300 F.3d 27, 35 (1st Cir. 2002). The presumption further extends to implicit findings. *See*, *e.g.*, *Teti v. Bender*, 507 F.3d 50, 59 (1st Cir. 2007) ("[I]mplicit credibility determinations . . . are exactly the type of factual determinations to which we defer, at least short of any indication of serious error."); *Mays v. Stephens*, 757 F.3d 211, 214 (5th Cir. 2014) (presumption applies to "'unarticulated findings which are necessary to . . . conclusions of mixed law and fact'"); *Cooper v. Brown*, 510 F.3d 870, 919-920

(9th Cir. 2007) (same; adding, "[t]he express and implied factual determinations by the state trial [and supreme] court[s] . . . are entitled to deference"). "The petitioner bears the burden of overcoming that presumption by providing 'clear and convincing evidence.'" *Teti*, 507 F.3d at 57, *quoting* 28 U.S.C. § 2254(e)(1).

## I.     The Kidnappings and Murders

The factual determinations made by the SJC regarding the kidnappings and murders, to which this Court must defer, are summarized as follows:

> The circumstances leading up to the killings began in July, 2009, when Hall beat Glasser with a baseball bat because he believed that Glasser had stolen and sold motor vehicle parts that belonged to Hall. While Glasser was being interviewed by a State police trooper two days later, Hall threatened Glasser in a telephone call. The State police arrested Hall that day and recovered a baseball bat from Hall's vehicle.

> In July, 2010, while the charge against Hall of assault and battery by means of a dangerous weapon was pending, Hall concocted a scheme to discredit Glasser by framing him on a false kidnapping charge. As part of this scheme, a friend of Hall, Nicole Brooks, falsely reported to the police that Glasser kidnapped her and shot at her when she escaped; another friend of Hall, Scott Langdon, planted Brooks's wallet and a revolver in Glasser's truck, where they were found by police during a search of the truck. The scheme resulted in Glasser's arrest, but the police soon exonerated Glasser and brought criminal charges against Hall and those who participated with him in the scheme.

> The [petitioner] began spending time with Hall and [David] Chalue in the latter half of August, 2011. Hall was a "sergeant [at] arms" in a local chapter of the Hells Angels motorcycle club and was described as an "enforcer." The [petitioner] was not a member of the Hells Angels, but there was evidence that he wanted to be. He began to wear a vest with a Hells Angels insignia on the front and kept a Hells

Angels sticker in his Jeep and apartment. Hall told a witness in the [petitioner's] presence of the possibility that the [petitioner] would get a motorcycle and become a prospective member of the Hells Angels. The [petitioner's] employer told the police that the [petitioner] had wanted to establish credit because he wanted to buy a motorcycle and that "you cannot be in the Hells Angels without buying the motorcycle."

The time line of events before and after the killings is important in evaluating the weight of the evidence implicating the [petitioner] as a participant in the killings. On Friday, August 26, 2011, Hall picked up a friend, Katelyn Carmin, in the tan Buick vehicle [FN 3] he had purchased earlier that month; the [petitioner] and Chalue were with him. While driving around to various bars, Hall went into a tirade about a person he called "Drummer Dave," [FN4] who he said had robbed him and then "snitched" on him. Hall said he was "going to kill that motherfucker." The [petitioner], along with Chalue, responded to Hall by assuring him that Hall will "get him." Later that evening, they drove to the Hells Angels clubhouse in Lee, where they rode in an all-terrain vehicle. Hall told Carmin to be careful because he needed the [petitioner] and Chalue for "a job."

> [FN3] The Buick at other times during the trial was described as gold in color.

> [FN4] Andrew Johnston, a childhood friend of Robert Chadwell, testified that people often referred to David Glasser by his nickname, "Drummer Dave."

On Saturday, Hall was seen outside the building where the [petitioner's] girl friend resided, talking to the [petitioner] while sitting in the girl friend's pickup truck. In the early afternoon, Hall, Chalue, and the [petitioner] went to a party held by the Springfield chapter of the Hells Angels at a tavern in Springfield; Hall and the [petitioner] left the party together early in the afternoon and returned at approximately 4:30 P.M. Hall, Chalue, and the [petitioner] left the tavern together at approximately 6:30 P.M., and drove away in Hall's Buick. Later that evening, Hall, Chalue, and the [petitioner] were at the Hells Angels clubhouse in Lee; they left later to go to the [petitioner's] house in Pittsfield. Hall drove to the [petitioner's] home in his own vehicle but first stopped at Steven Hinman's home in

Lenox. Hall showed Hinman a .45 semiautomatic pistol that he had in his vest, as well as a "dog food bag" that contained a .44 Magnum revolver, a sawed-off AR-15-type weapon, and a small revolver.

The [petitioner] and Chalue traveled to the [petitioner's] home with two women, Allyson Scace and Kayla Sewall, in Sewall's vehicle after stopping at a liquor store. When Hall arrived at the [petitioner's] home, he pulled the firearms out of the dog food bag and asked the [petitioner] where he kept brake cleaner and gloves. The [petitioner] directed him to a cabinet and went upstairs with Sewall. While they were upstairs, Hall and Chalue disassembled and cleaned the firearms. The [petitioner] asked Sewall to stay, but she declined and left with Scace at approximately 9 P.M., leaving Hall, Chalue, and the [petitioner] alone in the apartment.

The kidnapping of the three victims in Glasser's apartment in Pittsfield occurred shortly before midnight that Saturday or early Sunday morning. Glasser's upstairs neighbor asked Glasser to move his truck at approximately 10:30 P.M. that Saturday, and saw the three victims (and a fourth man) in the kitchen of Glasser's apartment at that time. The last telephone call made from Chadwell's cellular telephone was at 11:21 P.M. Shortly after midnight, the upstairs neighbor heard banging from the front downstairs hallway, and heard the voices of Glasser and Frampton, as well as some unfamiliar voices. Hall later told a friend, Rose Dawson, that, when they arrived at Glasser's apartment, one of the victims was using a computer and another was playing a video game.

The [petitioner's] girl friend had returned from a hiking trip on Friday night and was at her home on Saturday night. She made a telephone call to the [petitioner's] cellular telephone at 12:09 A.M. on Sunday, but the [petitioner] did not answer and she left a voicemail message. She sent him a text message on his cellular telephone at 1:20 A.M., but received no reply. She telephoned him again at 1:40 A.M., and again left a voicemail message after the call was not answered. At approximately 1:30 A.M. on Sunday, Hall appeared at Dawson's home in Pittsfield. He asked to borrow Dawson's cellular telephone, which she gave to him; he said he would be back soon. He entered the passenger seat of a vehicle described as a Jeep Wrangler [FN 5] and left; the [petitioner] owned a Jeep Wrangler.

[FN5] There was some confusion as to the color of the vehicle that was at Rose Dawson's residence at 1:30 A.M. Edwin Sutton, Rose's father[,] described it as a Jeep Wrangler and testified that, although he was not sure, he thought it might have been yellow. Ocean Sutton, one of Edwin's daughters, described it as a green Jeep Wrangler. The [petitioner's] Jeep is black.

Hall was next seen at a convenience store in Pittsfield at approximately 5:30 A.M., where he purchased three candy bars and a pack of cigarettes. Hall returned a few minutes later and purchased a pack of Black and Mild cigars. The police seized the [petitioner's] Jeep seven days later and subsequently searched it; they found a Black and Mild cigar wrapper inside. On September 12, in a search of the [petitioner's] apartment, to which he had recently moved, the police found four or five Black and Mild cigar wrappers in a duffle bag.

The store clerk observed that Hall had mud on his shirt and that his boots and blue jeans were wet, as was the cash he handed over to pay for the items. Tropical Storm Irene had reached western Massachusetts during the night, bringing heavy rain and high winds for much of the night and into the morning.

Shortly thereafter, Hall returned to the Dawson residence and parked his Buick on the front lawn. The [petitioner's] Jeep arrived behind the Buick. Hall walked from the Buick to the Jeep and left in the Jeep.

At approximately 10:30 A.M., Hall returned to the Dawson residence with Chalue and the [petitioner] in the [petitioner's] Jeep, which Hall was driving. Hall, who was wet and not wearing shoes, asked Dawson and her friend, Alexandra Ely, who was staying overnight with Dawson, to come to Hall's home to make breakfast. Hall gave them money, which was soaking wet, and told them to buy breakfast food and bleach; he also told them to wash their hands after handling the money. As Dawson and Ely drove to a supermarket in Hall's Buick, Hall telephoned Ely and told her to skip the bleach and not look in a bag in the vehicle. They looked inside the bag and saw what looked like a "batting glove or golf glove."

When they arrived at Hall's house, the [petitioner's] Jeep was parked in front; Hall, Chalue, and the [petitioner] were inside. Hall returned

Dawson's cellular telephone to her and told her to delete her call log and tell no one that he had borrowed it. Chalue was in bed, and the [petitioner] sat in a recliner "sleeping" and looking "tired." Dawson and Ely left later in Hall's Buick to return home. Hall, Chalue, and the [petitioner] retrieved the Buick from Dawson's home later that day.

At approximately 2 P.M., Hall arrived at the home of David Casey in Canaan, New York, approximately eighteen miles from Pittsfield, in the Buick. Hall said that he was having trouble with his vehicle and asked Casey if he knew anywhere nearby where he could park it overnight. Casey called a friend, Alan Pavoni, who agreed to let Hall park the vehicle in Pavoni's driveway in Becket. Hall then told Casey that he had killed Glasser, as well as "a fat guy" and a black man who were with Glasser. He explained that he had held Glasser down and pulled the trigger, but the gun misfired. As he tried to rechamber another round, Glasser ran into the woods. "Davey" ran after him and shot him, but did not kill him. "Davey" brought Glasser back to Hall, who then shot him. Hall said the other two men were stabbed to death. He said they thought the black man was dead and left him but, when they came back, they saw him sitting on a log, moaning. Hall also said that they "chopped [the victims] up," and added that "one of the guys really enjoyed torturing and cutting them up." Hall noted that it was "raining very hard" while this was happening.

Hall asked if Casey was still working with an excavator at a property in Becket, and Casey said that he was. Hall then asked if Casey would do him a favor; he wanted Casey to dig a hole to bury the bodies. Hall added that, if Casey did this favor for him, he would not harm Langdon. [FN 6] Hall wanted to go with him to dig the hole that day, but Casey said he would meet him there on Monday morning.

> [FN6] David Casey testified that Scott Langdon was living with and planned to marry Casey's sister. Casey knew that Langdon was cooperating with the police regarding the pending charges against Hall.

Between 5 and 6 P.M., Hall drove his Buick to Pavoni's property and parked it there; another person was with him in the Buick. A "Jeep-like vehicle" also arrived and picked up Hall.

Hall, Chalue, and the [petitioner] were seen late in the afternoon standing near the [petitioner's]' Jeep in the parking lot of the apartment building in Pittsfield where the [petitioner's]' girl friend resided.

Casey met Hall as scheduled at approximately 8:30 A.M. on Monday at Pavoni's property. [FN 7] Hall was with a man he identified as "Davey," whom Hall assured Casey he could trust because the man was a member of the Aryan Brotherhood, and a person had to kill someone to become a member; Casey identified this man at trial as Chalue. Hall opened the trunk of the Buick and said that it was "starting to smell." Hall later drove the Buick to the property where Casey kept the excavator. Casey used the excavator to dig a large hole, and Hall opened the trunk and dropped a number of plastic garbage bags, which Hall said contained body parts, into the hole.

> [FN7] The [petitioner] arrived for work as usual on Monday morning at the design firm where he was employed as a gardener.

On Monday afternoon, Hall and Chalue brought the Buick to a salvage yard and sold it for scrap, where it was later placed in a crusher. The interior carpets were coated with liquid, the back seat was mostly missing, and the carpet had been removed from the trunk. On Sunday, September 4, Hall, Chalue, and the [petitioner] drove past the salvage yard in the [petitioner's] Jeep, and then drove back in the other direction, arguably for the purpose of checking to see that Hall's Buick had actually been crushed. After they were stopped by police at a nearby gasoline station, the police seized and searched the Jeep, but found nothing of evidentiary value.

On Friday, September 9, after Casey had revealed to police the location of the bodies, the police dug up the plastic bags containing the victims' body parts. The autopsy of the body parts revealed that all of the victims had been shot and stabbed; their neck, arms, and legs had been removed, and two of the bodies had been cut through the torso. Most of the dismemberment had been accomplished by chopping or hacking with a sharp instrument such as a butcher knife.

On September 10, the [petitioner] was arrested and brought to the Pittsfield police station. At the station, a State police lieutenant told

the [petitioner] that he was protecting a "rat," referring to Hall, because Hall had offered to cooperate with the Federal Bureau of Investigation regarding the Hells Angels clubhouse in Lee a year earlier. As the [petitioner] was walking back to his cell, the [petitioner] said to Chalue, "[Y]ou hear what they're saying about our partner? They're saying he's a stoolie."

On September 12, the police executed search warrants at two apartments in the same building in Pittsfield: an apartment where the [petitioner] lived and an apartment from which he had recently moved. In the apartment where he lived, among other items . . . , the police found a September 6 edition of a newspaper with an article describing the disappearance of the three victims, and an article dated September 8, describing the search for the missing men.

*Commonwealth v. Veiovis*, 477 Mass. 472, 474-479, 78 N.E.3d 757, 762-766

(2017) (Gants, C.J.).

## II.    The Petitioner's Prosecution and State-Court Appeal

On October 6, 2011, a Berkshire County, Massachusetts, grand jury indicted

the petitioner on three counts each of murder, kidnapping, and intimidation of a

witness arising from the events described above. SA Ex.1/1-5. The petitioner was

tried before the Honorable Jeffrey Kinder and a jury beginning on September 5,

2014. *Id.* at 6, 14-16. The Commonwealth's theory was that Hall enlisted the

petitioner and Chalue to kill Glasser, who was a witness in two separate cases

against Hall due to go to trial soon in Berkshire Superior Court; the petitioner's

motive was to aid his plan to join the Hells Angels, of which Hall was the local

Sergeant-At-Arms; and the two other victims, Glasser's roommate and a friend,

were unluckily present when the crimes occurred.

9

After twelve days of trial and six days of deliberation, the jury found the petitioner guilty of all charges. *Id.* at 14-16. On September 29, 2014, Justice Kinder, as required by state law, sentenced the petitioner to life in prison without possibility of parole. *Id.* at 16; M.G.L. c. 265, § 2(a). That same day, the petitioner filed a notice of appeal. SA Ex. 1/16. The SJC entered the petitioner's appeal on its docket on December 15, 2015.[2] SA Ex.2/1. On July 19, 2017, the SJC affirmed his convictions. *Veiovis*, 477 Mass. at 474, 78 N.E.3d at 762. The SJC rejected, inter alia, the petitioner's claim that the evidence in support of his convictions was insufficient. *Veiovis*, 477 Mass. at 479-481, 78 N.E.3d at 766-767. The SJC also concluded that the verdicts of murder in the first degree were "fully consonant with justice" and "decline[d] to exercise [its] authority under [M.]G.L. c. 278, § 33E." *Veiovis*, 477 Mass. at 490, 78 N.E.3d at 773-774. The respondent provides additional facts regarding the trial and the SJC's decision in the relevant sections of the Argument below.

---

[2] Appeals from first-degree murder convictions in Massachusetts are heard directly by the SJC in the first instance. *See* M.G.L. c. 211A, § 10 (carving out exception for first-degree murder cases in establishing appellate jurisdiction of Massachusetts Appeals Court). In such instances "the entry in the [SJC] shall transfer to that court the whole case for its consideration of the law and the evidence. Upon such consideration the court may, if satisfied that the verdict was against the law or the weight of the evidence, or because of newly discovered evidence, or for any other reason that justice may require (a) order a new trial or (b) direct the entry of a verdict of a lesser degree of guilt, and remand the case to the superior court for the imposition of sentence." M.G.L. c. 278, § 33E.

## III.    The Petitioner's Habeas Corpus Action

The petitioner commenced the instant habeas corpus action on August 2, 2018. (USDC Doc. No. 1.) In his petition, he asserted a single claim for relief: that his "[c]onviction violated [his] right to due process where the evidence was legally insufficient to support the verdict[s] of guilty." *Id.* at 5. The petitioner filed a memorandum in support of his petition on November 15, 2020. (USDC Doc. No. 22.) As noted, the District Court denied the petition and issued a certificate of appealability in March of 2022. (USDC Doc. Nos. 25, 29)

## SUMMARY OF ARGUMENT

As the petitioner concedes, the SJC adjudicated his claim on the merits. Therefore, this Court must review his claim through the deferential lens of 28 U.S.C. § 2254.

The petitioner was convicted, as a joint venturer, of three counts each of murder in the first degree, kidnapping, and intimidation of a witness. In assessing the petitioner's claim that the evidence was insufficient, the SJC reasonably applied the state equivalent to the standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). As the SJC concluded, a reasonable jury could have found that the petitioner (1) was aware that Hall planned to kill Glasser in order to silence him as a witness; (2) had a motive to assist Hall in killing Glasser; (3) was with Hall and Chalue immediately before, during, and after the time that the kidnappings and

murders occurred; (4) demonstrated consciousness of guilt and described himself as a "partner" in the crimes; and (5) therefore, was the third person who participated in the killings and subsequent dismemberments. *Veiovis*, 477 Mass. at 479-481, 78 N.E.3d at 766-767 (citations omitted).

The evidence, as the SJC rightly determined, was more than adequate to support the petitioner's conviction as a joint venturer on grounds that he knowingly participated in the kidnappings and murders of Glasser, Frampton, and Chadwell with the requisite intent. The SJC's decision that there was sufficient evidence to support the convictions was thus fully consistent with *Jackson*.

## ARGUMENT

Reviewing the District Court's denial of habeas relief *de novo*, this Court should reject the petitioner's claim and affirm. *See Scott v. Gelb*, 810 F.3d 94, 98 (1st Cir. 2016).

## I. The Legal Standard Governing Review of Habeas Corpus Petitions Sets a High Bar for Relief

### A. Federal Habeas Review of State Convictions is Highly Deferential

Under 28 U.S.C. § 2254, this Court's review of the state court's decision is highly deferential. *See King v. MacEachern*, 665 F.3d 247, 251 (1st Cir. 2011). "In the case of claims adjudicated on the merits in state court, [28 U.S.C. § 2254] contemplates just two scenarios that warrant a federal court granting habeas relief." *Hensley v. Roden*, 755 F.3d 724, 730 (1st Cir. 2014). These scenarios are, first, if

the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," and second, where "the state court adjudication led to a 'decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Id*. at 730-31, *quoting* 28 U.S.C. § 2254(d)(1)-(2).

Under § 2254(d)(1), a state court's decision is "contrary to" clearly established Supreme Court precedent when it arrives at a conclusion of law opposite to that reached by the Supreme Court or when it resolves a case differently than the Supreme Court on materially indistinguishable facts. *Price v. Vincent*, 538 U.S. 634, 640 (2003). "In this context, clearly established law signifies the holdings, as opposed to the dicta, of th[e] [Supreme] Court's decisions." *Howes v Fields*, 565 U.S. 499, 505 (2012) (quotations omitted). Even if a petitioner shows that the state court applied a standard that was contrary to clearly established federal law, he is not automatically entitled to habeas relief. *Aspen v. Bissonnette,* 480 F.3d 571, 576 (1st Cir. 2007). Instead, the petitioner is still required to demonstrate that he "is in custody in violation of the Constitution or laws or treaties of the United States," which means that he "must show that his underlying detention is unlawful and not just that the state court employed faulty reasoning in his case." *Id.* The petitioner must demonstrate "'that Supreme Court

precedent requires an *outcome* contrary to that reached by the relevant state court.'" *Id.* (emphasis in original) (citation omitted). A petitioner cannot obtain habeas relief if, applying the correct constitutional standard, he would not prevail on his claim. *Id.*

A state court unreasonably applies clearly established Supreme Court precedent under § 2254(d)(1) "if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." *White v. Woodall*, 572 U.S. 415, 426 (2014). "For purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Harrington v. Richter*, 562 U.S. 86, 102 (2011), *quoting Williams v. Taylor*, 529 U.S. 362, 410 (2000). Under that clause, a habeas court must not grant relief unless the petitioner has "show[n] that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. "Even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. at 102. Also, "[e]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.'" *Id.* at 101, *quoting Yarborough v. Alvorado*, 541 U.S. 652, 664 (2004). "Federal habeas

relief only 'provides a remedy for instances in which a state court unreasonably *applies* [the Supreme] Court's precedent; it does not require state courts to *extend* that precedent or license federal courts to treat the failure to do so as error.'" *Bebo v. Medeiros*, 906 F.3d 129, 134 (1st Cir. 2018), *cert. denied*, 139 S. Ct. 1203 (2019), *quoting Woodall*, 572 U.S. at 426 (emphasis in original).

Under the second scenario, habeas relief is justified under § 2254(d)(2) if "the state court adjudication led to 'a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Hensley*, 755 F.3d at 731, *quoting* 28 U.S.C. § 2254(d)(2). To satisfy § 2254(d)(2), a petitioner must show that the state court's decision was based on factual determinations that were objectively unreasonable—that is, more than merely incorrect or erroneous. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003), *citing Williams*, 529 U.S. at 399. "A federal habeas court may not grant habeas relief under § 2254(d)(2) merely because it disagrees with a state trial court's factual determination." *Dennis v. Mitchell*, 354 F.3d 511, 518 (6th Cir. 2003). *See also Brumfield v. Cain*, 576 U.S. 305, 313-14 (2015) (federal habeas court "may not characterize . . . state-court factual determinations as unreasonable merely because [it] would have reached a different conclusion in the first instance." (quotation omitted)). A petitioner, thus, "must clear a high hurdle before a federal

court will set aside any of the state's factual findings." *Mastracchio v. Vose*, 274

F.3d 590, 598 (1st Cir. 2001).

## II. The SJC Reasonably and Correctly Rejected the Petitioner's Claim that There Was Insufficient Evidence to Support His Convictions Where There Was Evidence that the Petitioner Knowingly Participated in the Kidnappings and Murders with the Requisite Intent

The petitioner asserts that there was insufficient evidence to show that he

knowingly participated in the crimes or possessed the intent to kill. Pet.'s Br. at 46-

59. Specifically, he claims that the Commonwealth produced no physical or

forensic evidence tying him to the crimes and that no witness identified him as a

participant in the crimes. *Id.* at 51-52.

It is not entirely clear from his brief whether the petitioner is asking this

Court to analyze the SJC's decision under § 2254(d)(1) ("unreasonable application

of clearly established Federal law") or § 2254(d)(2) ("unreasonable determination

of facts in light of the evidence presented at trial"). Generally, sufficiency claims

are evaluated under § 2254(d)(1). *See O'Laughlin v. O'Brien*, 568 F.3d 287, 298

(1st Cir. 2009). In addition, as this Court has stated, "the special prophylaxis of

section 2254(d)(2) applies only to determinations of 'basic, primary, or historical

facts.'" *Ouber v. Guarino*, 293 F.3d 19, 27 (1st Cir. 2002), *quoting Sanna v.

Dipaolo*, 265 F.3d 1, 7 (1st Cir. 2001). Such things as "[i]nferences,

characterizations of the facts, and mixed fact/law conclusions are more

appropriately analyzed under the 'unreasonable application' prong of section

2254(d)(1)." *Ouber*, 293 F.3d at 27. It appears that the petitioner is attempting to challenge what he perceives as inferences reflected in the SJC's opinion. This Court should review this case under § 2254(d)(1) and deny the petitioner's request for habeas relief.[3]

## A. Review of Claims of Insufficient Evidence Is Twice-Deferential

Challenges to sufficiency of the evidence on direct review are governed by *Jackson*, 443 U.S. at 319; *see also In re Winship*, 397 U.S. 358, 361-363 (1970). *Jackson* requires the reviewing court to ask, "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319 (emphasis in original). In applying *Jackson*, all the evidence must be examined in the light most favorable to the prosecution, and "so must inferences that may be reasonably drawn from it." *Morgan v. Dickhaut*, 677 F.3d 39, 47 (1st Cir. 2012) (quotation omitted). This Court will not second guess the SJC's decision to accept the jury's view of the evidence—resolving conflicts is what juries do. *Magraw v. Roden*, 743 F.3d 1, 5 (1st Cir. 2014). The *Jackson* standard is highly deferential to a jury's verdict. *United States v. Bloch*, 718 F.3d 638, 641 (7th Cir. 2013).

---

[3] Even if this Court reviews the petitioner's claim under §2254(d)(2), relief is inappropriate for the reasons stated herein.

To obtain relief, a habeas petitioner must overcome a standard of review that is "twice-deferential." *Parker v. Matthews*, 567 U.S. 37, 43 (2012). "A state court decision rejecting a sufficiency challenge may not be overturned on federal habeas unless the 'decision was objectively unreasonable.'" *Linton v. Saba*, 812 F.3d 112, 123 (1st Cir. 2016), *quoting Parker*, 567 U.S. at 43. A petitioner must show not only that the evidence at trial fell short under the *Jackson* standard, but also that the state court unreasonably determined otherwise. *See*, *e.g.*, *Linton*, 812 F.3d at 123. A habeas court "do[es] not ask, as [it] might on direct review of a conviction in federal court, whether the evidence was constitutionally sufficient. [It] ask[s], instead, whether the state courts' ruling that the evidence is constitutionally sufficient was itself 'unreasonable.'" *Winfield v. O'Brien*, 775 F.3d 1, 8 (1st Cir. 2014). In this context "unreasonable" means that "the decision evinces some increment of incorrectness beyond mere error." *Id.* (quotation omitted).

### B.    The SJC's Conclusion that There Was Sufficient Evidence Was Neither Contrary to, Nor an Unreasonable Application of, the *Jackson* Standard

The petitioner appears to admit that the SJC adjudicated his claims on the merits. Pet's Br. at 50. Therefore, the highly deferential standard of § 2254 applies here. *See Johnson v. Williams*, 568 U.S. 289, 298 (2013); *see also Hodge v. Mendonsa*, 739 F.3d 34, 41-42 (1st Cir. 2013). And because the petitioner cannot

show that the SJC's decision was "contrary to or involved an unreasonable application of" *Jackson* under § 2254(d)(1), habeas relief should be denied.

The SJC did not cite *Jackson* in its decision, but it did identify and apply the state standard, which mirrors that announced in *Jackson*: the Court must "determine whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Veiovis*, 477 Mass. at 479, 78 N.E.3d at 766 (emphasis in original) (quotation and citation omitted). Because the SJC evaluated the petitioner's claim under a standard that is "synonymous" with the federal standard, its decision is not contrary to Supreme Court precedent. *See*, *e.g.*, *Foxworth v. St. Amand*, 570 F.3d 414, 426 (1st Cir. 2009) (observing that, in Massachusetts, "the sufficiency issue is essentially the same under both federal and state law . . .").

Nor did the SJC unreasonably apply *Jackson*. *Jackson* requires a reviewing court to assess the evidence "with explicit reference to the substantive elements of the criminal offense as defined by state law." 443 U.S. at 324 n.16. The petitioner was prosecuted under a theory of joint venture liability. *Veiovis*, 477 Mass. at 473, 78 N.E.3d at 761. Under state law, in order to establish the petitioner's guilt as a joint venturer, the Commonwealth had to prove, beyond a reasonable doubt, that he

knowingly participated in the killing with the required intent.[4] *Commonwealth v.*
*Zanetti*, 454 Mass. 449, 467-468, 910 N.E.2d 883-884 (2009). As the SJC
reasoned, Massachusetts law dictates that "[c]ircumstantial evidence . . . 'alone
may be sufficient to meet the burden of establishing guilt.'" *Veiovis*, 477 Mass. at
480, 78 N.E.3d at 766, *quoting Commonwealth v. Woods*, 466 Mass. 707, 713, 1
N.E.3d 762, *cert. denied*, 134 S. Ct. 2855 (2014).

Similarly, this Court has held, "[t]he elements of the crime charged do not
have to be proven with direct evidence; the government can use circumstantial
evidence as long as the evidence, viewed as a whole, is sufficient to warrant a
reasonable jury to conclude that the defendant is guilty beyond a reasonable
doubt." *United States v. Machor*, 879 F.2d 945, 948 (1st Cir. 1989); *see Magraw*,
743 F.3d at 6 (noting that "direct evidence is not necessary to sustain a conviction"
and that said principle "is even more firmly established in connection with the
deferential approach to state-court decision making that federal habeas review
demands"); *see also Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) ("[W]e
have never questioned the sufficiency of circumstantial evidence in support of a
criminal conviction, even though proof beyond a reasonable doubt is required. And

---

[4] "A joint venturer is one who aids, commands, counsels, or encourages commission
of a crime while sharing with the principal the mental state required for the crime."
*Commonwealth v. Semedo*, 456 Mass. 1, 8, 921 N.E.2d 57, 65 (2010) (quotation
omitted).

juries are routinely instructed that '[t]he law makes no distinction between the weight or value to be given to either direct or circumstantial evidence.'" (citation omitted; second alteration in original), *quoting* K. O'Malley, J. Grenig, & W. Lee, *Federal Jury Practice and Instructions, Criminal* § 12.04 (5th ed. 2000)); *Tibbs v. Florida*, 457 U.S. 31, 38 n.11 (1982) (favorably quoting statement in *United States v. Lincoln*, 630 F.2d 1313 (8th Cir. 1980), that, for evidentiary-sufficiency purposes, "'The verdict may be based in whole or in part on circumstantial evidence.'").

Here, there was sufficient circumstantial evidence to support the guilty verdicts. The jury could have found the following facts and made the following reasonable inferences, all of which taken together provide proof beyond a reasonable doubt that the petitioner was guilty of deliberately premeditated murder:

The petitioner had a motive to assist Hall in killing Glasser, "because he wanted to be a member of the Hells Angels chapter where Hall served as sergeant at arms, and helping Hall in the killing would curry favor with Hall and cause Hall to believe him worthy of trust." *Veiovis*, 477 Mass. at 480, 78 N.E.3d at 766; *see* SA Ex. 8/235-236, 244-245; 9/121; 10/110; 11/150-152; 13/142-150; 14/125, 132-134; 15/29-30.

Also, the petitioner was aware before the killings of Hall's plan to kill Glasser in order to silence him as a witness. *See* SA Ex. 8/183-184; 9/28, 75-78. Moreover, the petitioner was aware that the plan was underway on Saturday evening. The petitioner showed no surprise nor asked any questions when Hall, in a separate car, veered off from their planned rendezvous at the petitioner's apartment, to retrieve the murder weapons from Steven Hinman's house. *See* SA Ex. 3/28, 75-78. When those same guns were displayed by Hall on the living room table in the petitioner's apartment, SA Ex. 3/37-38, 96-97, and at Hall's request, the petitioner provided gloves and brake cleaner to clean the guns, both times again without asking any questions. SA Ex. 3/35-37.

Additionally, there was ample circumstantial evidence that the petitioner was with Hall and Chalue before, during, and after the kidnappings and murders. When Hall stopped at the Dawson residence at approximately 1:30 a.m., he was a passenger in the petitioner's Jeep, SA Ex. 9/130-133, and Chalue and the petitioner were still with Hall at approximately 5:30 A.M., when Hall (who did not smoke) purchased three candy bars at the convenience store and a brand of cigars smoked by the petitioner and cigarettes smoked by Chalue. *See* SA Ex. 9/141-147, 229; 11/134, 137-138, 146. "This inference grows stronger when one considers that the [petitioner]'s Jeep followed Hall when [Hall] dropped the Buick off at the Dawson residence shortly after leaving the convenience store, and that Hall immediately

left in the Jeep." *Veiovis*, 477 Mass. at 480-481, 78 N.E.3d at 766; *see* SA Ex. 11/7-10. Because nothing of forensic (e.g., serological or biological) evidentiary value was found in the Jeep, the jury could reasonably have "inferred further that the victims' dismembered bodies by this time were in the trunk of the Buick." *Veiovis*, 477 Mass. at 481, 78 N.E.3d at 767; *see* SA Ex.12/148-150. This was further reinforced by evidence that, following the burial of the victims' remains, Hall had the recently purchased Buick, the back seat of which was removed and the rear area and trunk stripped to bare metal, crushed at a local junkyard. *Veiovis*, 477 Mass. at 478-479, 78 N.E.3d at 765; *see* SA Ex. 8/285; 9/175-180; 10/87-92. Inside the petitioner's Jeep, investigators did find a night-vision monocular and a pair of binoculars. *See* SA Ex. 6/143-145.

The petitioner remained with Hall and Chalue when they returned to the Dawson residence at 10:30 A.M., with Hall now driving the petitioner's Jeep, and continued with them to Hall's house later that morning in the Jeep, where the petitioner appeared "sleepy." *See* SA Ex. 9/210-213, 219-219; 10/216.

The jury could also have reasonably inferred that the dismemberment of the victims took a substantial period of time to accomplish and that it would have been bloody and messy work in a tropical storm, *see* SA Ex. 6/97; 7/17, 25-26; 9/139-140, 212; 10/28, 58-59, 108-109, and that the petitioner remained incommunicado during this time period when he failed to answer two telephone calls and a text

message from his girlfriend, and made no outgoing calls from his cellphone. SA Ex. 14/117-118; 15/49-50. On Sunday afternoon, the petitioner was with Hall and Chalue outside the petitioner's girlfriend's apartment in Pittsfield, SA Ex. 3/157-161, shortly thereafter went in the petitioner's Jeep to Madison Avenue where they retrieved the Buick, SA Ex. 3/221-222, and spent the remainder of Sunday afternoon at the Hell's Angels clubhouse. *See* SA Ex. 3/41. On Sunday evening, the three dropped off the Buick (containing the dismembered remains of the victims) in Becket, leaving in the petitioner's Jeep. *See* SA Ex. 4/68-73, 82.

As described by Hall in his conversation with Dave Casey, Hall, Chalue, and a third assailant brought the victims to the woods in the heavy downpour of the tropical storm, killed them, and dismembered their bodies. *See* SA Ex.10/109-110,119; 14/114-117. The jury could have reasonably inferred that the petitioner was the third assailant. Hall said that third person "really enjoyed torturing and cutting them up." *Veiovis*, 477 Mass. at 478, 78 N.E.3d at 764; *see* SA Ex.10/119. In the petitioner's apartment, taped up on a wall, was a collage of anatomical illustrations of various forms of bodily dismemberment, some of which were consistent with the dismemberment of the victims. *See* SA Ex. 7/175; X/41-42. Also found in the petitioner's apartment were knives consistent with those used to inflict the injuries suffered by the victims, SA Ex. 6/194-197; 7/30, 32-34, 53-56, 60, 62-67, 75-79, and other weapons – a machete and a cleaver – consistent with

those used to dismember the victims' bodies. *See* SA Ex. 3/40, 98; 6/182, 186-188, 191-192; 8/21-22, 41-44.

Additionally, the jury could have found that the petitioner admitted to his participation in the crimes. After his arrest the petitioner was told that Hall had previously made attempts to "set up" his Hell's Angels brethren for the F.B.I. and was asked if he wanted to talk. He declined, SA Ex. 12/146-149, but after being returned to the holding cells, the petitioner said to Chalue (referring to Hall), "You hear what they're saying about our partner . . . ?" SA Ex. 12/150. The petitioner also displayed consciousness of his guilt by choosing to keep newspaper articles about the disappearance and the search for the victims in his apartment and conducting counter-surveillance of the State Police investigators after the killings. SA Ex. 12/107-114, 139, 143-145.

### C.     Petitioner's Arguments Fail

The petitioner makes two, specific arguments against the reasonableness of the SJC's conclusion that sufficient evidence supported the convictions: (1) that the Commonwealth presented no physical or forensic evidence linking the petitioner to the victims or a scene, no witness identified him as participating in the crimes, and there was no evidence of an incriminating admission or consciousness of guilt; and (2) that alternate inferences can be drawn from the relevant evidence. For the following reasons, both of those arguments fail.

### 1. Alleged lack of particular types of evidence

First, contrary to the petitioner's assertions, there was evidence of an incriminating admission and consciousness of guilt, and there was incriminating physical evidence at his apartment. SA Ex. 9/40, 98; 11/149, 191-192; 12/107-114, 143-145, 175, 182, 186-189, 191-192, 194-197; 13/30, 32-34, 53-56, 60, 62-67, 75-79; 14/21-22, 41-44, 117-118, 146-150; 15/49-50. "The petitioner's reading of the record is overly optimistic." *Housen v. Gelb*, 744 F. 3d 221, 225 (1st Cir. 2014) (noting that measuring "the sufficiency of the evidence in a circumstantial case is not an exact science," and that evidence need not be "ironclad" to sustain a conviction on habeas review). There is no requirement that the prosecution present evidence of any certain kind in order to prove guilt. *See United States v. Berrios*, 132 F.3d 834, 843 (1st Cir. 1998) ("The fact that the entire case against [the defendant] is based on circumstantial, rather than direct, evidence has no bearing on sufficiency; both types of evidence provide an adequate basis for conviction."). *See also Magraw*, 743 F.3d at 6 ("[U]nder *Jackson*, direct evidence is not necessary to sustain a conviction. . . . This principle is even more firmly established in connection with the deferential approach to state-court decision making that federal habeas review demands." (citation omitted)). Nonetheless, the Commonwealth did present evidence of incriminating admissions (referring to Hall as "our partner") and consciousness of guilt (spying on investigators and retaining

newspaper articles about the missing victims). *Veiovis*, 477 Mass. at 481, 78 N.E.3d at 767; *see* SA Ex. 12/189; 14/150. Also, the lack of any forensic evidence connecting the petitioner to the victims or any crime scene does not mean that the evidence was insufficient to support his convictions. The absence of evidence is not evidence of absence. Moreover, the lack of such forensic evidence applies equally to the petitioner's co-venturers, Hall and Chalue, about whom Veiovis himself states, "The evidence overwhelmingly established that Hall and Chalue participated in the killing." Pet.'s Br. at 53.

### 2.    Alternative inferences

Second, the petitioner argues that there are other, reasonable, non-incriminating inferences that can be drawn from the evidence. This argument is without merit. As this Court has observed with respect to a similar argument in another case: "This contention is unpersuasive. On habeas review of a state-court conviction for evidentiary sufficiency, we 'may not freely reweigh competing inferences but must accept those reasonable inferences that are most compatible with the jury's verdict.'" *Gomes v. Silva*, 958 F.3d 12, 22 (1st Cir. 2020), *quoting Magraw,* 743 F.3d at 7.

Also, the "prosecution was [not] under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 326. Rather, it was for the jury to resolve conflicts in the evidence. *Id.* at 319, 326.

And here, the jury did just that, permissibly crediting the prosecution's evidence and theory of the case over the petitioner's theory. *See Housen*, 744 F.3d at 226 (noting that prosecution's evidence need not be "ironclad"); *Magraw*, 743 F.3d at 7 (same); *Morgan*, 677 F.3d at 53 (federal habeas court "do[es] not ask whether there is a plausible alternate interpretation of the evidence"). *Jackson* "requires a federal habeas court faced with a record of historical facts that supports conflicting inferences [to] presume—even if it does not affirmatively appear in the record— that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Winfield*, 775 F.3d at 9.

The petitioner's reliance upon *O'Laughlin* to claim that the Commonwealth's evidence "failed to show beyond speculation that [the petitioner] was present during the killing or otherwise participated in the crimes" is misplaced. *See* Pet.'s Br. at 58. "In practice, *Jackson* challenges are rarely upheld on habeas and *O'Laughlin* is a rare exception." *Brown v. O'Brien*, 666 F.3d 818, 824 (1st Cir. 2012). *O'Laughlin* is inapposite for two reasons. First, the Court ruled in *O'Laughlin* that the Commonwealth's evidence of motive was "weak at best" and, second, that much of the evidence actively contradicted the Commonwealth's theory. *O'Laughlin*, 568 F.3d at 302-304. The Court noted that the Commonwealth had argued that the defendant assaulted the victim in order to steal money, but no money was taken. *Id*. at 302.

Here, in stark contrast, the Commonwealth's evidence of the petitioner's motive to curry favor with Hall and cause Hall to believe him worthy of trust was not only strong, but also consistent with the entirety of the compelling circumstantial evidence linking the petitioner to the crimes. *See Woods v. Medeiros*, 465 F. Supp. 3d 1, 10-11 (D. Mass. 2020) (distinguishing *O'Laughlin* because petitioner had "clear motive," circumstantial evidence was not weak, there was consciousness of guilt evidence, and much of the evidence did not contradict the Commonwealth's theory), *affirmed on other grounds* 993 F.3d 39, *cert. denied sub nom. Woods v. Alves*, 142 S. Ct. 450 (2021). "The sufficiency of the evidence in any given case must be tested against the record in that case. In performing that analysis, 'the minimum amount of evidence that the Due Process Clause requires . . . is purely a matter of federal law.' That law is exemplified by *Jackson* and, reasonably applied, *Jackson* leads inexorably to the conclusion that the evidence presented in the petitioner's state court trial was adequate to ground his conviction." *Housen*, 744 F.3d at 227 (emphasis and alteration in original), *quoting Coleman v. Johnson*, 132 S. Ct. 2060, 2064 (2012) (per curiam). In light of the evidence in this case and all the reasonable inferences that could be drawn from it in favor of the Commonwealth, a reasonable jury could have reasonably concluded beyond a reasonable doubt that the petitioner was the third person who participated in the killings and subsequent dismemberments.

Viewing the evidence and inferences from that evidence in the light most favorable to the Commonwealth, this Court should conclude that the SJC reasonably and correctly determined that a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Morgan*, 677 F.3d at 47, *citing Jackson,* 443 U.S. at 318-319. Here, there was sufficient evidence to support the petitioner's convictions, and in light of the double deference to which the SJC is entitled under § 2254 and *Jackson*, the petitioner's request for habeas relief should be denied. *See Linton*, 812 F.3d at 125.

## CONCLUSION

For the foregoing reasons, the Court should affirm the District Court's denial of the petition for writ of habeas corpus. The SJC's decision that the evidence was sufficient to support the petitioner's convictions was a reasonable and consistent application of *Jackson.*

Respectfully submitted,

MAURA HEALEY
ATTORNEY GENERAL

*/s/ David F. Capeless*
Special Assistant Attorney General
Criminal Bureau
One Ashburton Place
Boston, Massachusetts 01208
(413) 447-5530
June 29, 2022                           david.f.capeless@state.ma.us

## Certificate of Compliance With Rule 32(a)

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 8,157 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

/s/ *David F. Capeless*
Counsel for Colette Goguen,
Respondent-Appellee

Dated: June 29, 2022

## Certificate Of Service

I hereby certify that on June 29, 2022, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system.

/s/ *David F. Capeless*

# STATUTORY ADDENDUM

28 U.S.C. § 1291 ...................................................................................33

28 U.S.C. § 2241 ................................................................................... 33

28 U.S.C. § 2253 ...................................................................................35

28 U.S.C. § 2254 ...................................................................................35

Mass. Gen. Laws ch. 211A, § 10 ..........................................................38

Mass. Gen. Laws ch. 265, § 2(a)...........................................................39

Mass. Gen. Laws ch. 278, § 33E...........................................................40

# THE UNITED STATES CODE

## TITLE 28, JUDICIARY AND JUDICIAL PROCEDURE

### SECTION 1291 - Final decision of the district court.

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

### SECTION 2241 – Power to grant writ.

(a) Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions. The order of a circuit judge shall be entered in the records of the district court of the district wherein the restraint complained of is had.

(b) The Supreme Court, any justice thereof, and any circuit judge may decline to entertain an application for a writ of habeas corpus and may transfer the application for hearing and determination to the district court having jurisdiction to entertain it.

(c) The writ of habeas corpus shall not extend to a prisoner unless—

    (1) He is in custody under or by color of the authority of the United States or is committed for trial before some court thereof; or

    (2) He is in custody for an act done or omitted in pursuance of an Act of Congress, or an order, process, judgment or decree of a court or judge of the United States; or

(3) He is in custody in violation of the Constitution or laws or treaties of the United States; or

(4) He, being a citizen of a foreign state and domiciled therein is in custody for an act done or omitted under any alleged right, title, authority, privilege, protection, or exemption claimed under the commission, order or sanction of any foreign state, or under color thereof, the validity and effect of which depend upon the law of nations; or

(5) It is necessary to bring him into court to testify or for trial.

(d) Where an application for a writ of habeas corpus is made by a person in custody under the judgment and sentence of a State court of a State which contains two or more Federal judicial districts, the application may be filed in the district court for the district wherein such person is in custody or in the district court for the district within which the State court was held which convicted and sentenced him and each of such district courts shall have concurrent jurisdiction to entertain the application. The district court for the district wherein such an application is filed in the exercise of its discretion and in furtherance of justice may transfer the application to the other district court for hearing and determination.

(e)

(1) No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

(2) Except as provided in paragraphs (2) and (3) of section 1005(e) of the Detainee Treatment Act of 2005 (10 U.S.C. 801 note), no court, justice, or judge shall have jurisdiction to hear or consider any other action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or

is awaiting such determination.

## SECTION 2253 – Appeal.

(a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

(b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

(c)

    (1)    Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

        (A)  the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

        (B)  the final order in a proceeding under section 2255.

    (2)    A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

    (3)    The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

## SECTION 2254 – State custody; remedies in federal courts.

(a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or

treaties of the United States.

(b)

    (1)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—

        (A) the applicant has exhausted the remedies available in the courts of the State; or

        (B) there is an absence of available State corrective process; or circumstances exist that render such process ineffective to protect the rights of the applicant.

    (2)    An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

    (3)    A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.

(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

    (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

    (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in

the State court proceeding.

(e)

    (1)    In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

    (2)    If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

        (A)    the claim relies on—

            (i)    a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

            (ii)    a factual predicate that could not have been previously discovered through the exercise of due diligence; and

        (B)    the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

(f) If the applicant challenges the sufficiency of the evidence adduced in such State court proceeding to support the State court's determination of a factual issue made therein, the applicant, if able, shall produce that part of the record pertinent to a determination of the sufficiency of the evidence to support such determination. If the applicant, because of indigency or other reason is unable to produce such part of the record, then the State shall produce such part of the record and the Federal court shall direct the State to do so by order directed to an appropriate State official. If the State cannot provide such pertinent part of the record, then the court shall determine under the existing facts and circumstances what weight shall be

given to the State court's factual determination.

(g) A copy of the official records of the State court, duly certified by the clerk of such court to be a true and correct copy of a finding, judicial opinion, or other reliable written indicia showing such a factual determination by the State court shall be admissible in the Federal court proceeding.

(h) Except as provided in section 408 of the Controlled Substances Act, in all proceedings brought under this section, and any subsequent proceedings on review, the court may appoint counsel for an applicant who is or becomes financially unable to afford counsel, except as provided by a rule promulgated by the Supreme Court pursuant to statutory authority. Appointment of counsel under this section shall be governed by section 3006A of title 18.

(i) The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.

## MASSACHUSETTS GENERAL LAWS

**CHAPTER 211A**       **APPEALS COURT**

**SECTION 10**       **Concurrent appellate jurisdiction with supreme judicial court; limitations**

Subject to such further appellate review by the supreme judicial court as may be permitted pursuant to section eleven or otherwise, the appeals court shall have concurrent appellate jurisdiction with the supreme judicial court, to the extent review is otherwise allowable, with respect to a determination made in the appellate tax board and in the superior court department, the housing court department, the land court department, the probate and family court department, the Boston municipal court department in criminal session, the Boston municipal court department appellate division, the juvenile court department, the district court department in criminal session, and the district court department appellate divisions, except in review of convictions for first degree murder. A report from any such department of the trial court of any case, in whole or in part, or any question of law arising therein shall be deemed to be within the concurrent appellate jurisdiction of the supreme judicial court and the appeals court.

Without regard to whether review is by appeal, report or otherwise, appellate review of decisions made in the appellate tax board and in the superior court department, the housing court department, the land court department, the probate and family court department, the Boston municipal court department and the appellate division thereof, the juvenile court department, and the district court department, and the appellate divisions thereof, if within the jurisdiction of the appeals court, shall be in the first instance by the appeals court except in the following cases in which appellate review shall be directly by the supreme judicial court without the necessity of any prior hearing or decision by the appeals court on the merits of the issues sought to be reviewed:

(A) Whenever two justices of the supreme judicial court issue an order direct review by the supreme judicial court in any case on appeal, either at the request of one of the parties or at the court's own initiative, upon finding that the questions to be decided are:

(1) questions of first impression or novel questions of law which should be submitted for final determination to the supreme judicial court; (2) questions of law concerning the Constitution of the commonwealth or questions concerning the Constitution of the United States which have been raised in a court of the commonwealth; (3) questions of such public interest that justice requires a final determination by the supreme judicial court.

(B) Whenever the appeals court as a body or a majority of the justices of the appeals court considering a particular case certifies that direct review by the supreme judicial court is in the public interest.

In each case where appellate review is not within the jurisdiction of the appeals court, appellate review shall be directly by the supreme judicial court, unless such case is transferred by the supreme judicial court to the appeals court for determination in accordance with section twelve of this chapter.


## CHAPTER 265    CRIMES AGAINST THE PERSON

**SECTION 2(a)    Punishment for murder; parole; executive clemency**

(a) Except as provided in subsection (b), any person who is found guilty of murder in the first degree shall be punished by imprisonment in the state prison for life and shall not be eligible for parole pursuant to section 133A of chapter 127.

(b) Any person who is found guilty of murder in the first degree who committed the offense on or after the person's fourteenth birthday and before the person's eighteenth birthday shall be punished by imprisonment in the state prison for life and shall be eligible for parole after the term of years fixed by the court pursuant to section 24 of chapter 279.

(c) Any person who is found guilty of murder in the second degree shall be punished by imprisonment in the state prison for life and shall be eligible for parole after the term of years fixed by the court pursuant to section 24 of chapter 279.

(d) Any person whose sentence for murder is commuted by the governor and council pursuant to section 152 of chapter 127 shall thereafter be subject to the laws governing parole.

## CHAPTER 278    TRIALS AND PROCEEDINGS BEFORE JUDGMENT

### SECTION 33E    Capital cases; review by supreme judicial court

In a capital case as hereinafter defined the entry in the supreme judicial court shall transfer to that court the whole case for its consideration of the law and the evidence. Upon such consideration the court may, if satisfied that the verdict was against the law or the weight of the evidence, or because of newly discovered evidence, or for any other reason that justice may require (a) order a new trial or (b) direct the entry of a verdict of a lesser degree of guilt, and remand the case to the superior court for the imposition of sentence.  For the purpose of such review a capital case shall mean: (i) a case in which the defendant was tried on an indictment for murder in the first degree and was convicted of murder in the first degree; or (ii) the third conviction of a habitual offender under subsection (b) of section 25 of chapter 279.  After the entry of the appeal in a capital case and until the filing of the rescript by the supreme judicial court motions for a new trial shall be presented to that court and shall be dealt with by the full court, which may itself hear and determine such motions or remit the same to the trial judge for hearing and determination.  If any motion is filed in the superior court after rescript, no appeal shall lie from the decision of that court upon such motion unless the appeal is allowed by a single justice of the supreme judicial court on the ground that it

presents a new and substantial question which ought to be determined by the full court.